FILED

JUN 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KARL OLSON
RATHAUSSTRASSE 7/44
A-1010 VIENNA, AUSTRIA
Telephone Number: 43-1-402-3550

    Plaintiff,

    v.

CONDOLEEZZA RICE,
in her capacity as
SECRETARY OF STATE
U.S. DEPARTMENT OF STATE
WASHINGTON, D.C. 20520

    Defendant.

)
)
)
)
)
)

CASE NUMBER   1:06CV01205

JUDGE: Gladys Kessler

DECK TYPE: Administrative Agency Review

DATE STAMP: 06/30/2006

)
)
)
)

## COMPLAINT

Karl Olson, a Foreign Service Office ("FSO") at the Department of State ("DOS") received falsely prejudicial and inaccurate Employee Evaluation Reports ("EERs"), tainted by anti-homosexual bias and his rating officer's personal and managerial dysfunction, for the periods August 28, 1994 to April 15, 1995 and April 16, 1995 to April 15, 1996, while serving as Non-Immigrant Visa ("NIV") Chief of the U.S. Consulate General in Rio De Janeiro, Brazil.[1]  On November 7, 2005, the Foreign Service Grievance Board ("FSGB") issued its final decision on remand from the U.S. District Court for the District of Columbia.  Mr. Olson requests judicial review of this FSGB decision on remand which was arbitrary and capricious and tainted by prejudicial procedural errors.

---

[1] Every year each FSO is evaluated by his/her immediate supervisor (the rater) and a second –level supervisor (the reviewer) in a document known as the EER.

**JURISDICTION**

1. This Court has jurisdiction pursuant to 22 U.S.C. § 4140, judicial review of Foreign Service grievances.

**PARTIES**

2. Mr. Olson joined the DOS as an FSO in 1985, earning tenure in 1988 at the first possible opportunity. He is to complete his current posting as Arms Control Advisor at the U.S. Mission to the Organization for Security and Cooperation in Europe (OSCE) in August 2006. Mr. Olson also has served as Consular Officer in Monterrey, Mexico; as Consular and Fraud Officer in Bogotá, Colombia; as NIV Chief at the Consulate in Rio de Janeiro; as Consul in Cape Verde (Spring 2001) and as Consul in Haiti (Summer 2004). He was the first DOS FSO to study at the U.S. Army Command and General Staff College at Fort Leavenworth, Kansas (2001-2002).

3. Mr. Olson has received several DOS awards to include three Superior Honor Awards, Meritorious Honor Awards and a Meritorious Service Increase.

4. His foreign languages include Portuguese, Spanish, French and some German.

5. Until 1994 and after 1996, Mr. Olson's yearly EERs were consistently excellent.

6. Mr. Olson graduated from Columbia University in 1982 and received a Master of Arts degree from Georgetown University in 1992, attending part-time and financing this effort himself. He also received a Master of Military Arts and Sciences from the U.S. Army Command and General Staff College in 2002.

7. Mr. Olson is homosexual.

8. Defendant, Condoleezza Rice, is Secretary of State.

## PLAINTIFF'S CLAIMS

9. Mr. Olson arrived in Rio de Janeiro, the location of one of the four U.S. Consulates in Brazil, in 1993.

10. At the time, his DOS medical clearance was Category One (worldwide available).

11. In 1993, Rio was the highest volume non-machine readable visa post in the world.

12. Rio was also the highest volume-per-officer NIV-processing post in the developing world.

13. The problem of a spiraling workload became critical in July 1994 when the U.S. adopted a policy of visa "reciprocity" and began limiting the validity of visitor visas for Brazilian citizens to three months, rather than every four years, as before.

14. Mr. Olson's NIV Section suffered from chronic and severe understaffing. This problem reached crisis proportions while the reciprocity initiative was in effect.

15. The DOS acknowledged that reciprocity had serious workload implications, but refused to provide additional resources.

16. The Consulate in Rio also suffered from recurring systems failures, lack of space, equipment and supply shortages, air conditioning problems, sewage back up and flooding of the ground floor where the NIV Section was located, and a large surge in the volume of visa applicants trying to submit fraudulent and counterfeit documentation.

17. These working conditions caused stress-related medical problems for Mr. Olson and his overburdened NIV Section staff.

18. Of four junior FSOs who worked for Mr. Olson, only one completed his entire tour. One officer quit, one curtailed because of health-stress related issues, and the third was medically evacuated ("medevaced") twice for stress-related illnesses.

3

19. In February 1996, a DOS Office of the Inspector General Inspection Team recommended that management request a Regional Psychiatrist's ("RMO/P") visit to Consular Sections in Brazil.

20. Nonetheless, no RMO/P was requested or sent to Rio at any time during Mr. Olson's tour.

21. No one in the U.S. Mission Brazil, other than Mr. Olson and his staff, was actively involved in the daily activities of Rio's NIV Section.

22. The U.S. Embassy, the Ambassador, the Deputy Chief of Mission ("DCM") and their principal staff, including the Countrywide Consul General, were located in Brasilia, the capital, approximately 700 miles from Rio.

23. Neither Mr. Olson nor his staff communicated directly with the Ambassador.

24. Mr. Olson never met the DCM, although he spoke with him by telephone once in July 1994 and exchanged e-mails with him on another occasion in June 1995.

25. Numerous FSOs reported that the Consulates lacked management support from the Embassy in Brasilia.

26. In Rio, the offices of Mr. Olson's reviewing officer, Consul General David Zweifel, as well as those of the bulk of the Consulate General's substantive (political and economic reporting) officers, were located ten floors above the ground-floor NIV Section.

27. Mr. Zweifel rarely went down ten floors and through a separate entrance to observe Mr. Olson's interaction with his staff.

28. Even Mr. Olson's rating officer, Consular Section Chief Edwin Beffel, admitted that Mr. Zweifel did not appear in the Consular Section more than a few times.

29. The Administrative Section was located eight floors above Mr. Olson's Section.

30. Consular Section Chief Beffel worked mostly on the mezzanine, one floor above Mr. Olson's Section.

31. Only Mr. Olson and those officers who worked with visa applicants were located at street level, accessed through a separate entrance around the corner.

32. Mr. Olson supervised up to five junior officers and approximately 15 Foreign Service National employees ("FSNs").

33. When visas were denied by the U.S. Consulate in Rio, there were frequently public scenes and complaints.

34. As NIV Section Chief, Mr. Olson was the most visible consular officer in Rio. He, therefore, became the focus of more complaints from the public than other officers.

35. Mr. Olson personally took on the vast majority of the most difficult visa cases and, at times, therefore, became the focus of more complaints from the public than other officers.[2]

36. Over and above these usual public scenes and complaints, there was a public outcry, as well as negative press, when the U.S. Mission in Brazil implemented its reciprocity policy.

---

[2] In June 2003, the Assistant Secretary of State for Consular Affairs, in her monthly Consular Issues cable, wrote, "Consular supervisors need to be ready to back up their people in contentious situations. Many complainants will be mollified simply by an opportunity to express their concerns to someone at an appropriate level of authority. Please, when or if these situations arise, for your part, lead!" (2003 State 175696 June 20 2003, para 6)

37. The U.S. Mission expected this negative reaction.

38. Mr. Beffel admitted that Mr. Olson was the hardest working officer with whom he had ever served.

39. Five DOS officers provided statements indicating a homophobic atmosphere and anti-gay bias infected the top ranks of management in both Brasilia and Rio, including, *inter alia,* the U.S. Ambassador, Mr. Olson's immediate supervisor and EER rating officer Beffel, and Mr. Olson's second-level supervisor and EER reviewing officer Zweifel.

40. The DOS Deputy Assistant Secretary for Visa Services and a Consular Affairs Management Analyst corroborated each other's statements that an atmosphere of homophobia prevailed within the top ranks in Rio, that the then U.S. Ambassador to Brazil made comments during their courtesy visit which were homophobic in nature and that a particularly nasty strain of homophobia was present in the Consulate in Rio and the Embassy from the top down.

41. A Rio Consular Officer, who worked for Mr. Olson, stated she believed that Mr. Beffel omitted achievements and included prejudicial statements in the EERs of Mr. Olson because of Mr. Olson's homosexual orientation. She noted that Mr. Beffel, along with other Americans at post, participated in 'joking' and derisive comments about homosexuality referring to Mr. Olson. She opined that because of the widespread 'joking' and comments at post that Mr. Zweifel too may have unfairly criticized Mr. Olson on account of his homosexual orientation.

42. Another Rio Consular Officer, who worked for Mr. Olson, said it was well known in the Consulate community that Mr. Zweifel disapproved of homosexuality and that Mr.

Olson had a rough time because of this. This officer witnessed other Americans make very cutting, homophobic remarks about Mr. Olson and thought that the anti-homosexual atmosphere in the Consulate fostered such bias. This officer also said he heard Mr. Beffel make crude jokes about homosexuality, as well as an extremely prejudicial and inappropriate racial slur.

43. Another Rio Consular Officer, who was also homosexual and worked for Mr. Olson, said the tolerance toward homosexuals changed for the worse in August 1994, shortly after Mr. Olson hosted an office party at his home on July 30, 1994, which Mr. Zweifel attended. At that party, upon request from the guests, Mr. Olson showed a G-rated music video by American transvestite disco singer RuPaul which included a duet with British pop singer Elton John.

44. On August 3, 1994, a few days after Mr. Olson's July 30, 1994 office party attended by Mr. Zweifel, the Consulate General in Rio sent a cable to the DOS reporting Mr. Olson and another Rio officer for "clearly exhibit[ing] homosexual preferences." The DOS had no requirement to report a person's sexual orientation.

45. That cable, 1994 Rio de Janeiro 2982, triggered questions about Mr. Olson as a homosexual security risk.

46. Mr. Zweifel's name was clearly on the cable.

47. Mr. Zweifel's name on the cable shows he was present at post when it was sent. As principal officer, Mr. Zweifel would have received a copy of all outgoing and incoming cables other than medical channel cables.

48. Nonetheless, Mr. Zweifel denied any knowledge of the cable. He labeled the allegation "preposterous."

49. His averment that he knew nothing about this matter was inconsistent with the facts.

50. According to DOS Regulation 7 FAM 011(a), "The U.S. Department of State and our embassies and consulates abroad have no greater responsibility that the protection of U.S. citizens overseas." This responsibility applies to all U.S. citizens regardless of, *inter alia*, gender, sexual orientation or HIV status.

51. Despite this longstanding DOS policy, Mr. Zweifel did not support Mr. Olson when, on or about early June 1994, Mr. Olson and his American Services Officer, exercising the most important consular function - protecting U.S. citizens abroad - tried to assist an American citizen, living with HIV/AIDS, who urgently needed to return to the U.S.

52. According to Mr. Olson's American Services Officer, a VARIG Brazilian Airlines pilot made a scene using many AIDS-phobic and homophobic remarks and refused to allow the American passenger to board despite her formal request. She said that the pilot even threatened to have her removed from the aircraft.

53. Mr. Zweifel claimed that he received a complaint from the VARIG President because Mr. Olson later issued a single-entry visa to same pilot who forced the American off the plane and that the Foreign Ministry in Brasilia took the case up with the Embassy.

54. Mr. Zweifel's claim was untrue. The complaint came from the local VARIG Flight Operations Manager ("FOM"). The President of VARIG did not get involved in this incident and the Foreign Ministry in Brasilia never took the case up with the Embassy.

55. Rather than supporting Mr. Olson, Mr. Zweifel sent a letter to the FOM supporting the pilot.

56. In addition, Mr. Olson's rating officer Beffel presented Mr. Olson with a mock three-dollar bill. The insulting words, "Queer Reserve Note" were printed on the front of the "bill."

57. Mr. Olson was terribly embarrassed and insulted when his supervisor presented him with this "bill."

58. Although the Director of the DOS Grievance Staff questioned Mr. Beffel about the mock three-dollar bill and obtained two statements from Mr. Beffel, he never rebutted or addressed the issue of the three-dollar bill.

59. Moreover, in Mr. Olson's presence, Mr. Beffel discussed the marriages of other males, positively judging an officer's professional ability simply because he was married. These discussions made Mr. Olson feel uncomfortable and unwelcome at the Consulate.

60. One male Consular Officer stated that he was told by several other DOS employees, both FSNs and Americans, that when he was formally assigned to or "paneled for" Rio, Mr. Zweifel inquired about his family situation. When Mr. Zweifel was advised that he was recently married and had a son, Mr. Zweifel remarked that he was glad a heterosexual was finally coming to the Section.

61. Mr. Olson's immediate supervisor and rating officer Beffel had a serious alcohol problem.

62. During many evenings, Mr. Beffel would telephone Mr. Olson, other members of Mr. Olson's staff and other people at post outside of the Consular Section and conduct long-winded, rambling and inappropriate one-way conversations which upset the recipients of these calls.

63. An official DOS visitor to the Mission in Brazil even attested to what she and others witnessed of Mr. Beffel's problems with the drink.

64. Although Mr. Beffel's drinking was no secret, U.S. officials in Brazil were unwilling to deal with this issue.

65. Finally, in the first half of 1996, Mr. Beffel attended a Consular Conference in Uruguay, where the problem could no longer be ignored.

66. Mr. Beffel was medevaced for alcohol treatment in June 1996.

67. Although Mr. Beffel credits himself with 22 years of consular assignments, his so-called management of the Consular Section, exacerbated by his alcoholism, was dysfunctional, disruptive, inconsistent and unhelpful.

68. In addition, Mr. Beffel lacked understanding and competence in NIV operational matters.

69. According to one Consular Officer, Mr. Beffel knew little about running the NIV Section and he rarely spent the time to learn the workings of the Section. She noted that generally whenever Mr. Beffel involved himself with management issues in the Visa Section, the results were not helpful. She said he rarely spent time in the Section observing how things were working or asking for input from those who were there full time. He didn't seem to want to know the problems.

70. The same Consular Officer said that Mr. Beffel talked about getting rid of Mr. Olson and putting her in charge, promising her a promotion and a raise. She stated that Mr. Beffel's calls were very disturbing and when she said that she did not feel she could do the job as well as Mr. Olson, Mr. Beffel accused her of being against him. She noted that it was very difficult to end the phone calls as Mr. Beffel kept repeating himself.

71. Another Consular Officer stated that Mr. Beffel was very frequently absent from the office and had little understanding of the NIV Section's procedures or workload. He said that Mr. Beffel's behavior was typically bizarre and erratic, and he had a laundry-list of well known personal problems that severely impacted his performance as consular chief.

72. Mr. Beffel tried to undermine Mr. Olson's management of the NIV Section.

73. In March 1995, as soon as Mr. Olson went on leave, Mr. Beffel reorganized the NIV Section without Mr. Olson's knowledge.

74. One Consular Officer noted it was obvious that Mr. Beffel had been working on this reorganization for some time but had not discussed it with Mr. Olson and, in fact, had purposely waited until Mr. Olson's departure to tell anyone. She said that Mr. Beffel was not open to any suggestions from officers who worked in the NIV Section and were familiar with visa issues.

75. Mr. Beffel's reorganization plan was seriously flawed, because its main feature authorized FSNs, rather than American consular officers, to make visa issuance decisions.

76. Only an American Consular Officer may grant or refuse a visa and this authority may not be delegated.

77. Mr. Beffel's changes thus violated U.S. Government and DOS Regulations.

78. Another Consular Officer explained how Mr. Beffel's plan failed and resulted in chaos. He noted that Mr. Beffel's system backfired disastrously and kept the staff working longer hours to produce the same results as before. He said that Mr. Beffel was

incapable of comprehending or believing that his changes had increased rather than reduced the workload.

79. As a result of Mr. Beffel's dysfunction and incompetence in consular affairs, on August 28, 1995, newly arrived Consul General James Derham, who replaced Mr. Zweifel, instructed Mr. Beffel to keep his "hands off" the day-to-day operations of the NIV Section. Mr. Derham, in fact, issued written instructions to Mr. Beffel to "stay out of" the operational, processing-type functioning of the NIV Unit.

80. One Consular Officer noted that, despite Mr. Beffel's unprofessional conduct, Mr. Olson tried to keep his differences with Mr. Beffel from interfering in the operations of the NIV Section. She said that Mr. Olson consistently spoke respectfully of Mr. Beffel.

81. The record shows that despite such serious problems as anti-gay bias, dysfunctional management, lack of support, and understaffing, Mr. Olson performed the essential elements of his position extremely well, demonstrating a high degree of competence.

82. Nonetheless, for the period of August 28, 1994 to April 15, 1995, Mr. Olson received an EER that was tainted by rating officer Beffel's and reviewing Zweifel's anti-homosexual bias as well as Mr. Beffel's personal and managerial dysfunction. Similarly, for the period of April 16, 1995 to April 15, 1996, Mr. Olson's EER was tainted by Mr. Beffel's anti-gay bias and personal and managerial dysfunction.

83. Mr. Olson departed Rio on August 30, 1996, whereupon he took home leave.

84. In October – November 1996, defendant's Medical Division examined Mr. Olson, diagnosed him with depression, and downgraded his medical clearance from Category One to Category Two, limiting the places overseas where he could be posted.

85. Mr. Olson has taken medication for depression almost continuously since 1996.

86. Defendant's Medical Division must specifically approve each proposed overseas assignment. However, neither defendant's Medical Division nor any other medical professional associated with defendant's Medical Division has examined Mr. Olson since 1996 to determine whether his Category Two medical clearance for depression remains valid.

87. On May 22, 1998, Mr. Olson filed a grievance with the DOS because the two EERs he received from Mr. Beffel and Mr. Zweifel were prejudicial and inaccurate and omitted significant information. See Exhibit 1 – Mr. Olson's Grievance.

88. Mr. Olson asked that the DOS locate a cable sent from Rio in early August 1994, reporting him to Washington for being homosexual. The DOS responded that a Mr. Sam Hines conducted an unsuccessful search for the cable, or any cable from Rio dated July/August 1994 with information relating to Mr. Olson.

89. After the DOS was unable to locate the cable, on September 30, 1998, it denied Mr. Olson's grievance.

90. On November 25, 1998, Mr. Olson timely filed a grievance appeal with the FSGB.

91. On December 3, 1998, under the Freedom of Information Act, the DOS released to Mr. Olson a copy of cable 1994 Rio de Janeiro 2982, dated August 3, 1994, reporting Mr. Olson for "clearly exhibit[ing] homosexual preferences."[3]

92. That cable was printed out by Mr. Samuel W. Hines of the DOS Bureau of Diplomatic Security on November 6, 1996. The "Samuel W. Hines" who printed out the

---

[3] FOIPA Case No. 9603947.

cable on November 6, 1996 and the "Mr. Sam Hines" who was allegedly unsuccessful in locating the same cable in July/August 1998 are, in fact, the same person.

93.  The DOS also informed Mr. Olson that, "no replies to this cable could be located."

94.  On June 13, 2000, the FSGB determined that the cable responding to cable 1994 Rio de Janeiro 2982 and guidance or written instructions on the subject matter of the cable may be relevant and material to Mr. Olson's grievance and issued an Order to the DOS to provide this information to Mr. Olson.

95.  The DOS never provided the cable responding to 1994 Rio de Janeiro 2982.  The DOS never provided Mr. Olson with any guidance or written instructions on the subject matter of the cable.

96.  In the same Order, the FSGB stated that, if the DOS contended that the release of this information were not permitted, pursuant to 22 C.F.R. § 903.9(b)(3), the Secretary of State or the Deputy Secretary of State must personally certify in writing to the FSGB that the disclosure would adversely affect the foreign policy or national security of the U.S. or is prohibited by law.  Neither the Secretary of State nor the Deputy Secretary of State ever made such a certification to the FSGB in Mr. Olson's case.

97.  In the same Order, the FSGB rejected Mr. Olson's request for interrogatories for DOS employee Mary Jo Swinimer, the action officer who prepared the response to the Consulate in Rio, because it had already instructed the DOS to provide a copy of the cable responding to 1994 Rio de Janeiro 2982 and any guidance or written instructions.

98.  After the DOS did not comply with the FSGB Order, the FSGB did not revisit its denial of Mr. Olson's discovery request for interrogatories for the DOS employee who prepared the response to 1994 Rio de Janeiro 2982.

99. If a party refuses to comply with an FSGB Order for discovery, the FSGB has the authority to view the evidentiary issue in dispute in the light most favorable to the requesting party.

100. According to the FSGB Order of June 13, 2000, the "evidentiary issue in dispute" was "grievant's allegation that the criticisms and errors in the two EERs resulted in part from management's, specifically Mr. Beffel's and Mr. Zweifel's, bias against his sexual orientation."

101. The FSGB, however, chose not to view the evidentiary issue in dispute in the light most favorable to Mr. Olson.

102. The FSGB never conducted a hearing in Mr. Olson's case.

103. On April 4, 2002, the FSGB issued its final decision, rejecting Mr. Olson's claims.

104. Without factoring in the issue of homophobia, the FSGB concluded that the EERs fairly and accurately described Mr. Olson's performance and potential and, therefore, it did not have to examine whether sexual orientation bias may have been a substantial factor in the two negative EERs Mr. Olson received. The FSGB held that the "weighty evidence [of anti-homosexual bias] from credible outside observers" was irrelevant because it had already decided Mr. Olson's EERs were not inaccurate or falsely prejudicial.

105. Mr. Olson timely filed a Complaint and an Amended Complaint in the United States District Court for the District of Columbia, on July 9, 2002 and September 11, 2002, respectively, requesting judicial review under the Administrative Procedure Act ("APA") 5 U.S.C. §701 et seq.

106. In its Memorandum Opinion, dated February 3, 2005, the Court held as follows:

> The FSGB's decision was arbitrary and capricious because it failed
> to consider what the FSGB itself characterized as "weighty
> evidence" of Beffel's and Zweifel's anti-homosexual bias. The
> FSGB was charged with determining whether Beffel and Zweifel
> had fairly reviewed Plaintiff's performance. Thus, evidence of any
> bias would clearly be relevant to a decision about the fairness and
> accuracy of their judgment. The FSGB, however, reasoned that it
> need not even consider the evidence of bias because it had already
> determined that the EERs were fair. The logic of this reasoning is
> hard to fathom. How could the FSGB conclude that the EERs
> were fair and accurate, and ignore a relevant factor, such as bias, in
> determining whether the subjective judgments contained in the
> EERs were fair and accurate? Thus, the FSGB's decision both
> fails to consider a relevant factor and fails to evince a "rational
> connection between the facts found and the choice made." State
> Farm, 463 U.S. at 43. Therefore, the FSGB's decision was
> arbitrary and capricious and must be remanded for the FSGB to
> consider evidence of alleged anti-homosexual bias.

107. In its accompanying Order, the Court remanded the case to the FSGB "for

consideration of whether anti-homosexual bias unfairly tainted Plaintiff's employment

reviews." The Court also noted that allegations of Mr. Beffel's personal and managerial

dysfunction were certainly factors that should be considered by the FSGB on remand.

See Exhibit 2 – Court's Memorandum Opinion and Order.

108. The FSGB committed several arbitrary and capricious procedural violations before

and while Mr. Olson's case was on remand.

109. On April 6, 2005, for example, while his case was on remand, Mr. Olson personally

reviewed the FSGB Record of Proceedings ("RoP") for his case.

110. He discovered that, during the earlier action before this Court which resulted in the

remand to the FSGB, defendant withheld from the Administrative Record ("AR")

provided to the Court and to him documents pertinent to the processing of his case.

111. There were, in fact, 320 pages of documents which had not been included in Parts A or B of the AR filed with the Court on August 27, 2003. None of these documents was classified or otherwise privileged.

112. At that time, Mr. Olson realized some pages were missing from the AR. Consequently, on September 15, 2003, he filed a motion requesting that defendant submit the whole AR.

113. In response, on September 23, 2003, in an Errata Notice of Filing of Amendment to the AR, Part A, defendant turned over 40 missing pages, naming and numbering them Part A, 78A-78NN.[4]

114. These 40 pages were only part of 320 missing pages, all located in the same FSGB file.

115. Defendant chose not to disclose the existence of the remaining documents to the Court or Mr. Olson.

116. Also on April 6, 2005, Mr. Olson confirmed that the FSGB did not provide a complete and accurate copy of the cable 1994 Rio de Janeiro 2982 in the AR Part B at 120 and 671, as filed with the Court. The best copy in the AR, *see* Part B at 120, omits the first line of the cable as found in the FSGB's RoP, as follows:

HINES SAMUEL W        11/06/96/  143241        PRINTER:  HJ

[See numbered paragraphs 88 and 92 above.]

117. Also, while this case was on remand to the FSGB, there were ex parte communications between the FSGB and the DOS concerning Mr. Olson.

118. On September 7, 2005, DOS Grievance Staff officer, Henry J. Noonan, sent an ex parte e-mail to FSGB Senior Advisor Joseph Pastic, saying:

---

[4] Believing the AR was finally complete, Mr. Olson withdrew his motion.

17

> Good Morning Joe, In the Department's August 12, 2005 submission, the Department raised three Motions to Exclude in the second, third and fourth paragraphs of that submission. The Department has not received a ruling on the second and third Motions to Exclude contained in the third and fourth paragraphs. For ease of reference, I have attached our August 12, 2005 submission. Please, advise. Best Regards, Henry

119. On September 9, 2005, Mr. Pastic responded to this e-mail from his home computer (jpastic@cox.net) to Mr. Noonan's home computer (founding30@msn.com), deciding that Mr. Olson's "entire submittal [argument] will be excluded."

120. Although this exchange included substantive issues, its subject was "admin matters on Olson remand 98-087."

121. On September 2nd and June 15, 2005, there were also ex parte DOS/FSGB e-mails relating to Mr. Olson.

122. Upon information and belief, there are additional ex parte communications between the DOS and the FSGB concerning Mr. Olson which have not been provided to plaintiff or included in the FSGB's RoP.

123. Upon information and belief, there are also ex parte communications between Mr. Pastic and Mr. Noonan concerning Mr. Olson on their home computers or personal e-mail accounts which have not been provided to plaintiff or included in the FSGB's RoP.

124. Upon learning of numbered paragraphs 117 - 121 exchanges, on September 12, 2005, Mr. Olson's attorney sent a letter to FSGB Chairman Edward J. Reidy, requesting, *inter alia,* copies of all correspondence on Mr. Olson's case between the DOS and the FSGB not listed in the FSGB RoP, including e-mails, ex parte communications and records of telephone calls.

125. Mr. Reidy responded on September 26, 2005 stating he was "not aware of any documents not yet provided."

126. Mr. Olson's attorney wrote to the FSGB again on October 10, 2005, asking the FSGB to confirm it had looked for all ex parte communications, not only documents. She also asked to be advised if Mr. Pastic and Mr. Noonan had confirmed in writing whether there were any communications they had not yet provided.

127. Mr. Reidy responded in an October 13, 2005 Order, stating there were no ex parte communications "of the nature that must be placed in the record."

128. To ensure that that the FSGB RoP on Mr. Olson's case would be complete, on September 23, 2005, Mr. Olson's counsel sent a letter to the FSGB, asking to include in the RoP Mr. Pastic's September 9, 2005 e-mail excluding Mr. Olson's "entire submittal."

129. On September 26, 2005, Mr. Reidy refused, stating, "[t]here is no reason to include this in the record."

130. Again on October 10, 2005, Mr. Olson's attorney wrote a letter asking to include in the RoP:  Mr. Pastic's September 9, 2005 e-mail; counsel's September 23, 2005 and October 10, 2005 letters requesting information about and copies of ex parte communications; and Mr. Reidy's September 26, 2005 letter, denying these requests.

131. The FSGB issued an Order on October 13, 2005, denying the request, stating that no additional material would be included in the record.

132. The FSGB did not conduct a hearing on Mr. Olson's case while it was on remand.

133. The FSGB issued its final decision on remand on November 7, 2005, denying Mr. Olson's entire grievance appeal.  See  Exhibit 3 – FSGB Final Decision.

134. The FSGB's final decision was arbitrary and capricious.  It did not examine all relevant evidence, provide a satisfactory explanation for its conclusions, or show a rational connection between the facts and the choices made.

135. The FSGB's credibility determination focused on the premise that Mr. Zweifel was telling the truth when he denied knowledge of the cable reporting Mr. Olson for exhibiting homosexual preferences, because Rio was a post where the principal officer's name was automatically added to the end of the cable by CableXpress. The FSGB decided Mr. Zweifel was truthful, because the FAH at 5 FAH-1 H-247.2 states:

> At some posts, the principal officer's name is automatically added to the end of the telegram by CableXpress.

136. CableXpress did not exist in 1994 at any U.S. Foreign Service post anywhere in the world, including Rio.

137. CableXpress, therefore, did not automatically add Mr. Zweifel's name to the 1994 cable.

138. According to DOS Information Resources Management's CableXpress User Manual, CableXpress was first tested as a "pilot project" in Washington in 1996 and the development of a DOS version began in January 1998.

139. Furthermore, 5 FAH-1 H-247.2 is dated July 12, 2004, ten years after the cable reporting Mr. Olson for exhibiting homosexual preferences was sent from Rio.

140. The FSGB did not properly research CableXpress and ignored all of the evidence concerning the cable.

141. In considering credibility, the FSGB also ignored Mr. Zweifel's inconsistent statement regarding the VARIG Brazilian Airlines incident. In his statement, Mr. Zweifel falsely claimed that the President of VARIG complained to him about Mr. Olson's handling of the incident. Mr. Zweifel also falsely claimed that the Foreign Ministry in Brasilia took the case up with the Embassy.

142. The VARIG President did not contact anyone in the U.S. Government. The Foreign Ministry in Brasilia did not take up the case with the U.S. Embassy.

143. The complaint came from the local VARIG Flight Operations Manager ("FOM"). Appropriately, Mr. Zweifel's reply was sent to the local FOM, not to the VARIG President or anyone in the Foreign Ministry.

144. The FSGB also credited Mr. Beffel's statement that Mr. Zweifel, the DCM and the Ambassador were upset with Mr. Olson "because of the bad press the embassy received over a problem involving Olson and an AIDS victim."

145. Mr. Beffel's statement is inconsistent with the facts. There was no Brazilian press of any kind on the problem. Nor was there any press on VARIG Airlines' discriminatory treatment of passengers living with HIV/AIDS. The RoP includes press on American Airlines' discriminatory treatment of such passengers.

146. The FSGB did not even get the facts straight. The FSGB final decision said, "When a U.S. citizen, suffering from HIV/AIDS, sought to return to the United States, Olson attempted to assist her but the pilot would not allow her on board because of her illness."

147. The evidence in the RoP establishes that the U.S. citizen with HIV/AIDS was a male who urgently needed to return to the U.S. The RoP also shows that it was Mr. Olson's American Services Officer, not Mr. Olson himself, who assisted the U.S. citizen.

148. The FSGB admitted that there was contradictory evidence on the subject of credibility, but it failed to provide a rational reason for not addressing this evidence.

149. This evidence was probative of Mr. Zweifel's and Mr. Beffel's anti-homosexual bias against Mr. Olson.[5]

---

[5] This was the exact same "evidentiary issue in dispute" that was the subject of the FSGB Order of June 13, 2000 – see numbered paragraphs 94-101.

150. The FSGB did not consider that Mr. Zweifel and Mr. Beffel indeed had a motive to lie because, according to five witnesses other than Mr. Olson, Mr. Zweifel and Mr. Beffel were homophobic.

151. The FSGB also failed to address the issue whether Mr. Beffel's drinking problem, or his reported incompetence and dysfunction, gave him a motive to lie.

152. Nonetheless, the FSGB concluded that neither Mr. Zweifel nor Mr. Beffel "had any characteristics that would make them prone to be untruthful."

153. By summarizing, cherry-picking and employing a selective approach, purposely detrimental to Mr. Olson's case, the FSGB ignored relevant and material evidence, paraphrased witness statements omitting significant parts supportive of Mr. Olson, disregarded unrebutted evidence of anti-homosexual bias and finally decided that Mr. Olson's EERs were fair and accurate and not tainted by anti-homosexual bias.

154. The FSGB decision states, "Olson chafes at unflattering comments about his sexual orientation, but the attitude behind those comments does not by itself, undermine the validity of the EERs, even though 'anti-homosexual' bias could well infect them."

155. If, however, anti-homosexual bias infected Mr. Olson's EERs, their validity would indeed be undermined.

156. In using similar illogical and unfathomable reasoning on remand as it had previously, the FSGB ignored material, relevant and unrebutted evidence of Mr. Beffel's alcoholism and personal and managerial dysfunction and decided that he was not dysfunctional.

157. The reason the FSGB gave for finding that Mr. Beffel was not a dysfunctional manager was that "he rose to . . . . and remained in a supervisory position."

158. Mr. Beffel's personal and managerial dysfunction, his disruptive, inconsistent and unprofessional conduct, his drinking problems, and his impaired judgment made it impossible for him to adequately and fairly rate Mr. Olson.

159. The FSGB decision admits, "the fundamental question is how well did Olson perform the essential elements of his position on the consular staff."

160. As noted in numbered paragraph 81, the record shows that Mr. Olson performed the essential elements of his position extremely well, demonstrating a high degree of competence. Nonetheless, Mr. Beffel and Mr. Zweifel gave him biased and falsely prejudicial EERs.

161. In its decision on remand, the FSGB labeled Mr. Olson "a disruptive force in the workplace."

162. In its Annual Report for 2005, the FSGB labeled Mr. Olson's case as "not only protracted, but prolix" and as "a hotly contested proceeding" and confirmed that it had found Mr. Olson "to be a 'disruptive force' in the workplace."

163. There is nothing, nothing at all, in the RoP labeling Mr. Olson "a disruptive force in the workplace." Not one of Mr. Olson's EERs ever even indicated such a thing.

164. At no time in his Foreign Service career did any of Mr. Olson's superiors in Brazil or elsewhere ever even suggest that Mr. Olson depart post early (curtail), whether voluntarily or involuntarily. Mr. Olson, in fact, has always completed all of his Foreign Service assignments (tours), as scheduled, including extensions.

165. Mr. Olson has never been disciplined or proposed for discipline of any type at any time in his Foreign Service career.

166. It appears that the FSGB unilaterally and without any evidence made up the label "disruptive" for Mr. Olson to discredit him.

167. On March 7, 2006, 120 days after the FSGB issued its final decision, Mr. Olson timely filed a motion with this Court to reopen his case and a petition for review of the FSGB's decision on remand. See Exhibit 4 – Motion to Reopen and Petition for Review.

168. According to 22 U.S.C. § 4140(a), Mr. Olson actually had 180 days after the final action of the FSGB to request judicial review.

169. Defendant delayed responding to this motion for 76 days, from March 7, 2006 until May 22, 2006.

170. Had defendant answered in the 11 days required under LCvR7(b), Mr. Olson would have had 49 days to prepare a new complaint if required to do so. Defendant, instead, requested, and the Court granted, a one-month-plus extension of time until April 21, 2006.

171. If defendant had timely met that extension, Mr. Olson still would have had 15 days to file a new complaint.

172. Defendant, however, failed to timely respond by April 21, 2006.

173. After another 10-day hiatus, on May 1, 2006, defendant submitted still another motion, this one untimely, asking for another extension in time until May 22, 2006.

174. Although defendant's request said that the Assistant U.S. Attorney assigned to this case was on leave because of a death in the family, defendant failed to explain why neither of the other two attorneys whose names appeared on this case, did not timely submit an opposition motion or timely request an enlargement of time.

175. Defendant's delays totaled two and one-half months.

176. After taking specific actions to try to ensure that plaintiff could not timely submit a new complaint if required by the Court to do so, defendant finally submitted a response to Mr. Olson's motion to re-open his case and petition for review of the agency decision on remand. In this response, defendant argued that Mr. Olson had to submit a new complaint.

177. On June 20, 2006, the Court issued an Order denying plaintiff's motion to reopen his case. The Court decided, however, that, "if and when the Complaint is re-filed, the Court is willing to have the case assigned to its docket." See Exhibit 5 – Order, 06/20/06.

178. The FSGB decision and the EERs have caused Mr. Olson to suffer prejudice.

179. The FSGB decision and the EERs, which were falsely prejudicial, inaccurate and omitted important achievements, have caused Mr. Olson to suffer prejudice and harm.

180. These EERs, particularly the 1994-95 EER, were the reasons why Mr. Olson was not promoted in the mid-1990s, as he should have been to maintain regular career progression in line with other FSOs who entered the Foreign Service in 1985.

181. The defendant's promotion panels are under instruction to focus on EERs for the last five years. Accordingly, Mr. Olson's promotion to FS-02 was delayed until 2000, after the 1994-95 EER was included not in the last five years.

182. When Mr. Olson was finally promoted from FS-03 to FS-02, he had already served as an FSO for 15 years, while the average length of service for those promoted was 10.4 years. Mr. Olson had fallen about five years behind his peers.

183. Foreign Service promotion statistics (FS-3 to FS-2, Multifunctional Promotions, Consular) establish that the average time-in-class of the promotees was 4.9 years, while Mr. Olson's time-in-class was 10 years.

184. Mr. Olson's non-promotion resulted in loss of assignments, rank, position, pay, and benefits.

185. Mr. Olson's non-promotion resulted in stress caused by the worry about seeing his time-in-class expire for not advancing within the prescribed period of time, resulting in separation from the Foreign Service.

186. The two negative EERs and the omission of Mr. Olson's significant contributions toward breaking the visa reciprocity stalemate and ending the chaotic circumstances at the U.S. Consulates in Brazil meant that not even defendant's Bureau of Consular Affairs ("CA") knew of and credited Mr. Olson with his achievements in Rio.

187. As a result, CA developed skepticism about Mr. Olson.

188. At CA's request, Mr. Olson volunteered and served on temporary duty (TDY) as U.S. Consul in Cape Verde in the Spring 2001. At the request of the defendant's Bureau of Human Resources, Mr. Olson volunteered and served on TDY as a U.S. Consul in Port-au-Prince, Haiti, in the Summer 2004.

189. Mr. Olson successfully completed these consular TDYs at these hardship posts.

190. Despite this recent consular experience documented in his performance (EER) file, Mr. Olson received a cautionary letter from the 2005 selection (promotion) panel noting an alleged lack of consular experience since 1996. This cautionary letter renews the threat of premature termination of Mr. Olson's Foreign Service career.

191. Since 1996, CA has only considered Mr. Olson for consular assignments if they are below his personal grade. CA refuses to consider Mr. Olson for any at-grade consular assignments regardless of his qualifications for the assignment or the needs of the service.

192. Moreover, due to the negative EERs from Rio, Mr. Olson has been removed from consideration for a definite range of assignments and job opportunities and has had a very difficult time finding onward assignments.

193. While in Rio, Mr. Olson volunteered for an onward assignment to Zagreb, but, although the defendant needed to fill the job, Mr. Olson was turned down.

194. Mr. Olson also responded positively to a request for expressions of interest in volunteering for Kosovo. His response elicited nothing.

195. Mr. Olson bid on numerous overseas assignments, including almost every danger pay post, but with no success.

196. Even after his promotion to FS-02 in 2000, his excessive time-in-grade as an FS-03 was held against him.

197. On two occasions, he bid on positions in Beirut, which were out for bid on an urgent need-to-fill basis as high-priority assignments. Mr. Olson was well qualified for each position and had worked effectively with various personnel involved in Lebanon and Near Eastern Affairs. The DOS had no other candidate. Nonetheless, on both occasions, defendant not only rejected Mr. Olson when he was the only bidder, but actually pulled another person out of an ongoing assignment to serve in Beirut.

198. Mr. Olson also bid on Brussels, Frankfurt and St. Petersburg. He did not receive any of these jobs.

199. Mr. Olson applied for at least three positions in the U.S., but he was passed over. He did not even make first cut.

200. His bid on a consular position in Korea likewise was ignored, and the position remained vacant.

201. In the 2002 assignment cycle, Mr. Olson's bids - in response to a "Request for Volunteers" cable - on Afghanistan and Pakistan elicited no response.

202. Defendant has called upon all FSOs to consider serving in Iraq. Most recently, defendant has called upon FSOs to volunteer to serve on Provincial Reconstruction Teams ("PRTs") in Iraq. Mr. Olson has volunteered for temporary and long-term assignments in Iraq since 2003.

203. Defendant's Medical Division has established an absolute ban on service in Iraq by anyone without a Category One medical clearance. For this reason, Mr. Olson has not been able to serve in Iraq.

204. Mr. Olson remains interested in serving in Afghanistan, but defendant's Medical Division has also established an absolute ban on service in Afghanistan by anyone without a Category One medical clearance.

205. Mr. Olson no longer has a future in Consular Affairs.

206. Accordingly, he has had to re-tool himself to concentrate on political-military affairs.

207. In 2006, Mr. Olson applied to change his specialty from consular to political. Despite public statements of high-level DOS officials supporting greater integration between the DOS and the U.S. military, defendant denied his application with the negative comment that all of his political experience was political-military rather than simply political.

208. Upon information and belief, the defendant's Medical Division approved Mr. Olson's present assignment to Vienna, Austria, because a Regional Psychiatrist (RMO/P) is stationed there.

209. Since his arrival in Vienna September 30, 2002, Mr. Olson has never come to the attention of the RMO/P except through ordinary scheduled appointments. Mr. Olson has never been medically evacuated ("medevaced") from any location at any time in his entire Foreign Service career.

210. Despite Mr. Olson's full compliance with medical treatment recommendations and the absence of problems, the RMO/P in Vienna told Mr. Olson June 22, 2006 that he would never be able to regain the Category One medical clearance that he had until his 1993-1996 assignment in Rio de Janeiro, Brazil.

211. Defendant expects Mr. Olson to serve at difficult, hardship or unaccompanied posts. However, defendant's Medical Division has not provided Mr. Olson with any guidance to assist him in identifying difficult, hardship or unaccompanied posts which defendant's Medical Division will approve for Mr. Olson's service (see numbered paragraph 86). The Medical Division has only told Mr. Olson not to serve in Iraq or Afghanistan.

212. Mr. Olson has experienced stress, anxiety, humiliation and depression as a result of the prejudicial and inaccurate EERs and the FSGB's arbitrary and capricious conduct.

## COUNT I

## ADMINISTRATIVE PROCEDURE ACT

### (5 U.S.C. § 701 *et seq.*)

213. Plaintiff repeats and re-alleges the information contained in numbered paragraphs 1 through 212, herein incorporated by reference.

214. The Administrative Procedure Act empowers a Court to hold unlawful and set aside agency action, findings, and conclusions found to be: a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; b) contrary to constitutional right, power, privilege, or immunity; c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; d) or without observance of procedure required by law. In making the foregoing determinations, the Court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

215. The FSGB, as well as the DOS, committed and undertook actions that were arbitrary, capricious and an abuse of discretion. The FSGB did not examine all relevant evidence, provide a satisfactory explanation for its conclusions, or show a rational connection between the facts and the choices made. The FSGB's credibility determination focused on the false premise that Mr. Zweifel was telling the truth when he denied knowledge of the cable reporting Mr. Olson for exhibiting homosexual preferences, because Rio was a post where the principal officer's name was automatically added to the end of the cable by CableXpress. CableXpress did not exist in 1994 at any U.S. Foreign Service post anywhere in the world, including Rio. CableXpress, therefore,

did not automatically add Mr. Zweifel's name to the 1994 cable. The FSGB did not

properly research CableXpress and ignored all of the evidence concerning the cable.

In considering credibility, the FSGB also ignored Mr. Zweifel's inconsistent statement

regarding the VARIG Brazilian Airlines incident. In addition, the FSGB credited Mr.

Beffel's statement that Mr. Zweifel, the DCM and the Ambassador were upset with Mr.

Olson because of the bad press the embassy received over a problem involving Olson and

an AIDS victim. Mr. Beffel's statement, however, is inconsistent with the facts. There

was no Brazilian press of any kind on the problem. The FSGB did not even get the facts

straight. Its final decision stated that the U.S. citizen, suffering from HIV/AIDS whom

Mr. Olson attempted to assist, was a woman. The evidence in the record establishes that

the U.S. citizen with HIV/AIDS was a male who urgently needed to return to the U.S.

and that it was Mr. Olson's American Services Officer, not Mr. Olson himself, who

assisted the citizen. The FSGB did not consider that Mr. Zweifel and Mr. Beffel indeed

had a motive to lie because, according to five witnesses other than Mr. Olson, Mr.

Zweifel and Mr. Beffel were homophobic. The FSGB failed to address the issue whether

Mr. Beffel's drinking problem, or his reported incompetence and dysfunction, gave him a

motive to lie. Nonetheless, the FSGB concluded that neither Mr. Zweifel nor Mr. Beffel

"had any characteristics that would make them prone to be untruthful." In using similar

illogical and unfathomable reasoning on remand as it had in its previous final decision,

the FSGB ignored material, relevant and unrefuted evidence of Mr. Beffel's alcoholism

and personal and managerial dysfunction and decided that he was not dysfunctional. The

only reason the FSGB gave for finding that Mr. Beffel was not a dysfunctional manager

was that "he rose to . . . . and remained in a supervisory position." The FSGB failed to

examine the relevant evidence of reviewing officer Zweifel's and rating officer Beffel's anti-gay bias and Mr. Beffel's personal and managerial dysfunction, his disruptive, inconsistent and unprofessional conduct and his drinking problem. The anti-homosexual biases of both of Mr. Olson's supervisors and Mr. Beffel's dysfunction made it impossible for them to adequately and fairly rate Mr. Olson.

216. In applying the standard for arbitrary and capricious, the Court considers whether the final agency decision was based upon a consideration of the relevant factors and whether there was a clear error in judgment. The Court intervenes to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for the action. The Court also determines whether the agency decision evinces a rational connection between the facts found and the choice made. An agency decision that has not taken all relevant factors into account in a rational manner is arbitrary and capricious. The FSGB decision did not take all relevant factors into account. By summarizing, cherry-picking and employing a selective approach, purposely detrimental to Mr. Olson's case, the FSGB, in fact, ignored relevant and material evidence, paraphrased witness statements omitting significant parts supportive of Mr. Olson, disregarded unrebutted evidence of management's anti-homosexual bias and dysfunction and finally decided that Mr. Olson's EERs were fair and accurate and not tainted by Mr. Zweifel's and Mr. Beffel's anti-homosexual bias and Mr. Beffel's personal and managerial dysfunction. Moreover, the FSGB made numerous clear errors in judgment including, *inter alia*, basing Mr. Zweifel's credibility determination on a false premise about CableXpress, ignoring Mr. Zweifel's false statement regarding the VARIG airlines incident, crediting Mr. Beffel's false statement about the bad press the Embassy received when Mr. Olson

tried to help the American living with HIV/AIDS, and finding Mr. Beffel was not dysfunctional because he rose to and remained in a supervisory position.

217. The Court's final inquiry is whether the agency complied with its own procedures and applicable statutes. Judicial review is available to hold the agency to the procedural and substantive standards contained in its own regulations governing the administrative action. Defendant violated several procedures required by law, as well as by FSGB and internal DOS regulations and policy, by: withholding from the AR documents pertinent to the processing of Mr. Olson's earlier action before this Court, engaging in ex parte communications between the FSGB and the DOS, and refusing to complete the RoP, even after twice being requested in writing by plaintiff's counsel to do so. These actions taken in regard to plaintiff were contrary to his constitutional right to due process under the Fifth Amendment and without observance of procedures required by the Foreign Service Act and other federal laws and regulations.

218. As a result of defendant's actions, Mr. Olson has suffered and continues to suffer actual adverse and harmful effects and injuries which have impacted negatively on the past, present and future terms, conditions and privileges of his employment, causing harm and loss to him professionally and personally. The harm includes, but is not limited to: the downgrading of his medical clearance so that he is no longer available for assignments worldwide, the foreclosure of job opportunities and certain postings abroad, and lost promotions, pay, benefits, and assignments. Mr. Olson has suffered injury and damages in the form of loss of self-esteem, anxiety, stress, humiliation, depression, and expenses for legal action and costs. He has been stigmatized and his reputation impugned so as to seriously damage his standing and associations at work and in the

community and to foreclose his ability to take advantage of employment opportunities by excluding him from a definite range of assignments.

219.  Thus Defendant Rice, in her capacity as Secretary of State is liable to Mr. Olson under the APA for agency action, findings, and conclusions that were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this honorable Court:

1. Reverse the decision of the FSGB;

2. Order the promotion of Mr. Olson to FS-02 backdated to 1995 with interest;

3. Order Mr. Olson's promotion to FS-01 backdated to 2000 with interest;

4. Order his promotion to the Senior Foreign Service, Class of Counselor (FE-OC), backdated to 2005 with interest;

5. Order defendant to expunge Mr. Olson's 1994-1995 EER;

6. Grant Mr. Olson one additional year time-in-class and time-in-service;

7. Order defendant to expunge all falsely prejudicial and inaccurate comments in his 1995-96 EER (and retype the remainder so that the deletions are not apparent);

8. Order defendant to expunge any and all derogatory information in Mr. Olson's DOS records, including all of his personnel files and records of the Bureaus of Consular Affairs, Diplomatic Security and Human Resources, resulting from these two EERs;

9. Order defendant to include in his Official Performance (EER) File the omission in his 1995-96 EER concerning his substantial contributions and efforts on the visa reciprocity issue and their positive effects on U.S. policy;

10. Order defendant's Medical Division to conduct a complete medical examination to restore Mr. Olson's Category One medical clearance;

11. Order defendant to assign Mr. Olson to the Foreign Service assignment of his choice, to take effect within one year;

12. Award Mr. Olson equitable damages, including, but not limited to, lost wages beginning 1994 and continuing thereafter, plus benefits, if any, with interest;

13. Award reasonable attorney fees and costs, expenses and disbursements of this action and the previous one, Civil Case 02-1371 (GK), and

14. Order defendant to pay consequential damages, pursuant to 22 U.S.C. § 4137(b)(5) and the Equal Access to Justice Act.

Plaintiff further prays that the Court will award him any different and additional relief that it deems just, proper and appropriate.

Respectfully submitted,

Karl Olson
Pro Se

RATHAUSSTRASSE 7/44
A-1010 VIENNA, AUSTRIA
Telephone Number: +43-1-402-3550
E-mail:  olson@karlolson.com