# Exhibit 1


# Grievance

DEPARTMENT OF STATE

'98 MAY 22 A9:14

May 22, 1998

Actually,
10:14

TO:      M/DGP/PER - Alex De La Garza

FROM:    Karl Olson                                    TAB 1

RE:      Grievance Submission for Final Agency Review

In accordance with 3 FAM 4434.1, I hereby file the following
grievance.  This grievance falls within the definition of a
grievance provided in 3 FAM 4412.c.(5).

This grievance concerns two (2) efficiency reports prepared
for my second and third years at my previous post which are
inaccurate and falsely prejudicial, and also contain errors
of omission and inadmissible comments.  The first EER
covered the period 28AUG94-15APR95; the second covers the
period 16APR95-15APR96.  I also note that the required EER
for the period 16APR-30AUG96 was never prepared and reserve
the right to grieve this in the future as well.  The
reviewing officer for the first EER signed his statement
25MAY95 and I received the EER approximately 30MAY95 as
I had been on leave 25MAY95.  I am therefore filing this
grievance 22MAY98 to avoid any problem with deadlines such
as those in 3 FAM 4427.a.  I will be happy to provide any
specific documentary evidence upon request.

General Background Summary:

This grievance concerns a U.S. consular policy issue and its
effect on my own career.  Although it is not as interesting
and dramatic as the situation in the Political Section in
Panama decided by the FSGB several years ago (I can provide
details if requested), the effect on resources resulting
from this policy situation affected U.S. interests in South
America's largest and most important country for two years.
Our policy initiative was successful and Brazilian policy
was changed.  Although I was a loyal Foreign Service Officer
and supported our policies once they were decided by higher
authority, the rating and reviewing officers held me
personally responsible for the known and foreseen negative
effects.  Still, my official performance file omits any
mention of what was, as I will describe, my successful and
principal policy accomplishment during my assignment.
I have not been recommended for promotion from FS-03 to
FS-02 since 1994 and my career has been harmed.  The
following epic provides details.

06 1205

000007

**FILED**

*Exhibit 1*

JUN 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Background:

For many years, the two U.S. Consulates General in Brazil, Rio de Janeiro and Sao Paulo, have had the highest volume-per-officer NIV units of any posts in the developing world. I think that, since the Visa Waiver Pilot Program took broad effect, this ratio is actually the highest of any U.S. posts anywhere in the world. The NIV Chief and a staff of two junior officers were processing well over 110,000 visas when I arrived; the record number of walk-in NIV applicants was 696 in one day. It is my understanding that the usual standards for NIV staffing elsewhere in ARA provide one officer for every 15,000 or so NIV applicants. (I welcome any factual clarification.)

In any event, during my first year I concentrated on making our operation more efficient, reducing or eliminating certain time-consuming tasks of marginal utility. Individually, each had little impact, but cumulatively, they helped to focus our team on essential objectives. In some cases these recommendations were inconsistent with Brazilian cultural expectations. On the other hand, it is important to remain cognizant of the fact that what we do control, in such a situation, is our response. That said, we were very successful in making the operation more efficient and focused and in accurately recording workload statistics from which resource allocations flow. (I will be happy to provide excruciating details on request.)

One policy issue which created minor but high-profile problems was the prohibition on issuing visas to applicants neither resident nor physically present in the Rio Consular District. (Please let me know if exact FAM citation is necessary.) The wording of the regulation leaves us no discretion, yet it was very difficult to get other parties to understand that we had no discretion. This included officers from other sections of the post.

Another resource issue was our ongoing effort to install a microphone at the second NIV pre-screening window. When I arrived, there was only one pre-screening bank teller-type window; we requested that our Administrative Section switch two fixtures to create a second window. (This is difficult to describe but it involved only labor - no equipment.) We waited for Admin. to install a microphone. Seeing no activity after a couple of weeks, I prepared a formal written request on the appropriate GSO form. I also attached a justification, cleared by the Consul General, explaining why U.S. interests would be effectively served by allowing us to communicate with our applicants without shouting through thick Plexiglas. No action was taken. I submitted monthly follow-up requests including a complete copy of the original request with justification. No action was taken over a four-month period. It was impossible not

000008

*Exhibit i*

to interpret this course of events as apparent policy guidance that having a microphone with which to communicate to our NIV applicants was apparently not important.  It was impossible to coordinate effectively with Admin. as they were located nine floors above, did not use e-mail and took off-the-cuff remarks from consular FSNs as formal policy concurrence. (I realize that this statement implies that the post was dysfunctional; it was.)

One relevant detail was our policy towards professional air crew members of VARIG Brazilian Airlines.  At the time, validity of a D-visa was multiple entries within 24 months. This meant frequent revalidations as VARIG's Rio-based international air crews total around 4,000 people.  At VARIG's request, we established a special procedure whereby crew members could submit applications for renewal of visas by messenger, in a special bag, which we always processed first.  We worked until 7:00 p.m. many days to ensure that, among other things, we processed the special VARIG bag.

Space was a serious problem; the USIS Library occupied valuable space immediately above the Consular Section which precluded any expansion.  Lack of space meant that the Congressionally-mandated Machine Readable Visa (MRV) system could not be installed in Rio; the necessary equipment simply would not fit.  While hundreds of visa applicants daily were jammed into a very small waiting room, augmented by a little-used auditorium, actual walk-in patronage of the USIS Library upstairs rarely exceeded the library's own staff.

One of my key recommendations to Mr. Zweifel, made before Mr. Beffel's arrival, concerned the USIS Library.  I prepared a concise yet detailed memo justifying why the space occupied by the USIS Library should be awarded to the Consular Section.  Although the logic was impeccable, actually making and confirming the decision to close the USIS Library was delayed for considerable periods, as the U.S. Mission Brazil worried about adverse host nation reaction to the closure.  (I had no such worries due to limited walk-in patronage of the Library; in fact, once the closure was announced local newspapers buried the news on around page C17, followed by a couple of letters to the editor from persons who admitted that they had last visited the USIS Library years earlier.)  Once the decision was made, actually implementing the closure took much more time, as did the planning process for renovating the space for the Consular Section.  Actual construction began only in September, 1996, right after my departure from post.

I am including these details as an explanation of apparent mission priorities:  although the Consular Section attracted

000009

*Exhibit 1*

far more public attention than our USIS operation, and although the Ambassador specifically identified consular operations as highest-profile, that stated high priority did not extend actually to deciding to make a decision that would actually improve the situation. This inconsistency characterized the overall attitude of the mission towards consular operations in general. I had to point this out frequently to Mr. Beffel and others in encouraging various elements of the mission to make decisions.

Also for many years, Brazil had issued 3-month visas (tourist and business) to Americans, with a fee for business visas, while the U.S. had issued four-year business-tourism visas to Brazilians, without fee. Furthermore, also for many years, the Embassy in Brasilia had discussed the issue of liberalization with Brazilian Foreign Ministry officials, who were sympathetic but pointed out that the 3-month validity for tourist visas was set by a Brazilian law, passed by Congress, which could only be amended by passing another law. The 3-month validity for business visas was fixed by an administrative decree which could only be amended by issuing another administrative decree. This is relevant to the grievance. The Brazilian Foreign Ministry was sympathetic to our position, but was unable to effect any change whatsoever.

We also took as policy guidance the fact that we were provided limited resources with which to fulfill our mission, and we cabled the Department our interpretation of this: that if we had not been given sufficient resources to perform all functions, then that fact constituted an instruction that the least important functions shall not be performed. We know that the Assistant Secretary of State for Consular Affairs saw that cable; we never received an objection.

It had been generally agreed among all elements of the U.S. Mission in Brazil that only imposition of strict reciprocity would result in a change in Brazilian policy, and that such a move would also increase dramatically the NIV workload at Brazil posts, which was already the highest-per-officer in the world. Reciprocity had not been imposed because of the belief, shown to be true, that the cost in resources would be considerable, and require a significant period of time. It was also the consensus of virtually everyone within the Mission that U.S. interests would not be most effectively served by ``shooting ourselves in the foot'' like this. Furthermore, the Department warned Embassy Brasilia that the Mission would not receive any additional resources because of the initiative.

Nevertheless, our government made the decision to impose strict reciprocity with Brazil effective the middle of July,

000010

*Exhibit 1*

1994, after the U.S.-hosted World Cup soccer championship. This was announced publicly in approximately May, 1994, under the apparent impression that this would galvanize Brazilian public opinion to encourage Brazil to liberalize its own policies.  Of course, what actually happened to the Brazilian public was that it galvanized itself to obtain passports and U.S. visas before the rules changed.  This included many influential members of society who were forewarned and prepared.

In the decision-making process, the Consulate General at Rio de Janeiro made its reservations known, following the general guidelines indicated above.  Once our government made a decision, however, I supported it and worked for its successful conclusion like a loyal Foreign Service Officer. I wish I could say the same of my rating and reviewing officers, or indeed of the Embassy in Brasilia.  Their actions in specific situations were inconsistent with our overall objective of changing Brazilian policy. Furthermore, no one else in the Mission understood the urgent necessity for working for this change, as the NIV workload would, and did, increase dramatically.

Two other facts are relevant before describing the atmosphere at the beginning of the first rating period at issue.  In approximately early June, 1994, while we had limited consular officer staff available, my American Citizens Services officer, Ms. Eileen Amer, assisted an American citizen living with HIV/AIDS who had fallen ill in a local hospital and needed to return to the United States. She spent an entire day making necessary arrangements (which in Brazil can be very bureaucratic) for him to return to New York on flight departing c. 11:00 p.m.  The pilot denied boarding in a scene including, according to Ms. Amer, many AIDS-phobic and homophobic remarks.  All of us agreed that his behavior was unwarranted and particularly inappropriate given the good relationship we had enjoyed with VARIG and its personnel, as demonstrated by our special visa processing arrangement and other mutually cooperative activities.  Ms. Amer had to spend an entire additional day in order to make all the necessary arrangements for the person to depart on the next (night) flight.  All of this because of the uncooperative decision of the pilot.

A specific issue which we in the Consular Section discussed was how to respond to this incident.  It was of sufficient gravity not only because we lost Ms. Amer for an entire extra day, but also because lack of response might affect VARIG's responsiveness in similar situations in the future. On the other hand, given resource constraints, it would be difficult if not impossible to identify exactly where in the vast VARIG bureaucracy a complaint should be directed. Furthermore, any complaint would probably elicit a legalistic letter which would not address the key issue:

000011

*Exhibit  1*

that our traditionally strong and cooperative relationship
with VARIG was not respected by the pilot in that incident.
No consular section has much time to discuss a solution, but
we entered the pilot's personal particulars in CLASS so that
it would flag any subsequent visa application.

Fortunately, the very same pilot soon applied for a
revalidation of his visa, through the special VARIG bag
described earlier.  Again, due to the press of business and
resource constraints (which sound incredible described on
paper but please feel free to contact anyone else in the Rio
Consular Section to verify), it was not possible to converse
with him directly.  We also did not see any justification
for denying him a new visa.  Therefore, I issued him a new
visa - valid for one entry within one month (one of the
handful of limited-validity visas I issued in my entire
tour).  This would presumably get his attention and send a
message that we considered the situation very serious.

The pilot returned to the Consulate General a short time
later to apply for another visa.  As we were being assisted
by personnel from other sections who were not aware of the
situation, the application was again approved and brought to
my attention only in the middle of processing.  I issued
another visa, also valid for one entry within one month.

We found out later that, only at this point, did the pilot
bring the situation to the attention of higher-level VARIG
management.  This already served part of our objective -
forcing him to identify himself to his superiors and to
explain, exactly, why he was having this problem with us.
His superiors suggested that he reapply for a visa for his
next trip and, again, an officer from another section
handled his application and it was not brought to my
attention until after it had been approved and was being
processed.  I again approved a visa, once again valid for
one entry within one month.

This had the desired effect of focusing higher-level VARIG
management on the issue, and resulted in a telephone call to
the Consul General, Mr. David Zweifel, from the Director of
Flight Operations.  Mr. Zweifel was initially very
dismissive of what we had been trying to accomplish, and his
contempt showed in the velocity with which he sent the
letter in my direction.  We in the Consular Section
objected, and met with him (in the afternoon) to explain why
we thought that the pilot's actions highly inappropriate.
This meeting occurred during the month or so preceding Mr.
Beffel's arrival, when we had only three officers (half of
our staff) actually present at post and working.

In such a context, as AIDS first appeared in the gay
community in the United States, it is impossible to separate
an individual's views on AIDS with an individual's views on

000012

*Exhibit 1*

gays.  I do not know if AIDS/gay issues had any relevance to
Mr. Zweifel's reaction, but his conduct in early August,
1994, some of which is documented by Department records, may
have some bearing on this.  In any event, the response to
VARIG was pending when Mr. Beffel arrived at post.

The final preliminary factor is already documented in my
performance file.  The Brazilian public, forewarned of a
change in U.S. policy, applied for visas *en masse* while
four-year visas were still available.  The Consulate General
in Rio de Janeiro had to cope with large crowds while
simultaneously setting up a public affairs strategy.  We set
new records every day, with 800+ people in line every day
for two weeks.  The line the last day totaled 1,378 people.
For some reason, we were aware of almost no countrywide
public affairs strategy for managing the implementation of
this policy change, and our local USIS operation was exactly
as former Rio de Janeiro PAO Howard Shapiro described in a
recent article in Foreign Service Journal.

I finally used a handout from the New York-based direct
action group The Lesbian Avengers to create a media event
that would not only explain why the U.S. was changing its
policies, but also get out the word that the Consulate
General in Rio de Janeiro would be closed on the last Friday
before the policy changed.  (Our interpretation was that we
had to issue, physically, any four-year visa before the date
the new policy took effect.  The Embassy, on the other hand,
was undercutting our government's policy by insisting that
any application submitted before the cutoff could receive
the longer validity.)  This was a typical example of other
USG organizations backing away from the policy they had
supported and encouraged.  Our action worked:  my pitch
appeared on national television and helped us avoid a
problem on Friday because everyone knew that the Consulate
would be closed.  We successfully processed everything by
COB on the last day.

In celebration, on the last Saturday in July, 1994, I hosted
a luncheon event at my home (Brazilian Feijoada) at which
the entire Consular Section and a substantial portion of
other Consulate General personnel were invited.  During the
event, I showed a (G-rated) music video by disco singer
RuPaul.  Quite some time later, I heard a rumor going around
the post that I was being investigated as a homosexual
security risk based on that event.

While I dismissed the rumor, at the same time, I also
investigated it.  I later filed a Privacy Act request for
all information in my security file added since mid-1993.
This took some time to process, but it was eventually
completed.  A case file control sheet showed that, indeed,

000013

*Exhibit 1*

my security case file was referred to the office DS/CR/CIL
on August 5, 1994, around one week after the event.  This is
completely consistent with the original hypothesis and thus
adds significant credibility to the rumor.  I have tried
repeatedly to confirm further my suspicion that Mr. Zweifel
had a problem with my sexual orientation, by viewing a copy
of the cable, but so far have not yet obtained a copy.
(I am requesting one below.)

Mr. Beffel arrived at post after we had gone for over a
month with only three of six consular officer positions
actually filled and present at post.  I understood through
informal gossip that at Tijuana, Mr. Beffel's previous post,
his management style caused such trauma that the word
"Beffel" became a verb, e.g., "I've been Beffeled."  I also
understand that he had six NIV officers to handle 90,000 NIV
cases each year.  In other words, he had twice as many
people to do half as much work.

Specific Events

One of the first issues I discussed with Mr. Beffel was the
response to the letter from VARIG.  His initial reaction was
very AIDS-phobic, although I advised him that the issue of
persons living with HIV/AIDS being kicked off of airplanes
had generated significant interest in the gay press in the
U.S.  I provided him a copy of a mid-1994 article in the
U.S. magazine The Advocate about the public relations
problems of American Airlines over one such incident.
(I recall from the Advanced Consular Course a similar
incident in Seoul, Korea.)  Although my draft response
specifically mentioned AIDS, the final letter signed by Mr.
Zweifel did not.  It did, however, state our concern about
our relationship with VARIG and specifically mention the
special visa services we provided.  (I do have these letters
but do not have a copy of the final VARIG response praising
Mr. Zweifel's diplomatic skills.)

Although it involved the Consul General on a longer-term
issue of protection of American citizens, the entire
incident did what we had hoped it would:  it sent a message,
from very high levels of VARIG to everyone in their
organization, that it was in no one's interest to bother the
American Consulate.  This was a policy success because I was
at post for two more years and we never had a problem with
VARIG.  Nevertheless, this contributed to the negative
comments in my EER and I think that they are falsely
prejudicial in nature.  Mr. Beffel and Mr. Zweifel
personalized what was really a necessary policy issue.

000014

*Exhibit 1*

Homophobic actions continued. As a joke, Mr. Beffel actually gave me a mock three-dollar bill featuring President Clinton. (I still have it and can present it if requested.) The fact that Mr. Beffel, in discussions about other (male) officers not present at post, specifically cited an officer's marriage, did not leave me feeling that I was at all welcome in the Consular Section in Rio. At the same time, what else could I have done?

Another early encounter concerned installation of a microphone at the second NIV pre-screening window. After four months of gracious, patient waiting, not wanting to disrupt our Admin. operation, I concluded that only drastic action would actually result in what we wanted: that a microphone be installed at the window, as we had requested in writing four months previously. Mr. Beffel criticized my approach in dealing with the problem, even though the new microphone was installed within an hour of my conversational request. I graciously thanked Admin. for their assistance and advised that the microphone would be put to full use the following morning.

The situation deteriorated from there. Mr. Beffel gave many instructions in the form of fiats, which we tried to implement as best we could. (Inspector David Block/Bloch confirmed this in an initial draft of the inspection report c. NOV95.) Unfortunately, they were in many circumstances inconsistent with the overall post policy of providing our services to everyone resident in our district without artificial limits. The post had established this before my arrival to avoid having to deal with numerous, intense requests for exceptions or special treatment. I actually had to seek an individual appointment with the Consul General to confirm my understanding that, notwithstanding whatever fiats would come from Mr. Beffel, our overall objective of avoiding artificial limits would remain our policy. I can understand why Mr. Beffel initially thought this way: At his previous post, he had twice the people to process half the work, so there were resources available to take care of certain little problems. In Rio, however, we could not; he never really understood this.

We also observed other erratic behavior. Although on many days the process of passing back visaed passports extended to 5:00 p.m. or beyond, and I always stayed until the work was finished, Mr. Beffel departed shortly after 4:00 but chastised us for staying later. It made no sense. Furthermore, the inconsistent and often contradictory instructions caused an unnecessary amount of stress for the staff.

000015

*Exhibit 1*

I believe, but cannot prove, that the Department assigned Mr. Beffel to Rio de Janeiro at the instigation of then-Principal Deputy Assistant Secretary of State for Consular Affairs, David L. Hobbs, as retaliation for a grievance I filed with the State Department in which he was involved.

I did my best to try to get along with Mr. Beffel, even at the price of my own personal dignity, but he seemed to go out of his way oppose anything I did. The perfect example concerns my conversational reprimand of an FSN for issuing visas (and distributing the passports) without the required namecheck (since CLASS-AVLOS was down, this meant using the microfiche). Ms. Leilani Straw personally witnessed this. Mr. Beffel then complained that I had been "too hard." I am sorry, but it is my understanding that the World Trade Center bombing occurred, in part, because an FSN in Khartoum processed a visa without checking the microfiche. To be told that I was totally wrong was quite disconcerting. Is it indeed the official policy of the Department of State that an FSN who processes a visa without checking the lookout system should not be disciplined in some way? If so, it should come as no surprise that Congress passed the Visa Lookout Accountability Act to ensure that this is done. I should not be held responsible for a negative impression by Mr. Beffel based on his incorrect view of U.S. policy.

In other situations, he also went out of his way to disrupt a reasonably smoothly running operation, to which we were making continuous improvements as we identified 'glitches' or problem areas. I have already described our special procedures for professional VARIG international air crews. Another airline, Transbrasil (which flies to Dulles), asked the Economic Section how their professional air crews could avoid personal appearances to revalidate visas. Under our division of responsibilities, this was Mr. Beffel's area, but I recommended that we just extend the same privileges to Transbrasil. Instead, Mr. Beffel suggested that they use a different channel that had never been used by an airline before, which was far more complicated and time-consuming. (I will be happy to provide excruciating details on request.) This made no sense, and I suspect that Mr. Beffel made this decision solely to land opposite my recommendation.

On several occasions during our mutual tours (exact dates were provided to the U.S. Department of Labor in a Workers Compensation proceeding), Mr. Beffel telephoned me and other members of the Consulate General's American staff (no FSNs to my knowledge) and subjected us to >20-minute incoherent

000016

*Exhibit 1*

11

conversations that made no sense. Recipients included James Derham, Leilani Straw and Nadia Tongour. This even happened in February 1997 while I was back in Rio on leave. (I have witnesses.) Discussions (etc.) about these telephone calls caused excessive stress for me and other members of the staff, and for no reason at all.

Mr. Beffel criticized me in the first EER for "his" (i.e., my) "no documents" policy. This makes no sense. The policy was initiated before my arrival at post. I quickly became a strong supporter because it served our overall interests: it concentrated an officer's attention on making a decision to issue/refuse a visa to a person, without the distraction of dealing with a sheaf of papers. Mr. Layton Russell, Mr. Beffel's predecessor, can provide details. On the few occasions when Mr. Beffel did interview on the NIV line with us, his actions in requesting and looking at documents, as well as other comments, caused a serious disruption in the applicant flow as well as resulted in at least one issuance (limited validity) to a person who did not return to Brazil. To fulfill Mr. Beffel's instruction, I did authorize officers to look at a specific document if, after conducting the interview, they were still undecided and had determined that the document was, in fact, material to the decision. As a practical matter, this happened very rarely, however. I got the impression that his overall motivation was simply to contradict me, once again.

It should come as no surprise at this point that conditions deteriorated. Brazil initiated a new economic plan 01JUL94 which made tourist travel to the United States relatively inexpensive, thus accelerating the increase in our workload even before we began to receive requests to revalidate expired 3-month visas. With no additional resources, and no help whatsoever from USIS Rio, the public affairs environment also deteriorated. On the one hand, as the NIV Chief I saw it as my duty to deal with complaints referred to me by my junior officers. On the other hand, it is not always possible (and was, in fact, very infrequent) for us to satisfy someone totally given the other constraints. Mr. Zweifel's comment that I was the most frequently targeted official, due to what I saw as my duty to deal with dissatisfied people, is falsely prejudicial because it does not acknowledge the context of my leadership position and our U.S. policy initiative to change Brazilian policy through strict reciprocity. We predicted that there would be chaos; chaos happened. How is it that I am the only one held personally responsible?

000017

*Exhibit 1*

There were several situations in which personal criticism was directed against me by individuals who were entirely unreasonable. One was Arminda Rodrigues-Proulx, who rudely telephoned my office from the Political Section in the Consulate General in Sao Paulo, insisting that I somehow instruct our Consular Agent in another city (Salvador da Bahia) to accept personal responsibility for passports for her relatives who hoped to travel to the U.S. within a very short period of time. Based on my experience in similar situations, it was a "no win" situation for our post, and I declined. She immediately launched a vicious, personal fax-attack to the Consul General, which was totally unwarranted. She claimed to have approached me in her personal capacity, which was belied by her constant reference to the Political Section in Sao Paulo, and was otherwise totally unreasonable. For persons such as her I am held responsible? This makes no sense.

On another occasion, the Economic Section asked me to revalidate a B-1/B-2 NIV for a high GOB official whose residence was in Sao Paulo and office in Brasilia, in both cases, outside our consular district. Unfortunately, the FAM specifically banned us from processing an application under such circumstances, leaving no discretion. The response of the economic officer (Ms. Portia McCollum) was to present the passport to the Consul General with a note, "Karl Olson is refusing to process this." This resulted in the Consul General personally delivering the passport to me, again at high velocity. (So, I violated the regulation.) What is most disturbing about this situation was the Embassy's total disregard of our efforts to obtain a Department waiver of this regulation. The Consul General in Brasilia sat on our cable for four months (from December 1995 to April 1996) before I could persuade the new Rio Consul General to weigh in. Although the regulation had caused significant problems, only when I raised the issue in a very negative manner did the Embassy pay attention. This was typical of the way the Mission ran itself at the time. It was very frustrating.

I could go on, but I think that the above examples describe the situation as it actually existed. A separate issue concerns inconsistent directions from Mr. Beffel. The best evidence of this is the two Areas for Improvement (Section III.C). Reviewed together, they are mutually contradictory and make no sense. His reaction when I conversationally admonished an FSN for processing approved visas without checking the lookout system is also inconsistent with his guidance in the second Section III.C. It's enough to drive anyone crazy.

000018

*Exhibit 1*

There are also inadmissible comments in the rating officer's section of the second EER, such as the ambiguous phrases "remarkably well" and "rightfully take pride." Recent Department notices have labeled these comments as inadmissible and I request that they be removed.

Having described so much at this point, I will seek to concentrate the remainder of the grievance, as the overall atmosphere has been adequately described and further specific details would be less useful.

The USIS Library was closed and certain other space became available on the Mezzanine floor (above the Consular Section) which allowed us to expand, thus permitting us to install the Machine Readable Visa. I had specifically identified space as the essential issue for MRV installation but considerable energies were required actually to implement that.

The overall policy support by the Embassy for the initiative to change Brazilian policy evaporated the moment we announced our new policy. There was constant pressure to undercut our objective, which was to inconvenience sufficient influential individuals so that they would encourage Brazil to change. I noticed a disturbing trend on the part of Mr. Zweifel to be very solicitous of wealthy individuals. (One person alleged that it was because he was seeking post-Foreign Service employment in Brazil, which he subsequently found.) In any event, a wealthy family traveling by yacht to Hong Kong and then to the U.S. planned to take over three months to travel. Mr. Beffel immediately directed me, per request of Mr. Zweifel, to find a way to issue a longer-term validity visa to them. I actually had to bring up the Foreign Affairs Manual to convince an FS-01 Consular Section Chief that our policy meant what it said. The thought of asking the yacht owners to try to persuade their government to change its policy never entered their minds.

Meanwhile, the three-month visa continued. Brazil had a democratic election in November, 1994, and a charismatic, multi-lingual President, Fernando Henrique Cardoso, took office at the beginning of 1995. A State Visit took place in April, 1995. This was the diplomatic initiative which prompted the Brazilian side to look at resolution of the visa issue as a 'deliverable.' Still, almost total incompetence (which Layton Russell can confirm) on the Brazilian side put even that in jeopardy. Brazil issued an administrative decree extending the validity of business

000019

*Exhibit 1*

visas shortly before President Cardoso departed for the
United States.  (I suspect he actually signed it on the way
to the airport.)  He also sent "Rush Rush" legislation to
the Brazilian Congress to extend the validity of tourist
visas.  The House passed the law and the Senate scheduled a
vote, but did not vote.  Thus, during his State Visit,
President Cardoso could only announce that business visas
would be valid for multiple visits within five years.
Nothing happened with tourist visas.

I took a well-deserved vacation in April of 1995, departing
Rio c. 05APR95, coinciding with the State Visit to
Washington.  (I delivered my EER input to Mr. Beffel before
departure.)  During my absence, he made several significant
(and senseless) changes to the operation, and caused even
more significant stress.  The staff had been run ragged in
my absence, so that I decided to respond to a volunteer
cable for an onward assignment in Zagreb, Croatia.  Leilani
Straw responded to another volunteer cable for a consular
position in Shanghai, PRC.  My CAO, Michael Regan, was
clearly aware of the difficulties, but could not offer a
specific solution.  The situation was completely untenable.

Upon my return, in addition to assisting in the recovery of
the unit from my absence, I also organized a successful
Machine Readable Visa (MRV) installation.  This included
processing all pending cases three times (leaving nothing
pending) so that the statistics would be accurate.  (I can
provide excruciating detail if necessary.)

By this point, the pressures on the Consular Section were
approaching the breaking point.  To his credit, Mr. Zweifel
actually prepared a cable to Brasilia, which I presented to
the Labor Department, suggesting that we find a way to
retreat from our policy position.  This acknowledged the
considerable cost it was having.  Unfortunately, little of
those sentiments were reflected in his Review Statement.

Another Embassy request for special treatment for large
travel agency groups from the state of Bahia, received, as I
recall, the eve of the Brazilian holiday (which I recall was
a Thursday, 15JUN95), pushed even Mr. Zweifel to the
breaking point.  (Excruciating detail is available if
necessary.)  It should suffice to say that Mr. Zweifel told
the Brasilia Consul General, in a loud and impatient voice,
"Layton, it's time for Brazil to get off the dime!"
(emphasis in original)  Unfortunately, by the time Mr.
Zweifel himself accepted that I had a point, he had already
signed the review statement.  Having Mr. Beffel mention this
in his statement the next year had little effect.  That

000020

*Exhibit 1*

difficulty occurred frequently during my assignment in Brazil: by the time someone agreed with what I was doing, it was already too late. To his credit, Mr. Zweifel did support us in his last days at post, and I appreciate that.

To avoid negative public relations problems caused by passports not processed when anticipated, the processing time gradually lengthened. It was at this point that I had a telephone conversation with Consular PDAS David Hobbs on an appropriate resolution of the crisis. I explained to Mr. Hobbs that the Brazilian Senate was still in session, but that the Embassy had not been encouraging and persuading the Senators to pass the law. Instead, they had been bombarding us with requests for special treatment for influential individuals, without ever thinking that U.S. interests might be most effectively served by asking those influential individuals to use their influence to encourage their Senate to pass the law. We agreed to watch the situation, but Mr. Hobbs suggested (thinking out loud) that we consider "really messing things up" (quotation not necessarily exact) if the Senate recessed without approving the law. The post was in a crisis.

Another crisis occurred the week following Memorial Day 1995. (I would have to check a calendar to determine the exact day, but have none available at this time.) We received a special authorization from the Department to issue MRVs without fee, until the Embassy in Brasilia could make arrangements with a local bank for fee collections. The fee receipts were available for sale two days before they would be required, and USIS Rio de Janeiro issued the standard press release. The articles were buried in the paper. I foresaw a crisis and urged Mr. Beffel to do something on television the last day of 'free' visas. This would ensure that very few people showed up without the receipts on the first day the fee took effect.

My advice was disregarded, and chaos resulted. Of the hundreds of people in line the first morning, only two (yes, two) had previously purchased receipts. The mob walked several blocks to the bank, forcing it to violate Brazilian law by opening up early. When they returned, they were not in the order recorded by the guards. Security was threatened, and negative television coverage appeared on the mid-day and evening news. Gunnery Sergeant David Vazquez (USMC Detachment Commander) tore up the waiting list to calm the crowd. (We also, of course, agreed to take anyone in line without an arbitrary cut-off.) I hate to say, "I told you so," but this was another example of Mr. Beffel taking an opposite position from me for no reason at all.

000021

*Exhibit 1*

At this point, approximately 30MAY95 (after a couple of days of pre-approved leave), I received my EER which Mr. Zweifel had signed 25MAY95. Clearly, it was already late and, furthermore, the post was under a crisis at the time. Given the saga of intensive events described above, I object very much to the patronizing nature of the panel comments in Section VII because of errors of omission. First, having delivered my EER input to Mr. Beffel and departed on leave c. 05APR98, he clearly had more than one month to prepare the EER and the statement does not reflect this. Second, I did not <u>receive</u> the EER until approximately 30MAY98 and thus I did not have "nearly a month" to prepare my statement. The panel's summary dismissal of the simultaneous crisis was particularly insulting and falsely prejudicial as well as an error of omission. It should be deleted.

In mid-June, when Mr. Beffel was on leave, the situation reached a crisis point and I felt that I had little to lose. (In fact, I was hoping to get sent home and out of that madhouse.) At this point, the Brasilia DCM's office forwarded a request for special visa treatment for the President of the Brazilian subsidiary of the international auto manufacturer Fiat. I am quite certain that Mr. Beffel and Mr. Zweifel would have preferred that I just extend the courtesies, leaving the 'important' issues to be handled by the Embassy. Instead, I objected. I e-mailed the then-DCM, Mr. Mark Lore, suggesting that U.S. interests would not be effectively served by extending special treatment. (Why it would have been special treatment requires excruciating detail which I will be happy to provide.) I suggested to Mr. Lore that forcing him to cancel or reschedule his trip would send a very strong message to a very influential person that it would be in his own personal interest for Brazil to liberalize its policies. Since all of the other VIPs had been forewarned and obtained four-year visas before we changed our policies, this was actually a rare opportunity. I asked Mr. Lore for instructions, which I would follow.

To his credit, Mr. Lore (who was about to leave Brazil) took the diplomatic initiative. He did not want actually to force the Fiat President to reschedule his trip, but did not mind making him sweat a little. He did call in Fiat's lobbyist in Brasilia and made the pitch. It worked; not only does any major corporation in a developing country 'own' a few Senators, but several Brazilian Senators are actually Fiat dealers (!) (punctuation included in DCM's e-mail). We asked for their help, and agreed to help them. (Excruciating detail is available.) Anyway, I issued the

000022

*Exhibit 1*

visa on a Friday, which I believe was 26JUN95), and the
Brazilian Senate passed the bill on Monday.  [Ambassador
Levitsky actually suggested that we liberalize our policies
at this point, not taking into account the need to
consolidate our diplomatic victory.]  In any event,
President Cardoso signed the law shortly thereafter and it
was published in the Diario Oficial c. 11JUL95.  We
responded with a similar liberalization (multiple entries,
ten years) the following week.  Especially given the
resource crisis and its long-term effects, this was a
significant accomplishment capping fourteen years of talk
and one year of hard work.  We received a commendation from
the Assistant Secretary of State for Consular Affairs.

Yet, although Messrs. Beffel and Zweifel were infoed on the
e-mail exchange with the DCM, none of this appeared in my
EER.  I find it quite a serious error of omission that the
highest-priority consular objective in the Mission Program
Plan for Brazil, in whose accomplishment I played both a
short-term and long-term integral role, was not even
mentioned in my EERs.

The saga continues.  After we started to issue ten-year
visas, we were deluged with swarms of Brazilians, some
renewing expired three-month visas, and many more getting
the ten-year U.S. visa before our policies might again
change.  (This was actually prudent; Brazil reduced its own
passport validity from ten years to five years effective c.
20AUG96.)  We processed a total of c. 255,000 NIV cases in
FY-95 and (I am told) a similar figure for FY-96.  Rio was
the fifth-highest-volume NIV processing post in the world in
FY-95.  To place this in context, it would be useful to
compare the staffing at other posts with similar volumes.

The relationship improved the second year, but it was not
without problems.  During a visit of the new Brasilia DCM,
Mr. Lacy Wright, to Rio de Janeiro, Mr. Beffel actually
asked me to extend.  (Since he would still be there in my
fourth year, I declined.)  The new Consul General, James
Derham, actually removed Mr. Beffel from active involvement
in NIV processing.  (Mr. Beffel managed the travel agency
program, for which he deserves great credit in encouraging
the agents to organize clerical review and support, as well
as referrals.)  This and the additional staff we were able
to hire after winning the "visa war" helped us to keep
current on our workload, although the experience was not
without challenges.  What I ended up with in my EER for the
period, was more ambiguous comments.  I am quite certain
that the ambiguous comments, identified above, However,
despite maintaining our service standards of always

000023

*Exhibit 1*

processing anyone in line at 11:00 a.m. during my entire tour, Mr. Beffel's evaluations were more based on his moods. Erratic behavior continued and caused more stress. Finally, I understand that then-CA/EX Deputy Executive Director Marsha Barnes (now on LWOP in London, I believe) learned of (or observed) his behavior at a Consular Conference in Montevideo, Uruguay, in approximately May 1996, and advised post that he should travel to the U.S. on med-evac in June. (Mr. Derham confirmed my suspicions re the diagnosis.) Only this intervention from Washington did anything in this regard; resources available to the post/mission did nothing. I was asked in a routine security clearance form if I was having medical difficulties due to employment. I answered in the affirmative and explained that Mr. Beffel was driving me crazy. Even though I have a signed receipt for the form from the RSO, no action was taken. All of us suffered greatly because of the Department's and the Mission's refusal to deal with the situation.

I will conclude the epic here with the observation that, although I stayed through the end of August 1996 in part to receive another EER (since the period exceeded 120 days and was under the same rating officer and the same reviewing officer), Mr. Beffel never prepared it. I gave him my EER input in early August and corresponded with him via e-mail in mid-October 1996 when he confirmed that he was preparing it. In any event, it was never prepared and the Department should have no problem confirming from its own records that it was both required and never prepared. I reserve the right to grieve this omission at appropriate time (i.e., after results of the 1998 promotion panels are announced).

I request the following relief:

1.  I request that the negative comments in the EERs be removed as they are falsely prejudicial.

2.  I also request that the error of omission regarding the significance of the success of our initiative to liberalize Brazilian visa policy, including my contribution, be corrected.

3.  I request that the thus-amended file be re-reviewed by the 1995, 1996 and 1997 selection boards (both consular and multi-functional).

4.  In the alternative, I request expungement of the 1994-5 EER and another year of TIC, removal of the inadmissible ambiguous comments from the 1995-6 EER and correction of the error of omission described in para 2 immediately above, as

000024

*Exhibit 1*

well as review of the thus-amended file by the 1996 and 1997 selection boards (both consular and multi-functional).

5.  I also request other relief as may be just and appropriate.

I understand that the Department (PER/G), in addition to requesting an outline (or epic) of the situation as described above, also requests that I identify individuals who may be contacted regarding the matter.

The following are consular staff in Rio at the time.

David C. Connell (now in ARA)
Eileen Amer
Leyda M. Garcia (now at U.S. Despatch Agency Miami)
David A. Schlaefer (now in Matamoros, Mexico)
James H. Thiede (now in Tijuana, Mexico)
Leilani Straw (now in CA/EX/CSD in Washington)
Margaret Cooperman (now in CA/VO/L/C in Washington)
Leigh Carter (now in CA/EX in Washington).

There may be others as well and I will be happy to provide further information if requested.

I also request agency records (per 3 FAM 4426.1.b):

1.  I hereby request a complete copy of the cable from AmConsul Rio de Janeiro to the Department that caused my file to be referred to DS/CR/CIL 05AUG94, and the Department's response to that cable.  I need this information to determine whether Mr. Zweifel had any negative opinion regarding my sexual orientation.

2.  To the extent practicable, I request that the Department obtain copies of relevant e-mail messages.  Please let me know if this presents any difficulty or problem.

3.  I request information regarding why no State Department Regional Psychiatrist was sent to Rio de Janeiro during my tour.

AFSA is not representing me and I request that no information of any type be provided to AFSA.

Additional comment:  I will be happy to answer any of your questions or provide information or documents.  I reviewed my performance file with my CAO 18MAY98; she advised me that the 1994-5 EER was, indeed, harming my career.  I thus only had a few days to prepare this grievance.  I have done the best I can in limited time.

000025

*Exhibit 1*

Please note that I am not discussing this matter with anyone
in my current office.  Thank you very much.

May 22, 1998        FS-03        Karl Olson    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

Current assignment PM/ISP    202-647-1186

Home Address:    P.O. Box 5452
                 Washington    DC    20016-1052

000026

*Exhibit 1*