# Exhibit 3

# FSGB

# Final Decision

## BEFORE THE FOREIGN SERVICE GRIEVANCE BOARD

In the Matter Between

|  |  |
|---|---|
| Karl Olson<br>Grievant | Record of Proceedings<br>FSGB No. 98-087 Remand |
| And | Date: November 7, 2005 |
| Department of State | **DECISION** |

For the Foreign Service Grievance Board:

| | |
|---|---|
| Presiding Member: | Edward J. Reidy |
| Board Members: | Edward A. Dragon<br>Jeanne L. Schulz |
| Special Assistant: | Joseph Pastic |
| Representative for the Grievant: | Janine M. Brookner, Esq. |
| Representative for the Department: | Joanne M. Lishman<br>Director<br>Grievance Staff |
| Employee Exclusive Representative: | American Foreign Service Association |

*Exhibit 3*

06 1205

**FILED**

JUN 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## OVERVIEW

This is a decision on remand from the United States District Court for the District of Columbia. Karl Olson, a consular officer with the Department of State, alleged that certain evaluations of his performance while stationed "in Rio de Janeiro were falsely prejudicial." His strongest argument was that the negative comments in his evaluations were the product of bias against him because he was homosexual. In its earlier decision the Board found "weighty evidence" of a homophobic attitude at post. Even so, it concluded that there was no reason to treat fully Olson's claim of bias because there was adequate evidence otherwise to support the negative comments made. On this conclusion the Court found it was an error not to treat that important issue and remanded the case to us "for consideration of whether anti-homosexual bias unfairly tainted . . ." Olson's employment reviews. The Court added that Olson's contention that his reviewer's personal and managerial dysfunction "certainly is a factor that should be considered by the FSGB on remand."

On remand the Board found that Olson failed to shoulder his burden of establishing, by a preponderance of the evidence, that the grievance was meritorious. The Board examined in depth the question directed for resolution on remand and concluded that Olson's claim that anti-homosexual bias tainted his evaluations had not been satisfactorily demonstrated. The Board recognized that the facts presented showed evidence on both sides of the issues, but found more credible the evidence which showed the validity of the evaluations.

The decision also addressed Olson's contention that his rater was a dysfunctional manager not competent to properly evaluate him. This, too, was found unsupported. The Board concluded that the evaluations had not been shown to be falsely prejudicial and rather met what we long have held was the critical test of an EER: they fairly and accurately described Olson's performance with adequate clarity and documentation to constitute reasonably discernible, and were objective and balanced appraisals, citing FSGB Case No. 93-15 (December 23, 1993).

*Exhibit 3*

## DECISION

### I.    GRIEVANCE

This matter is now before the Foreign Service Grievance Board (Board) on remand from the Court in *Olson v. Powell*, Civil Action 02-1371, (D.D.C. filed February 3, 2005). The Court "[o]rdered that the case is remanded to the FSGB for consideration of whether anti-homosexual bias unfairly tainted Plaintiff's employment reviews." In addition to the specific directive in that order, the Court noted that grievant Karl Olson's allegations of personal and managerial dysfunction of Edwin L. Beffel, then Chief of the Consular Section in Rio de Janeiro, Brazil, and grievant's rater for both of the Employee Evaluation Reports (EERs) "[c]ertainly is a factor that should be considered by the FSGB on remand." Because it was going to remand this case, the Court determined it "unnecessary to consider this issue at this time." Whatever our conclusions, the Court is advising that our decision must evince a rational connection between the facts found and the choice made.

The foregoing factors are those that the parties agree are now to be considered on remand.

At this time, Olson requests the following relief:

A. Recommend to the Secretary his promotion to FS-02 backdated to 1995, with interest;

B. Recommend to the Secretary his promotion to FS-01 backdated to 2000, with interest;

C. Expunge his 1994-95 EER and grant one additional year time-in-class and time-in-service;

*Exhibit 3*

D. Expunge all falsely prejudicial and inaccurate comments in his 1995-96 EER (and retype the remainder so that the deletions are not apparent);

E. Expunge any and all derogatory information in Department records, including his personnel file and records of the Bureaus of Consular Affairs, Diplomatic Security and Human Resources, resulting from these two EERs;

F. Include in his Official Performance (EER) Folder the omission in his 1995-96 EER concerning his substantial contributions and efforts on the visa reciprocity issue and their positive effects on U.S. policy;

G. Recommend a complete medical examination to restore his Category 1 medical clearance;

H. Award reasonable attorney fees and costs, expenses and disbursements of this action, including consequential damages, pursuant to 22 U.S.C. § 4137(b)(5); and

I. Award additional relief as may be appropriate.

## II.    BACKGROUND

A. Procedural Background

Olson, a Foreign Service Officer with the Department of State (Department, agency), alleged that the EERs covering the periods August 28, 1994 to April 15, 1995 and April 16, 1995 to April 15, 1996 when he served as a consular officer in Rio de Janeiro are inaccurate, falsely prejudicial, omit favorable information, and contain inadmissible comments.  In addition, and most importantly on remand, Olson contended that the falsely prejudicial and inaccurate statements resulted from the rater's and the reviewer's bias against his sexual orientation.  Olson is a homosexual.

*Exhibit 3*

In our decision of April 4, 2002, we denied much of Olson's grievance, yet awarded him relief that is no longer relevant. While the Court sustained the Board in most particulars, it made this statement:

> The FSGB also found that there was "weighty evidence [of anti-homosexual bias] from credible outside observers," but held that the evidence of bias was irrelevant because it had already determined that Plaintiff's EERs were not inaccurate or falsely prejudicial."

That recitation gave rise to the following conclusion by the Court:

> The FSGB's decision was arbitrary and capricious because it failed to consider what the FSGB itself characterized as "weighty evidence" of Beffel's and Zweifel's anti-homosexual bias . . . . The FSGB was charged with determining whether Beffel and Zweifel had fairly reviewed Plaintiff's performance. Thus, evidence of any bias would clearly be relevant to a decision about the fairness and accuracy of their judgment. The FSGB, however, reasoned that it need not even consider the evidence of bias because it had already determined that the EERs were fair. The logic of this reasoning is hard to fathom. How could the FSGB conclude that the EERs were fair and accurate, and ignore a relevant factor such as bias . . . ?

The central focus of this remand has been established by these comments in the decision.

Elsewhere, the Court made a remark that bears noting as the Board renders its decision on remand. Footnote 7 reads:

> The Court recognizes that, on remand, the FSGB may well reach the same conclusion as it did previously. Plaintiff undoubtedly had serious personality issues, as reflected in his EERs. However, the job of the FSGB is to consider *all* relevant evidence in determining whether the judgments *and* evaluations (which were necessarily subjective) of Beffel and Zweifel were tainted by bias or were, in their totality, fair and accurate. (Emphasis in original.)

*Exhibit 3*

Also, and importantly in our view, the Court held that any of the contentions by Olson that the Board decision was tainted by procedural errors were not meritorious, stating that any such errors were not prejudicial.

To set the stage for our decision, in our acknowledgement letter of March 3, 2005, we expressed our belief that the remand was limited to the broad question of whether anti-homosexual bias tainted Olson's EERs. Because we considered that the existing record was adequate to enable a fair decision, we saw no need to accept additional evidence on this question unless the parties established a need. In so concluding, we were advertent to the ruling by the Court that the decision "must be remanded . . . to consider evidence of alleged anti-homosexual bias." We added, however, that we would prescribe a schedule for argument on the issue directed to us on remand. And we did so. On September 19, 2005 we issued an Order establishing the record upon the content of which our decision would be based. That has been followed here.

B. <u>Summary of Witnesses Statements</u>

In this section we will set forth a summary of the relevant and material evidence of the many witnesses who made submissions.

Witness Leigh Carter wrote that she "can certainly attest to a particularly nasty strain of homophobia that was present in the Consulate and Embassy from the top down and . . . witnessed . . . your boss' [Beffel] problems with the drink." She was unable to provide any opinion whether the Ambassador was "guilty of discrimination." Evidently Carter was not stationed at Rio, and her comments were based on observations when she visited the post in February 1996 along with Ms. Donna Hamilton. Hamilton

*Exhibit 3*

FSGB 98-087 REMAND

corroborated Carter's statement that in Rio and Brasilia, there were indications of homophobic attitudes "by management at both posts."

David C. Connell, a member of the Foreign Service from March 1992 to July 1998, served in the consular office in Rio from February 1993 to March 1995. Olson was his immediate supervisor during part of that time. Connell, also a homosexual, stated that until August 1994 he had experienced no "professional discomfort" in Rio about that orientation. He believes that later, when Consul General David E. Zweifel ordered an evaluation of all who exhibited homosexual tendencies after an Olson-hosted party, the tolerant climate "changed for the worse." But whether Edwin Beffel's views, or those of Zweifel, about the homosexual culture influenced their comments in grievant's EERs he could not speak to.

Beffel was the rater in both EERs in question. When, in June 1998, the agency sought his views on these two EERs, Beffel provided a lengthy response. Because the office was busy, many at Rio worked long overtime hours and Beffel felt Olson was pressing the staff unduly. At times Beffel considered conversations with Olson "annoying" and grievant all too often challenged proposed changes. Grievant was the subject of a variety of complaints from the public as well as criticism by the press for the way he handled visa applications and interviews. Beffel felt Olson was overly demanding and sometimes abrupt, and did not react well to "constructive criticism". He even took "heat" from others in the Embassy about Olson's public image. Saying that Olson had a "serious problem" dealing with visa applicants, Beffel remarked how one Brazilian tourist guide even referred to grievant as a "neo-nazi."

Exhibit 3

7                                            FSGB 98-087 REMAND

Beffel also wrote that during the time period of the second EER, he saw a "much better performance." He recommended Olson for immediate promotion. Yet, despite obvious improvement, grievant continued to "irritate some officers with the way he presented his views." Nevertheless, Beffel had many compliments for Olson saying, "He came up with a lot of good ideas." Not only that, but for the most part Olson was well regarded and respected, even though at times he was "somewhat abrupt" with the Foreign Service Nationals (FSNs). Moreover, Beffel particularly faulted Olson for being late in submitting performance reviews on the FSNs. In Beffel's view, Karl did a "fine job running a section"; "performed extremely well in managing" the workload, performed diligently with dedication and displayed "management and intellectual skills."

Beffel steadfastly denies -- by insisting it was "absurd" -- that the EERs were the product of his distaste for Olson's sexual orientation. Never before, he insists, had he heard this claim. He even suggests that the homophobic issue has been blown out of proportion -- purposely by Olson. He strongly doubts that Zweifel criticized Olson in his EER because of his sexual orientation. Indeed, Zweifel was rarely seen in the consular section. Zweifel, the DCM, and reportedly the Ambassador as well, were upset with Olson because of the bad press the embassy received over a problem involving Olson and an AIDS victim.

In his submission of August 25, 1998, where Beffel explains his memory was refreshed when he reviewed his sections of the challenged EERs, he begins by restating that "Karl put in a good performance." Beffel seems puzzled how Olson "not only grieved a few well-intended mild statements but also words which meant no criticism at all." He even allowed Olson to edit his initial comments "to the point where, upon

*Exhibit 3*

8                                          FSGB 98-087 REMAND

review . . . that there is little remaining which doesn't bear his hand." It took two drafts to do so and Beffel incorporated Olson's own words where possible. He was intent to assure that grievant was satisfied with the comments in the EER. Olson understood his rater's purpose and was "impressed and appreciative" of his efforts. His "overall objective," asserts Beffel, was to provide Olson "a great EER." Beffel cannot understand why Olson wants to expunge every observation that does not "laud his performance in unmistakable terms." Even his mild criticisms were quickly counterbalanced by more favorable statements. Olson, at the time of the drafting, fully agreed with the statement in the AFI section that his late preparation of EERs for FSNs was a fair criticism.

Beffel was critical of the way Olson treated the FSNs, noting that, at times, Olson lost his temper. Still, he softened these concerns in the EER down to the observation that grievant was a demanding supervisor. Among others, Beffel specifically identifies the Chief of Personnel Anna Maria Miranda, and her supervisor Roland Estrada, as post personnel who brought to his attention complaints raised by FSNs about Olson. As one who often defended Olson against criticism by others, Beffel says he is disappointed that Olson – an officer whom he respected and praised – has sought to attribute comments in the EERs about his performance to an alleged bias against his sexual orientation.

The reviewer in the earlier EER was David E. Zweifel. He submitted a statement on July 28, 1998 commenting on the issues Olson raised in his grievance. Up front, Zweifel emphatically insists it is "errant nonsense" for Olson to assert that his performance review of grievant was the product of "homophobic bias." After that, evaluation of Olson in 1994-95 was difficult in a service given to hyperbole and "pulling punches." In Zweifel's view, it took "uncommon courage" for Beffel to address some of

*Exhibit 3*

9

Olson's weaknesses. He agrees with Beffel that the criticisms were "toned down considerably" in the final evaluation and only then following "long and contentious conversations" between Olson and Beffel and later, between Olson and him.

Additionally, Zweifel wrote that

> . . . all too frequently, either the Supervising Consul in Brasilia, the DCM, the Consul General in Sao Paulo, and even the Ambassador called me to complain about his communications with those posts [or important contacts].

Employees in the consular section, both American and Brazilian, sought Zweifel out on occasion to complain of grievant's imperious attitudes and rudeness to them as well as to the visa public. Zweifel asked for understanding because of workload stress, but some rejoined that they, too, were similarly stressed.

Zweifel conceded that Olson and Beffel did not have a close relationship and both were strong-willed. Inasmuch as Beffel was the more experienced by far, Zweifel tended to side with him when policy differences between them arose. Beffel was "quite correct" to comment on Olson's reluctance at times to abide by decisions Beffel made.

Olson had a uniquely poor sense of public relations which imposed on Zweifel the need to take an inordinate amount of time to try to sooth "the outrage of one or another Brazilian who had taken offense" at some action taken by Olson. Once, a letter of complaint about Olson was published in an influential local newspaper. This created "unhelpful publicity." Zweifel agrees with Beffel that the rater's comments in the AFI section were "as muted as possible" while still heeding to Olson's need to develop a better sense of how to deal with the visa public.

Exhibit 3

FSGB 98-087 REMAND

With respect to an incident involving the refusal by VARIG Airlines to board an AIDS patient, Zweifel supported the pilot who was acting in accordance with the bilateral agreement with Brazil. In no way was he dismissive of Olson, as grievant maintains.

Zweifel knows nothing about an alleged investigation into grievant as a homosexual security risk that he supposedly instigated. He denounces this allegation as "preposterous."

Another who provided considerable detail relevant to this grievance was James Thiede. He was a subordinate of Olson in Rio. Some of his comments were favorable to Olson. Many were not. Paraphrased here are some of the comments not favorable to Olson in the sense that they support the criticisms others have made.

> Olson personally attracted quite a bit of negative press coverage in the Brazilian media, principally as a result of several incidents throughout 1995 and 1996 in which he yelled and screamed at difficult or obtuse visa applicants. His tendency to be rude towards all with whom he came in contact also contributed to some of these incidents.

> The 1995 EER significantly understated the severity of Olson's behavior/ management problems towards subordinates, peers, and visa applicants.

> Grievant had a penchant for yelling and screaming at others as well as being rude toward most regardless of their rank. Thiede personally witnessed such conduct.

> Olson's usual rudeness, yelling, and screaming resulted in him alienating most of the consular staff at Rio. It is believed that his transfer away was the cause of some FSNs to celebrate at a party.

With respect to the EER of April 1995 - April 1996, Thiede wrote:

> Olson literally terrorized the staff and had employees walking in fear and trembling when he was physically present. FSNs considered him not at all fair, but vindictive, vicious, ferocious, and excessive.

*Exhibit 3*

Olson sometimes responded angrily to criticisms or proposals for alternate processing methods.

Thiede never witnessed anyone criticize Olson's sexual orientation, mock it, or express opposition to or disdain for it. When Olson was criticized, "it was always for the manner in which he mistreated fellow employees through verbal and psychological abuse, never for his sexual preference."

Observing that Rio had a history of having its consular section staffed by gay officers, Thiede nonetheless concluded:

> I do not believe that Consul General Zweifel and Mr. Beffel included critical . . . comments in Mr. Olson's EERs because of an anti-homosexual bias.

Despite these averse comments, Thiede sums up his impressions of Olson as a highly competent consular officer; knowledgeable; intellectually sharp and; possessing a keen eye for making procedures more efficient. Where he fell down was in interpersonal relations. He alienated his peers, superiors, and applicants through his yelling and screaming fits. Olson was rude, every day.

Mark Lore, the Deputy Chief of Mission (DCM), recalled that during the time of these EERs, the Mission's visa sections were operating under considerable stress. Work was up, staffing down, and unusual issues materialized. Lore's contacts with Olson were not frequent, but "in one or two direct contacts with him " . . . Mr. Olson did strike [him] as unnecessarily rigid and insensitive . . . " Grievant's occasional display of insensitivity toward local visa applicants was well known both by Brazilian and U.S. officials. This deportment generated informal complaints by Brazilian Foreign Ministry officials "on several occasions."

*Exhibit 3*

12                                             FSGB 98-087 REMAND

In commenting on Olson's claim of bias by supervisors against him, Lore did not observe any prejudice on the part of Zweifel or Beffel. Rather, he portrayed them as acting "professionally in dealing with the often difficult management problems of the visa unit in Rio."

Layton R. Russell, Consul General, wrote at length in his statement of August 17, 1998. In remarking about the EER for the period August 28, 1994 to April 15, 1995, he found unfairly prejudicial the statements that Olson was, at times, an "overly-demanding" yet "tough and fair supervisor." Instead, Russell found one of Olson's chief assets was his ability to "motivate his subordinates to exert the extra effort; . . . " Inasmuch as he served with Olson just prior to the times in question, he accentuates that his comments "are grounded on personal experience."

As to the EER covering the period from April 16, 1995 to April 15, 1996, Russell had this to say (paraphrases):

Beffel intended no indirect criticism in using the words "remarkably well" and "rightfully taken pride;"

The criticism that Olson was at times overzealous is particularly valid and, if anything, understated;

Olson's perception that his actions were decisive in influencing the Brazilian Senate to amend the law to extend the validity of tourist visas is not factual, and while he played a role, it was of secondary importance and not always positive.

Olson generated negative feelings among Americans – including other homosexuals – by using his official position to promote homosexuality and engaging in a flamboyant life style. Still, Russell has no reason to "believe this was a factor contributing to the criticisms in his EERs."

*Exhibit 3*

FSGB 98-087 REMAND

Russell considered that Olson's tendency to strongly resist every minor policy change contributed to certain inefficiencies, and " . . . his particular style in dealing with visa applicants sometimes exacerbated the post's public relations problems." Still and all, Olson is "a very talented officer" who may not receive fair recognition for his accomplishments but if so, Russell is "quite confident it had no direct relationship to his sexual orientation."

There were times, maintains Russell, when Olson would "deviously" make changes that he knew would not be acceptable to his supervisors. It was typical of grievant "to do everything short of clear insubordination to get his way."

Nadia Tongour was only able to give general observations because she rarely worked directly with Olson. Nevertheless, she described Olson as a hard working officer who had disagreements with Beffel because temperamentally they were quite different. One issue which became a serious source of friction between them, as well as the Consul General (CG), was that of "public relations/image." Negative press, some of it criticizing the visa section for rudeness and on occasion citing Olson by name, in particular, disturbed the CG.

She has no knowledge of whether the CG or Beffel were homophobic and never heard them express any sentiment that would create that impression. The criticism Tongour heard about Olson centered on Olson's manner of dealing with the public.

Leilani Straw "has a great respect" for Olson. During her ten months as the immigrant visa officer for Brazil, she found Olson helpful in all ways. Oftentimes she felt that post management did not give him the respect he deserved, observing that "may well have been related to his homosexual orientation . . . "

*Exhibit 3*

14

She concedes grievant may have come across "as officious" but adds that may have been the product of his penchant for "getting through cases quickly." She comments that it is probable that Beffel omitted achievements and included prejudicial statements in the EERs because of grievant's homosexual orientation.

Roland Estrada was cautious in his comments. He was only at Rio for the last three months of the rating period between August 28, 1994 to April 15, 1995. Still, he described the working conditions as deplorable owing to workload, staff shortages, and cramped working space. Olson was not well regarded either by the Americans or local staff, Estrada recalls. Olson had a tendency to argue over small details, and there was "no telling what issues would provoke an argument." When the issue of visa validity arose, grievant "would regularly lose self control and become loud and unable to continue the discussion." Locally hired employees reportedly found him difficult and overbearing at times. Estrada held in esteem Olson's intellectual abilities. Indeed, he credited him as a person with many good ideas. Estrada perceived that the relationship between Olson and Beffel was "a difficult one." Moreover, the work relationship between Olson and Derham, coupled with a tug-of-war between Olson and Beffel, made a smooth running office very difficult.

Charles D. Trotter served in Rio from August 1993 until April 1995. He did not directly supervise Olson or Beffel. He portrayed grievant as an extremely hardworking consular officer, highly dedicated and who performed well in a demanding job. Zweifel and Beffel both are depicted as "honest and objective." They always treated grievant fairly "without regard to his sexual orientation." Others, more than just Trotter alone, accepted most of the observations made by these two officers mainly because of their

*Exhibit 3*

FSGB 98-087 REMAND

reputations. In his summation, Trotter concluded: "based on my observations, I believe strongly that Mr. Zweifel and Mr. Beffel rated and reviewed Mr. Olson's 1995 EER accurately and that they did not make any falsely prejudicial statements in it whatsoever. Neither . . . made any comments because of Mr. Olson's homosexual orientation."

Ambassador Levitsky also provided a statement for the record. He qualified it by remarking that he did not have close knowledge of Olson's performance. Still he felt "able to contribute several comments . . . based upon what he [did] know of [Olson's] work." Summarized, these are:

> [H]e was aware of several instances of grievant's rudeness and discourtesy to visa applicants. Some were brought to his attention by the Foreign Ministry. Others were noted by the Brazilian press. As a result, it became necessary for him to embark on a campaign to emphasize "courtesy and respect" by visa officials. Levitsky felt that the raters and reviewers probably "understated" this aspect of Olson's performance. He added that, on one occasion, the chairman of the Brazilian Senate Foreign Relations Committee visited him to complain about the treatment given applicants by Olson's visa unit.

> Olson was a hard worker; knowledgeable; and willing to take a stand on matters of principle. At times, however, he went out of his way to challenge what he considered to be undue pressure on him in certain visa cases.

> [W]here Olson complains that his efforts on the so-called visa reciprocity issue were widely ignored, Ambassador Levitsky asserts Olson "greatly exaggerates his role." Success was due to high-level pressure.

David Schlaefer, who was not present in Rio during the rating period, felt it would be inappropriate to offer any opinion as to the accuracy of any specific EER sections. Saying he met Zweifel only three times he felt that Zweifel had little understanding of what transpired in the consular section. Others told him that Zweifel had a prejudice against homosexuals and that Olson had a hard time because of it. He actually heard

*Exhibit 3*

16                                                    FSGB 98-087 REMAND

others make very cutting, homophobic remarks about Olson and Schlaefer has always thought that the anti-homosexual atmosphere in the Consulate fostered such bias. However, Schlaefer stresses that he never heard Zweifel personally make any inappropriate comments about Karl in particular, or gays in general.

As to Beffel, Schlaefer said he lived a "somewhat wild lifestyle" and had well-known personal problems that severely impacted on his performance as consular chief. While Beffel made crude jokes about homosexuals, he did not "recall any specific comment directed against Karl." He had no opinion as to whether Beffel's negative EER comments were partly motivated by bias. Schlaefer never heard James M. Derham make any derogatory comments about homosexuals nor was he aware of any bias on Derham's part against gays generally or Olson in particular.

Leyda M. Garcia gave a "brief statement" saying that no superior of Olson's made any derogatory remarks reflecting on Olson's sexual preference while in her presence. Even so, she did witness "a complete lack of support" for Olson's efforts to facilitate work and improve the overall morale of Rio's consular section.

Derham, Olson's reviewer in the second EER, opens his statement by giving as his overall recollection the comment that Beffel and he were "extremely generous" in their rating and reviewing statements in his EER for April 16, 1995 to April 15, 1996. The matter of an EER for the period April 16, 1996 through August 30, 1996 was never discussed with him.

As to specific portions of the EER, Derham

[A]grees fully with the comments Olson tended to become over-involved in minor procedural debates.

*Exhibit 3*

17                                    FSGB 98-087 REMAND

[O]pines that the comment that Olson does not hesitate to express dissent and accepts new ideas cautiously is a very positive statement, whereas in his experience grievant's reluctance to accept guidance often crossed the line into insubordination.

[S]tates that rather than observing as does the EER, that Olson generally exhibits insight and is tough but fair, he would have been more critical because Olson "was often abusive in his verbal or written communications . . . "

[C]onsidered that Olson was properly faulted for his procrastination in preparing evaluations for FSNs as that was a serious and continuing problem.

[R]emarked that Olson's insistence on certain procedures "sometimes slipped into fanaticism."

[F]inds it not "plausible" that Olson played a major role in the change in Brazilian legislation and thus supports the failure of the EER to include praise for that accomplishment.

Derham's recollection is that nothing in the EER prepared by Beffel reflects bias against homosexuals. Neither Olson nor others "who were friendly with Mr. Olson and frank in their discussions with [him]" ever mentioned this issue or raised it with him. As a general statement, Derham faulted Olson for having a "general tendency to make matters unpleasant for everyone."

## III.    POSITION OF THE PARTIES

### A.  OLSON

Grievant presents his position under two generic topical headings which correspond to those matters that we find relevant for our consideration on remand. First, anti-homosexual bias unfairly tainted Olson's evaluations. Second, the personal and managerial dysfunction of his supervisor, Beffel, also unfairly tainted these evaluations.

*Exhibit 3*

FSGB 98-087 REMAND

We deal with the specifics of these arguments in greater detail in our Discussion and Findings. They are broadly summarized now.

1. Evidence of Anti-homosexual Bias

(a) There is evidence from five credible Department officers revealing that homophobic atmosphere and anti-gay bias existed. Among those exhibiting this prejudice were Olson's rater and reviewer (Zweifel) and the Ambassador;

(b) A cable, 94 Rio de Janeiro 2982, which reported Olson as exhibiting homosexual preferences, triggered questions about grievant as a security risk. Although Zweifel's name was on the cable, he denied knowing about it, casting doubt on his credibility;

(c) When Olson attempted to assist an American citizen plagued with HIV/AIDS who urgently needed to return to the U.S., the pilot of VARIG Brazilian Airlines created a scene, made homophobic remarks and refused to accept her as a passenger. When this matter blew-up, Zweifel sided with the pilot rather than Olson;

(d) Beffel, to humiliate and insult Olson, gave him a mock three-dollar bill with the words Queer Reserve Note printed on the front;

(e) Beffel, in Olson's presence, discussed the marriages of other male officers, positively judging the officer's professional ability simply because he was married. These discussions made Olson feel uncomfortable and unwelcome; and,

(f) Insisting that evaluations are largely subjective, supervisory evaluations must be closely examined "for evidence of bias." When, as here, both rater and reviewer are shown to be biased based upon the credible evidence of Department officials, colleagues, co-workers and subordinates, Olson's EERs in question must be found tainted. In that these evaluations have inherent inconsistencies, Olson sees bias at the root.

Exhibit 3

19                                    FSGB 98-087 REMAND

2. Managerial Dysfunction

Grievant points to evidence designed to show Beffel:

> (a) had a serious alcohol problem that resulted in disruptive, inconsistent and dysfunctional consular section management and ultimately led to medical evacuation;

> (b) lacked understanding and competence in non-immigrant visa (NIV) operation matters; and

> (c) Even tried to undermine Olson's management of the NIV section.

Among the arguments made were these:

> (1) Beffel oftentimes at night telephoned Olson and other staff members and engaged in long-winded, rambling, disturbing and inappropriate conversations;

> (2) Beffel threatened to replace Olson and even produced a flawed reorganization of the NIV Section during the absence of the grievant; and

> (3) Witnesses Thiede, Straw and Schlaefer all agreed that Beffel knew little about running the NIV Section and made scant effort to learn. In addition, he was frequently absent and for the reason that his judgment was impaired by alcoholism, it was not possible for Beffel "to adequately and fairly rate" Olson. The combination of his impairments produced evaluations that "were falsely prejudicial, inaccurate and omitted important achievements."

Upon his arrival as the new CG, Derham instructed Beffel to keep hands off the day-to-day operations of the NIV Section. This decision was attributable to "Beffel's dysfunction and incompetence in consular affairs." His problems with alcohol are supported fully by the facts of record as is the obvious conclusion that Beffel's "drinking


Exhibit 3

20                                FSGB 98-087 REMAND

resulted in diminished competence, inconsistent and disruptive supervision and impaired judgment."

The harm and prejudice suffered by Olson "were the reasons he was not promoted in the mid-1990's." Another consequence was that he had to endure "loss of rank, position, pay and benefits, as well as stress . . . " Indeed, owing to the stress created, Olson fell into depression and even now is limited in his potential assignments. Worse still, Olson "was removed from consideration for a definite range of assignments and job opportunities and had a very difficult time finding an onward assignment."

Because, when questioned about it, Beffel ducked any answers about a mock three-dollar bill, Olson concludes this evasion is proof that he gave it to Olson in order "to mock, disparage and humiliate him because of his sexual orientation."

Another reason why these evaluations must be rejected is that Beffel has even conceded that his evaluation of Olson was possibly "inaccurate or badly phrased."

On August 17, 2005, Olson filed "Grievant's Reply Memorandum" in further support of his contention that anti-homosexual bias and managerial dysfunction unfairly tainted his performance evaluations, 1994-96. Of his many arguments there made, some are repetitions of others already presented. In any event, we highlight Olson's arguments that are particularly relevant:

> (a) In alleging that Olson has not carried his burden of proof, the agency has placed undue reliance "on statements of people who did not know" the totality of the circumstances, whereas his witnesses were the more believable because they gave eyewitness accounts;

> (b) It is a mistake to characterize Derham as an unbiased and fair observer simply because Olson did not specifically contend he was homophobic and because he was not even at the Consulate General during the 1994-95 EER period;

*Exhibit 3*

21                                    FSGB 98-087 REMAND

(c)  Any statements blaming Olson for the Mission's poor public image are erroneous;

(d)  Statements accusing grievant of making unreasonable demands on his supervisor's time are false;

(e)  Contrary to what the agency claims, cable 94 Rio de Janeiro 2982 fully supports grievant's claim of anti-gay bias; and

(f)  The VARIG Airlines incident has been consistently mischaracterized by the agency.

## B. AGENCY

The Department's fundamental position is "that Mr. Olson has not established by a preponderance of the evidence that Mr. Beffel and Consul General Zweifel engaged in anti-homosexual bias in writing the critical comments in the two EERs." Twelve individuals commented on whether the challenged comments in the EERs were motivated by anti-homosexual bias. Only two, Schlaefer and Straw, who worked with Olson in the consular section, thought there was some basis for the complaint that negative EER comments were motivated by bias based on sexual orientation. Schlaefer, however, acknowledged that he never personally heard Zweifel make any comments about Olson's sexual orientation; he had only heard remarks about Zweifel's attitude from other Consulate General personnel. Straw, who said she did not hear Zweifel comment on Olson's homosexual orientation, felt that this factor probably resulted in unfavorable EER comments. Straw heard Beffel make general comments, but none specifically directed at Olson.

*Exhibit 3*

FSGB 98-087 REMAND