In contrast, the other ten individuals -- the overwhelming majority -- wrote that the allegation is unfounded or they saw no evidence of bias based on sexual orientation. They include Ambassador Levitsky, DCM Lore, Russell, CGs Zweifel and Derham, Deputy Principal Officer (DPO) Trotter, Tongour, Beffel, and two consular section staff, Garcia and Thiede.

The Department sees a particular boost from the statement by Consul General Derham -- the reviewer for the second EER in dispute -- that covered the one-year period April 16, 1995 to April 15, 1996. Derham's statement corroborates the criticisms of Beffel and Zweifel in Olson's EERs and confirms the same type of interpersonal shortcomings that both Beffel and Zweifel referenced in the EERs grieved by Olson. The Board should attach significant probative value to Derham's statement regarding the issue of whether the EER criticisms were based on anti-homosexual bias because Olson does not contend that Derham was biased against him owing to his sexual orientation. Consequently, Consul General Derham must be found to be an unbiased and fair observer of what transpired during this year-long rating period. His testimony is entitled to great weight in that he was the reviewer of the second grieved EER and was on-site at the Rio Consulate General observing first hand the day-to-day operations and interactions between Olson, Beffel, staff, Brazilian visa applicants and the public. Importantly, Derham attested that Olson never raised the issue of anti-homosexual bias with him, the reviewer. Derham also notes that other officers, who were friendly with Olson and frank in their discussions with him, did not mention this issue of bias either.

With respect to Olson's contention that cable 94 Rio de Janeiro 2982 establishes that he was being discriminated against because of his homosexuality, the Department's

*Exhibit 3*

23                                                    FSGB 98-087 REMAND

response is varied. First, Olson has not submitted any evidence to link the Rio cable to the disputed EER statements. Second, the text of the Rio cable explicitly states that

> RSO requests background info to conduct proper defensive briefings for each, including relationship reporting under provisions of 3 FAM 609. We have not learned of any infamous or notorious conduct nor have CI [Counter Intelligence] concerns, such as contact patterns, arisen.

Furthermore, in a letter dated August 23, 2000 to Olson, Ms. Tilton, Regional Security Office Secretary from June 1993 to June 1996, relates how this was a typical cable to Diplomatic Security (DS) on how to handle lifestyle issues and serves as additional evidence that this cable, 94 Rio de Janeiro 2982 was a routine action taken to ensure post's compliance with DS reporting requirements. The Department submits that the purpose of the Rio cable was for the RSO to obtain background information to conduct a proper briefing. Moreover, the cable does not concern just Olson, but also another individual, thus, not supporting Olson's claim that he was the victim of discrimination.

In summary, the agency maintains that there is ample evidence in the record that the performance deficiencies were substantiated and that the employee was counseled. The grieved EERs are balanced and contain positive as well as negative comments and examples of performance.

## IV. CREDIBILITY ISSUES

Olson, questioning the credibility of Zweifel, comments: "Mr. Zweifel denied any knowledge of the cable[1] reporting Mr. Olson for exhibiting homosexual preferences, stating, "this allegation is, prima facie, preposterous." Emphasizing that the cable "clearly bears his name" Olson sees an inherent inconsistency in Zweifel's "disingenuous" denial that he was even aware of the cable. That said, grievant challenges

---

[1] 94 Rio de Janeiro 2982

*Exhibit 3*

Zweifel's fairness and impartiality, and doubts "the truth and reliability of his entire statement." What is more, because Olson has presented "five credible, unbiased witnesses" who testified about the anti-homosexual attitudes against which Zweifel and Beffel have presented only "general denials," there is brought "into question management's credibility as a whole." In that Zweifel and Beffel in particular are key witnesses in this proceeding, we agree that the issue of believability of their statements carries special importance.

There is no question but that cable 94 Rio de Janeiro 2982 has the name Zweifel at the very end. But, because he has denied any knowledge of that cable, grievant tries to portray that as proof that Zweifel is not truthful. We do not accept that argument. The agency handbook explains at 5 FAH-1 H-247.2:

> At some posts, the principal officer's name is automatically added to the end of the telegram by CableXpress.

Couple that with reliable testimony that Zweifel is "honest and objective" and has been recognized as a uniquely fine officer and we do not find the circumstance of his name being on the cable -- a routine addition -- establishes a basis on which to conclude he has been other than truthful.

Moreover, we find no valid evidence that either Zweifel or Beffel had any character traits that would make them prone to be untruthful. We credit their statements. Neither had any motive to lie. Zweifel calls "errant nonsense" that he was biased, calling attention to the fact that other openly gay officers who worked under him received very positive EERs.

*Exhibit  3*

While we recognize that there is contradictory evidence, we are persuaded by so many witnesses giving evidence corroborative of the criticisms made against Olson. Beffel, in particular, had personal knowledge of Olson's performance. He had a full opportunity to observe and was positioned to relate what he saw. Their believability is further strengthened by a reliable statement in the record that Zweifel and Beffel are "honest and objective." We conclude that Olson's performance was fairly and truthfully described in the testimony of Zweifel and Beffel.

## V. DISCUSSION AND FINDINGS

### A. Legal Standards Applicable

As mentioned in the base decision, Olson has the burden to establish by the preponderant evidence that his grievance is meritorious. 22 CFR 905.1(a). As also there stated, an EER need not be perfect but it must be objective and balanced. Employee evaluations are designed to point out weaknesses as well as strengths and while, as pointed out in *Shea v. United States,* et al Civil No. 00-748 (D.D.C. filed June 27, 2001), they carry a presumption of regularity, we acknowledge that presumption yields if the EER is shown to be, as alleged here, tainted by bias.

Olson chafes at unflattering comments about his sexual orientation, but the attitude behind those comments does not by itself, undermine the validity of the EERs, even though "anti-homosexual" basis could well infect them. In other words, an expressed abhorrence of Olson's life-style does not require a finding that that attitude is reflected in the EERs, although as the court mentions, it is a relevant matter. Truly dispositive is whether that attitude fatally tainted the evaluations. As we see it, the

*Exhibit 3*

FSGB 98-087 REMAND

fundamental question is how well did Olson perform the essential requirements of his position on the consular staff.

In FSGB Case No. 2005-015 (June 23, 2005), we held:

> In this case, in addition to the statutory and regulatory evidentiary requirements that are addressed below, grievant is faced with overcoming the familiar presumption of regularity that attaches to the official acts of public officers. This presumption, established by the federal courts, "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they properly discharged their official duties." *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926). "This presumption has been recognized since the early days of the Republic." AFGE, AFL-CIO v. *Reagan*, 870 F.2d 723 (D.C. Cir. 1989). Every public official is presumed to act in obedience to his duty, until the contrary is shown; and *a fortiori* this presumption ought to be favorable applied to . . . " AFGE, AFL-CIO *supra*. Specific evidence is required to overcome the presumption that public officers have executed their responsibilities properly. *INS v. Miranda*, 495 U.S. 14, 18, (1952).

In FSGB Case No. 94-50 (March 2, 1995), the Board was also met with an allegation that an EER was prepared by rating and reviewing officers who had a "personal bias" against the grievant. The Board recognized that a strained relationship existed but ruled that:

> The issue in the grievance is whether these differences resulted in an inaccurate and falsely prejudicial EER harmful to his career.

This, we believe, stands for the proposition that even biased raters and reviewers can prepare valid EERs. *Toy v. United States et al*, 263 F.Supp 2d 1 (D.D.C.) is to the same effect for it held:

> As the finder of fact, . . . the FSGB has the authority to find one witness more credible than another . . . *United States v. Abel*, 469 U.S. 45, 52 . . . (1984) (reasoning that the finder of fact is entitled to assess all evidence weighing on credibility and bias to determine the accuracy and truthfulness of testimony . . . )

*Exhibit 3*

In FSGB Case No. 93-72 (April 17, 1995), the grievant there charged that an EER was prepared by a negative and incompetent rating officer. The Board, recognizing that the rating officer had his faults, nonetheless found evidence to support his evaluation of the grievant's performance. In other words, we have previously found even a flawed supervisor can make a valid and supportable EER. So, a most important initial question is whether the comments by Beffel in these EERs were contaminated as the product of the rater's managerial flaws.

We would never countenance an evaluation that was the product of bias. When the Board is met with a claim of bias, our practice is to give a searching review of what the rater and reviewer said, or even failed to say, about the rated employee. Importantly, the Court in remanding did not direct that we quantify the anti-homosexual sentiment at Olson's post. We were told to determine whether the "weighty evidence" of a homophobic attitude found in the base decision tainted the EERs in question. That is in our mind as we decide this case.

## B. The Allegation That Beffel's Managerial Dysfunction Was a Source Of Prejudicial EERs Is Unfounded

Under this topic we address both the question of whether Beffel was a dysfunctional manager, as well as the considerably more significant issue of whether the challenged EERs bear any taint of a dysfunctional managerial style.

We do not find preponderant evidence to support the insinuation that Beffel was dysfunctional. We so find even though the record is sprinkled with evidence that Beffel had problems with alcohol. We note that throughout his career Beffel advanced progressively. The fact that he rose to a position of supervisory duties is certainly some

*Exhibit 3*

evidence that he was not impaired in his managerial skills. That he remained in a supervisory position is, we find, a further sign that his own supervisors had confidence in him. We hold that the record will not support a finding – to be established by the preponderant evidence – that Beffel was a dysfunctional manager.

But the far more important question we have been directed to consider on remand is whether the two EERs have been infected by bias. We conclude that the preponderance of the evidence does not support the alleged cause-and-effect argument that homosexual bias produced the criticisms of Olson in the two EERs in question. Not only are the criticisms Olson condemns supported by the evidence of rater Beffel, and Olson's reviewers, but they also are corroborated by several others whose remarks are strikingly similar among themselves. Even if Beffel was a poor manager, we see no evidence that this fault seeped into preparation of these EERs. As we discuss, their validity has not been successfully denounced. There was nothing wrong with the ratings given grievant. Abrasive, rude, unduly temperamental, and unnecessarily provocative are some of the terms regularly used by a wide range of witnesses in describing Olson's behavior. These are not traceable to Beffel's performance as a manager, but are shown by the record, and are personal to Olson.

In the 1994-95 EER, a continuing and primary responsibility of Olson's work requirements was to manage the section "courteously." Not just that, but a specific objective in his role as Chief of the Non-Immigrant Visa Unit was for him to "[r]edouble efforts to improve the PR image of the NIV unit." As is apparent from his evaluation report and the supporting evidence, he did not succeed in meeting these requirements. The evaluation describes him as "at times overly demanding"; having a "narrow focus"

Exhibit 3

29                                    FSGB 98-087 REMAND

on suggested changes resulting in "a lot of time wasted" over minor issues; displaying "a tendency to be overly officious with NIV applicants"; an officer who should have been more "sensitive"; and suggesting that a "little fine-tuning of his interpersonal skills" would be advantageous.

The reviewer wrote that he agreed with the rater's criticisms and added that: "Mr. Olson was the most frequently targeted official in visa complaints" reaching his attention; grievant "still has to work to overcome a negative reputation"; and Olson should adopt "a calmer, more open manner."

C.  The Argument That the Recommendation In Olson's EER Evaluation Of Potential (Section III.B.) That He Needed Additional Experience Is Falsely Prejudicial Is Not Persuasive

Because Olson's previous evaluations were consistently excellent, the inconsistencies are said to be unexplained and do not make sense to him. For instance, his EER for 1993-94 stated he had the potential to perform at a higher level. The frailty of this argument is seen from *Marro v. United States* C.A.No. 99-0789 (WBB) (D.D.C. filed January 12, 2004). There the Court concluded that

> this type of argument fails to account for the fact that circumstances invariably change and evolve over the course of a year, hence the necessity of yearly performance appraisals . . . simply because . . . performed well prior to . . . does not mean he will continue to perform well into perpetuity.

D.  Olson's Argument That the EER Did Not Take Into Account, But Should Have, "Severe Problems the NIV Section Faced . . . " Is Totally Erroneous

Under the Special Circumstances section, both challenged EERs recognized that there were staffing and space shortages as well as a very high workload. The body of the 1994-95 EER had these comments:

*Exhibit* 3

He gets the work done against tremendous pressures and lack of staff, space, and resources.

The workload has simply overwhelmed us.

It was a very hectic time.

The 1995-96 EER had this to say:

Rio experienced a seismic explosion of its NIV workload.

Before reinforcements arrived during the summer 1995, we were 50 percent understaffed.

Karl has grown into a very capable, tolerant and experienced manager under unimaginably stressful, constantly changing circumstances.

Mr. Olson . . . responded to a serious crisis with a masterstroke.

Initially what strikes us is that Olson seems to have made a disingenuous argument. He also has contended that he received no support for the known resource shortages. (This argument somewhat eats away Olson's prior assertion that the EER did not account for problems in the NIV Section.)

Certainly this matter was not ignored. The reviewers for his 1995-96 EER wrote:

The Consular Section in Rio underwent close scrutiny during the rating period. Inspectors, myself, the DCM and Consular Affairs senior management all took a careful look at the section to see what would be done to deal with the overwhelming increase in visa requests.

The record also belies Olson's assertion that his performance had not been fairly credited in his EERs. Indeed, these evaluations very pointedly praise him: for his vast knowledge of visa regulations; for advancing innovative ideas; being an excellent teacher; as an extremely hard working officer; noting that he has solved many knotty problems; because he negotiates effectively; and, in that he has refined the NIV section into a smoothly running machine.

*Exhibit 3*

E. The Contention That The Comment In His 1994-95 EER That Olson Was
   "Overly Demanding Of Staff" In Overall Performance (Section II.A.) Is
   Falsely Prejudicial Is Not Supported By the Preponderant Evidence.

Olson claims that the only witnesses who support this criticism are Beffel and

Zweifel. Inasmuch as they do not know the totality of the circumstances and have made

statements that are the product of bias, their evidence should be discounted. That

argument collapses upon recalling that Derham, the reviewer for the 1995-96 EER,

whose review of Olson is highly laudatory, appended a cautionary note: "At times, a

touch of over zealousness slips into his performance." He added that Olson was often

abusive in his verbal and written communications and concluded that his insistency "on

certain procedures sometimes slipped into fanaticism." Also, Estrada, commenting that

Olson was not well regarded by both the American and local staff, added that he had a

"strident personality" and that he received "reports that his supervision over locally-hired

employees was at times difficult and overbearing." And then witness Thiede stated that

the severity of Olson's behavior toward subordinates was significantly understated in his

evaluation and he actually witnessed grievant "yelling and screaming" toward most,

regardless of rank. He even went so far as to say Olson "literally terrorized the staff and

had employees walking in fear and trembling when he was physically present." Lore

found Olson, at times, unnecessarily "rigid and insensitive." Strong criticisms, indeed!

And, from several sources.

Olson argues that the comments of his own staff should be credited over those of

his "less credible" supervisors because they were in the best position to judge whether or

not he was overly demanding of them. There is indeed conflicting evidence about

whether Olson was overbearing. Some witnesses dispute that description but, unlike

*Exhibit 3*

32                                          FSGB 98-087 REMAND

Olson, we do not discredit the evidence of Zweifel and Beffel, whose testimony freely

supports the "overbearing" comment. See *Toy supra.*

Our conclusion is preponderant evidence does not support the claim that the

comment about overbearing is falsely prejudicial.

F. **The Facts Do Not Support the Argument That Beffel Falsely Attributed to Mr.**
   **Olson the "No Documents Policy" (Section II.A. 1994-95)**

Resolution of that charge is aided by a recitation of certain portions of Section

II.A. of the 1994-95 EER as written by the rater. When he arrived, Beffel noted that the:

> section had a garrison mentality and relations with other sections were
> strained. Mr. Olson and I had several disagreements over suggested
> changes in which I detected a narrow focus. Karl understandably didn't
> want to tinker with a system which worked reasonably well and had
> already survived one crisis. Eventually, minor changes in policies and
> procedures were effected but not until a lot of time was wasted in
> unproductive arguments over issues like timely lunch breaks for line
> officers and his "no documents" policy.

Olson says the "no documents policy" was not of his doing because the policy

was in effect "well before . . . 1993." This policy derives its name from the fact that

virtually all documents in Brazil are notoriously unreliable. Consequently, junior officers

were instructed not to rely on visa applicant documents and instead base decisions on

interviews and data from the passport and application form.

We find that Olson has mistakenly parsed this language. A statement that it was

"his" policy does not necessarily mean he instituted it. Indeed, there is no question that

the policy was in existence at the time and followed by him so, in a sense, it was his

policy. In fact, the first specific objective in his 1994-95 work requirements statement

*Exhibit 3*

was for Olson to "relax the present 'no documents' instruction to allow for more flexibility."

Of greater importance, however, is that the entire point of the comment in the EER was that Olson's attitude caused wasted time in dealing with minor issues. That has been established. His argument fails for want of proof.

G. The Alleged Error Of Omission In the 1995-96 EER Has Not Been Established

When, in July 1994, the United States adopted a policy to issue only three-month visas to Brazilians, the workload in the NIV Section surged dramatically. Olson says that recognition of the hardships engendered and Olson's "contribution to the efforts to ameliorate the situation" were conspicuously absent from his 1995-96 EER.[2]

In Section II.A., under Substantive Knowledge, Olson was lauded as follows:

In actively participating in our on-going debate about how to rationalize the overwhelming onslaught that had every post in Brazil almost on the ropes last year, Karl used his thorough command is this area . . .

Also, in noting there was the "seismic explosion of NIV workload," the EER says:

Thanks to Karl, Rio not only has no backlogs . . .

The reviewer wrote:

Mr. Olson has had to manage the NIV Unit under difficult circumstances – skyrocketing visa demand, staff shortages, inadequate physical plant – but through intellectual ability, hard work, and attention to his subordinates, has improved morale and productivity. It has been an impressive performance and he merits immediate promotion.

---

[2] We find this argument overstated. In the Special Circumstances section of the 1995-96 EER (I.C.) it is noted, "The NIV workload rose 40 percent in FY-95 and has doubled since Mr. Olson's arrival." Moreover, Section II.A. reads, in part, "Rio experienced a seismic explosion of its NIV workload."

*Exhibit 3*

FSGB 98-087 REMAND

A reviewer has labeled Olson's performance "impressive" and warranting of "immediate promotion." In that circumstance, the "omission of recognition argument" is far from persuasive.

### H. Not Sustained Is the Argument That Beffel's Comments In the Areas For Improvement Section (II.C.) In the 1995-96 EER Are Inaccurate and Falsely Prejudicial

The Areas For Improvement Section (AFI) reads:

> While not a major problem, Karl needs to focus a bit more on the timeliness of performance-related actions; mainly efficiency reports, but also including prompt counseling of difficult employees. The pressures and immediate demands of an almost unmanageable work load have understandably limited the time available for close monitoring of such a large staff but in some cases the performance of employees (mainly FSNs) who were performing below standard could have been improved.

In assailing these comments Olson says they are "an excellent example of Mr. Beffel's lack of knowledge and his resentment of Mr. Olson . . . " Contradicting these comments Olson claims he "trained, encouraged" and counseled employees to follow governing rules and "was generally able to timely prepare efficiency reports by working nights and weekends." First of all, we find these AFI comments somewhat tempered by such qualifications as "while not a major problem"; needs to focus "a bit more"; and faced with "an almost unmanageable work load" which "understandably limited the time available . . . " and in "some cases" improvement could have been achieved.

By its own terms the mandatory AFI section of the 1995-96 EER identifies as the area where Olson "should concentrate" his "efforts to improve" as the timely issuance of efficiency reports for FSNs. We do not find this section falsely prejudicial because there

*Exhibit 3*

is unmistakable evidence, despite Olson's efforts, that some evaluations were not timely prepared. The lack of a report can adversely affect an FSN's pay. Thus, it is a flaw worthy of comment where it exists.

## I. Other Allegedly Falsely Prejudicial Comments About Olson's Overall Performance In Section II.A. Of the 1994-95 EER Are Unproven

Olson has placed some emphasis in contesting Beffel's assertion that when he and Beffel had disagreements, grievant displayed a "somewhat narrow focus." Olson counters this by insisting as the "more competent in consular operation," he felt obliged to run the office in accordance with governing regulations, procedures, and policies. And, allegedly, some of Beffel's suggestions violated regulations and required the staff to work longer hours than necessary.

Lore found Olson "unnecessarily rigid"; Russell said Olson had a tendency to strongly resist every minor policy change; Estrada explained how grievant had a tendency to argue over small details; Trotter announced he "strongly" believed Zweifel and Beffel evaluated Olson accurately; Ambassador Levitsky remarked that Olson, at times, went out of his way to challenge what he considered to be undue pressure being put on him; and Derham related how Olson became over-involved in minor procedural debates and that his insistence on certain procedures "sometimes slipped into fanaticism."

The foregoing summary certainly erodes grievant's claim that the "narrow focus" comment is not supported by appropriate evidence.

## J. Evaluation Of Performance (Section II.A.) Of 1995-96 EER Is Not in Error

Olson is said by Beffel to sometimes get "over-involved in minor procedural debates," and "does not hesitate to express dissent at any level, which occasionally irks

*Exhibit 3*

FSGB 98-087 REMAND

some officers." Additionally, Olson "accepts new ideas cautiously but increasingly well."

Given the rater's bias and the fact he and Olson were "at loggerheads over issues within Mr. Olson's area of responsibility and expertise," grievant wants these expunged. They will not be. They have not been shown to be erroneous. These comments have ample support. Thiede said Olson sometimes responded angrily to criticisms or proposals; Lore found him "unnecessarily rigid." Russell noted that any suggestion that Olson was at times over zealous is not only valid, but even understated, and that Olson resisted "every minor policy change." Estrada found that grievant had a tendency to argue over every small detail and there was no telling what issues would provoke an argument. Ambassador Levitsky tells us Olson went out of his way to challenge what he considered undue pressure on him. Derham agreed Olson had a penchant for getting overly involved in minor procedural debates, and stated pointedly, that Olson had a "general tendency to make matters unpleasant for everyone."

K. <u>No Error Of Omission Has Been Shown</u>

What grievant considered his "most significant accomplishment" in 1995-96 is said to have received no mention. Here, Olson is speaking about his involvement in the successful effort to persuade the Brazilian Senate to approve the law extending the validity period of Brazilian visas. He claims that he was the one who took advantage of media opportunities to raise the issue and, on one occasion Olson says he told the DCM that the only reason the visa of an official of Fiat had expired after only three months was:

*Exhibit 3*

FSGB 98-087 REMAND

Brazilian policy that we were reciprocating, and that U.S. interest might be better served by forcing them to reschedule his trip sending a message that it was in Fiat's interest for Brazil to change.

Olson agreed to issue the visa on the date the DCM had requested, but also took the opportunity to work personally with Fiat's visa messenger, presumably to lobby for a change to Brazil's visa validity period. The DCM also passed a message to a Fiat lobbyist that the Consulate could not always be so accommodating on short notice and that it would be in Fiat's interest to lobby this issue with the Brazilian Senate. Because the Brazilian Senate passed a bill on this the very next business day, grievant claims he failed to receive sufficient credit for his successful plan.

It is worth noting that what is included in the limited space of an EER is wholly within the discretion of the rating and reviewing officers. Olson implies that discretion here has been abused. We do not agree. Under Substantive Knowledge in the 1995-96 EER are the following comments:

> Karl used his thorough command in this area to focus high-level Embassy attention on what the Brazilians are doing to implement the new and more liberal visa policy, to the point that the Ambassador raised it with the Foreign Minister, who agreed to comply.

Under the topic Intellectual:

> The previous Consul General eventually agreed with Karl, that after a year of issuing three-month visas, it was time for Brazil to do something.

In addition, Ambassador Levitsky[3] states that grievant "greatly exaggerated his role in the visa reciprocity issue"; Beffel says the result achieved was not the product of any "single-handed" step; Russell suggests that the part Karl played in this matter "was of secondary importance." Derham, speaking in retrospect, explained it was not plausible

---

[3] He was, we find, in the best position to explain the process because of his role at post and in the action taken.

*Exhibit* 3

38                                    FSGB 98-087 REMAND

that action (or inaction) on one NIV case can be credited with passage of legislation in Brasilia.

We have also evaluated the comments to the contrary by Thiede, Straw, and Schlaefer, all of whom agree that Olson played a pivotal role. On balance, we do not find preponderant evidence that there has been an error of omission or that any restrained praise was influenced by anti-homosexual bias.

L. Olson Has Not Shown Harm

It should be clear that we disagree with many of Olson's contentions and find them contradicted by louder voices. See *Toy, supra.* On the other hand there are some contentions for which there is simply no support at all. For instance, he claims harm by not being awarded overseas assignments. We believe this claim crumbles by Olson's statement that he now is an Arms Control Advisor in Vienna, Austria. He adds that he has recently served as Consul in Cape Verde in 2001 and Consul in Haiti in 2004. Moreover, complaints against individual assignments are not included with the meaning of a grievance (22 CFR 901.18(c)(1)). Thus, it is not an argument that aids grievant.

In addition, Olson contends that in evaluating potential, the rater and reviewer needed to, but did not, consider the severe problems the NIV section faced . . . . We find this a gratuitous contention. It ignores the facts of record. The EER covering the period August 28, 1994-April 15, 1995 states in Section I.C.:

> the section is grossly understaffed, lacks space, is years behind in adequate automation. The NIV volume increased 40% last year and has one of the highest case per officer workloads in the world.

*Exhibit 3*
39                                          FSGB 98-087 REMAND

The section covering any special circumstances influencing the work program in the EER for April 16, 1995-April 15, 1996 makes this observation:

> The physical plant in Rio's Consular Section is woefully inadequate, as was the Consular staffing for much of the rating period. The NIV workload rose 40 percent in FY-95 and has doubled since Mr. Olson's arrival.

The potential section of his 1994-95 EER discussed his dedicated management achievements in designing a system to cope with a mind-boggling volume of work and keep it functioning against tremendous odds and unreasonable pressures. His 1995-96 potential section credits him with being an experienced manager under unimaginatively stressful circumstances and states he has clearly demonstrated potential to serve effectively at higher levels now.

As the foregoing establishes, Olson's argument that the EERs were poisoned by the anti-homosexual attitude by his raters and reviewers falls shy of the mark. Apart from his own assertions Olson presents only limited support. The agency, on the other hand, has presented a varied array of witnesses who either stated they did not credit Olson's argument that his sexual orientation spawned the negative comments in the EERs, or emphatically challenged it. That the EERs in question have not been shown by the preponderant evidence to be the product of homophobic bias is, as we see it, found in the testimony of many. The Ambassador, the reviewing officers, and the rater state with continuing certainty there was no such bias in the preparation of the EERs. To be sure, there is even believable evidence to suggest that the rater and reviewers succumbed to the temptation to lessen any controversy with Olson by selecting bland and moderate language -- somewhat more positive than they truly felt warranted.

*Exhibit  3*

Olson's argument that some of the information Ambassador Levitsky provided discloses his anti-homosexual bias is exaggerated, we find.  Conceding that Levitsky did "not have a close knowledge" of Olson's performance, this is what he said on the bias matter:

> I did discuss on several occasions with . . . Zweifel and Derham my displeasure with the problems [in the] . . . visa section . . . but Mr. Olson's sexual orientation was never the basis of their or my concern.
>
> . . .
>
> I have no personal knowledge of any of the instances Mr. Olson cites as examples of bias against his sexual orientation.

Unquestionably these EERs have many laudable comments; Olson's deep knowledge, skills, and abilities were fully recognized.  In fact, the EERs virtually teem with examples of his competence.  Where he falls short is in interpersonal relationships.  At the same time, there are in the record varied criticisms of Olson's employment performance.  Among the latter are:  (a) many examples of highly agitated behavior directed at FSN staff in particular, as well as treatment of visa applicants, which attracted negative press coverage locally; (b) his strong resistance to even minor policy charges produced inefficiencies, and by one account, almost amounted to insubordination; and (c) deportment that all too often made the work environment demonstrably unpleasant.

An EER must present a balanced portrayal of performance, slighting neither strengths nor weaknesses.  It need not mechanistically attempt to offset each negative comment with a positive one, or vise versa.  The degree to which comments tilt toward praise or criticism depends upon the performance of the rated employee during the rating

Exhibit 3

FSGB 98-087 REMAND

period. Balance implies fairness and accuracy. Here we find insufficient evidence to view these EERs as lacking balance.

Inasmuch as we are finding that Olson has failed to shoulder his burden that his grievance is meritorious, we have no reason to further address the question of harm.

In sum, we find the content in the EERs challenged is fair and adequate, and Olson has failed to carry his burden to establish that the critical comments included are inaccurate or falsely prejudicial. They are supported by a variety of witnesses and especially by a rater and reviewer who have similar comments.

M. <u>The Preponderant Evidence Does Not Show That the VARIG Pilot Incident Establishes That Zweifel Was Biased</u>

When a U.S. citizen, suffering from HIV/AIDS, sought to return to the United States, Olson attempted to assist her but the pilot would not allow her to board the plane because of her illness. At the same time, the pilot allegedly made "many AIDS-phobic and homophobic remarks".

When the same pilot later sought a new visa, Olson approved its issuance with limitations. Olson did this, he says, to send a diplomatic message to the pilot that, just as consular personnel depended upon the cooperation of the professional VARIG crew in accomplishing their mission, so, too, did the pilot depend upon the cooperation of the U.S. Consulate to accomplish his. When VARIG complained about this action by Olson, Zweifel apologized for the incident and in doing so supported the pilot, not Olson. Grievant labels Zweifel's actions in this matter "contemptuous."

*Exhibit* 3

FSGB 98-087 REMAND

We do not find evidence to suggest Zweifel was disrespectful to Olson. It seems wholly inappropriate for Olson to misuse the visa process in an attempt to convey a message. To the Board it seems spiteful.

Also, we see no connection between Zweifel's action here and his comments in the EER. The pilot had legitimate concerns over allowing one with an infectious disease to emplane and was acting within the terms of a bilateral agreement.

In summary, what this record depicts is an officer highly skilled and adept in consular matters but hardly so in his interpersonal relations. He has been a disruptive force in the workplace. We find that the challenged comments in the EERs are not a consequence of any bias, but rather are attributable to Olson's conduct. In their totality, the evaluations are "fair and accurate." They have a rational basis. Olson has not carried his burden. See 22 CFR 905.1(a).

These appraisals meet what we have long held was the critical test of acceptable EERs: they fairly and accurately described Olson's performance with adequate clarity and documentation to constitute reasonably discernible, objective and balanced appraisals. (FSGB Case No. 93-15 (December 23, 1993).

**V. DECISION**

The grievance appeal is denied in all respects. The attorney fee issue need not be reached. Grievant is not a prevailing party.

*Exhibit 3*

FSGB 98-087 REMAND

For the Foreign Service Grievance Board:


_____

Edward J. Reidy
Presiding Member


_____

Edward A. Dragon
Member


_____

Jeanne L. Schulz
Member


*Exhibit 3*