UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
KARL OLSON,                                    )
                                                          )
             Plaintiff,                             )
                                                          )
                      v.                             )          Civil Action No. 06-1205 (GK)
                                                          )
CONDOLEEZZA RICE, Secretary of State, )
                                                          )
             Defendant.                          )
_____)


**DEFENDANT'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE DISPUTE**

        Pursuant to LCvR 7(h), and in support of her cross-motion for summary

judgment, defendant respectfully submits this statement of material facts as to which

there is no genuine issue.  After some introductory facts, this statement summarize

witness statements in the record that bolster the FSGB's findings that plaintiff's

employee evaluation reports ("EERs") accurately reflect his job performance and that

anti-homosexual bias did not affect the substance of the EERs.  Then, defendant

discusses Cable 94 Rio de Janeiro 2982, in which the Regional Security Officer reported

plaintiff's homosexuality and asked for guidance from the Diplomatic Security Bureau.

Finally, defendant addresses the issues plaintiff raises concerning the administrative

record.

<u>Introduction</u>

1.      Plaintiff joined the foreign service in 1985.  Complaint, ¶ 2.  He was posted to Rio de Janeiro in 1993, where he served as chief of non-immigrant visas.  <u>Id</u>. ¶¶ 2, 9.  Plaintiff left Brazil in the summer of 1996.  <u>Id</u>. ¶ 83.

2.      Plaintiff's job in Rio was a demanding one, in large part because fraud in visa applications was a serious problem, and Rio had an extremely high volume of visa applicants.  <u>Id</u>. ¶¶ 11-16.   In part, the volume reflected the United States' reciprocity policy; because Brazil would only grant short-term visas to Americans, the United States would only issue short-term visas to Brazilians.  <u>Id</u>.  Staffing and automation also increased by 1996, easing the burden on the visa unit.  <u>Id</u>.

3.      Foreign service officers are evaluated each year by a rating official and a reviewing official on a form called the Employee Evaluation Report ("EER").  <u>Id</u>. n.1.  Edwin Beffel, the chief of the consular section in Rio, was the rating official for plaintiff's evaluations in 1995 and 1996.  <u>Id</u>. ¶ 28.  David Zweifel, the Consul General, was the reviewing official in 1995.  James Derham replaced him as Consul General and served as the reviewing official in 1996. The evaluations they prepared reflected plaintiff's mixed performance.  A 066-077.

4.       Plaintiff's job performance in Rio was mixed.  The non-immigrant visa section was able to keep up with the high volume of applicants despite the stressful environment.  <u>See</u>, <u>e.g.</u>, Witness Statements of James Thiede (A 1213), & Roland Estrada (A 1225).  However, in dealing with the workload, plaintiff was overly demanding and unsupportive of his staff, often yelling and screaming at them.  The unit "walked on effshells" and some complained about plaintiff to more senior officials.  <u>See</u>, <u>e.g.</u>,

Witness Statements of Edwin Beffel (A 1196, 1198, 1202), David Zweifel (A 1204-05), Roland Estrada (A 1225-26), James Thiede (A 1211-12, 1215), James Derham (A 1291). Plaintiff was also stubborn and impolitic in handling policy disagreements with his supervisors and other embassy officials.  See, e.g., Witness Statements of Edwin Beffel (A1196-98), David Zweifel (A 1204-05), James Thiede (A 1213), Mark Lore (A 1216), Charles Trotter (A 1228), Layton Russel (A 1217-19), & James Derham (A 1290). Furthermore, plaintiff often demonstrated poor tact when dealing with visa applicants. See, e.g., Witness Statements of Edwin Beffel (A 1197, David Zweifel (A 1205), James Thiede (A 1210-11), Amb. Melvyn Levitsky (A 1232), & Mark Lore (A 1216).

     5.     One of the results of plaintiff's deficiencies was negative press coverage and headaches for more senior diplomats.  See, e.g., Witness Statements of Edwin Beffel (A 1197), David Zweifel (A 1205), James Thiede (A 1210-11), Amb. Melvyn Levitsky (A 1232), & Layton Russell (A 1217).  These problems were especially evident in the 1994-1995 rating period; plaintiff's performance improved considerably the following year.

     6.     Both the 1995 and 1996 EERs laud plaintiff's work ethic, his mastery of visa regulations, and the efficiency of the visa operations that he supervised.  Thus, Mr. Beffel wrote in 1995 that "Mr. Olson is the hardest working officer I have ever served with.  He gets the work done against tremendous pressures and lack of staff, space, and resources."  A 073.  Mr. Beffel also noted that "Karl's management skills enabled the unit to survive several crises imposed upon the unit from outside . . . ."  Id.  Finally, Mr. Beffel noted that "Mr. Olson is a talented, dedicated, and hard-working officer who takes his job seriously and does his best against tremendous and often unreasonable pressures

from the public.  The NIV unit lacks the resources to be able to accommodate all of the

demands levied on it by the public and other sections.  He set up an efficient system to

process visas based upon available resources."   A 075.  Mr. Zweifel added that "Mr.

Olson worked tirelessly with the understaffed section to handle a workload consistently

topping 1000 applications a day."  A 076

     7.  The next year, Mr. Beffel began his evaluation by stating that "Mr. Olson's

performance was excellent; remarkable in several areas."  A 067.  He again stated that

plaintiff "is one of the hardest working officers I've served with."  Id.  He added that "[h]e

has refined our NIV operation into a smoothly running machine, such that Rio is the only

high-volume NIV post in Brazil without a backlog.  Karl's constant fine-tuning of the

system ensures maximum efficiency."  Id.  Mr. Beffel also praised plaintiff's "profound"

knowledge of visa regulations and procedures, and noted that plaintiff's substantive

knowledge helped "solve many knotty problems . . . ."  Id.  Reviewer James Derham also

lauded plaintiff for standing "up to the pressures of an impossible workload."  A 068.

     8.  The EERs also acknowledged the short-comings in plaintiff's performance—

particularly in the 1994-1995 period.  Mr. Beffel noted that plaintiff was "at times overly

demanding of his staff," but indicated that plaintiff was "a tough but fair supervisor" and

that "[h]e conscientiously leads by example, never asking others to do what he will not do

himself."  A 073.  Mr. Beffel noted that plaintiff ruffled feathers at times, and he had

several disagreements with plaintiff "over suggested changes [in protocol] in which I

detected a somewhat narrow focus."  Id.  This led to "a lot of time wasted in

unproductive arguments."  Id.  Mr. Beffel also noticed "a tendency to be overly officious

with NIV applicants.  This generated an unusual amount of complaints directed against

him publicly." Id.  In the Areas for Improvement section, Mr. Beffel stated that "Karl should try to be more flexible and tolerant of other's opinions, agendas, and to some extent cultural idiosyncracies.  A more buoyant, relaxed, and collegial attitude would help him deal more effectively with other sections.  A bit more sensitivity would help him with NIV applicants and avoid complaints."  A 075.  Mr. Zweifel noted that "Mr. Olson was the most frequently targeted official in visa complaints reaching my attention," and he "counseled Mr. Olson to adapt a calmer, more open manner."  A 076.

9.  Criticisms in the 1996 EER were limited and muted.  Mr. Beffel stated that "[w]hen Karl himself is challenged or criticized, he has increasingly demonstrated tolerance while negotiating a mutually satisfactory (and often ingenious) solution."  Mr. Derham provided "a slight cautionary note that he should temper [his positive qualities] with a sense of perspective.  At times a touch of overzealousness slips into his performance."  A 069.  Finally, the Areas for Improvement stated that plaintiff "needs to focus a bit more on the timeliness" of efficiency reports and counseling of difficult employees.  A 068.

10.  Plaintiff filed a grievance in 1998 seeking to have every negative comment removed from his EERs.  Complaint, ¶ 87.  He also sought to expunge positive comments that, in his mind, were insufficiently robust.  Id., Exhibit 1.  Plaintiff contended that these two EERs were falsely prejudicial and omitted a significant achievement.  A 007-026; see also 22 U.S.C. § 4131(a)(1)(E).  During the course of his grievance, plaintiff asserted that these flaws resulted from anti-homosexual bias, and he also asserted that his supervisor and rating official, Edwin Beffel, was a dysfunctional manager.  In short, plaintiff sought

to rewrite or whitewash history and to deflect attention from his own performance to the performance and purported prejudices of his supervisors.

11.  The most significant evidence developed during the grievance proceedings came in the form of witness statements.  <u>See</u> A 1006-1016; A 1196-1292.  Some of the significant statements concerning the environment in the consular section and plaintiff's performance are already cited above.  A few witnesses did provide statements indicating that "management" in some ways displayed "homophobic attitudes."  A1006-1014.  Two witnesses indicated that Mr. Beffel had made joking comments about homosexuality (A 1224 and A 1246) and two witnesses made very circumscribed statements indicating possible homophobic sensitivities on the part of Mr. Zweifel, A 1015-16 and A 1246.  Only one witness opined that anti-homosexual views could have affected plaintiff's reviews.  A 1224.

12.  By contrast, five witnesses stated that bias did not affect the content of plaintiff's EERs.  A 1232, A 1230-31, A 1292, A 1218-19, A 1214.  Mr. Beffel and Mr. Zweifel adamantly denied the charge as well.  A 1199-1200, A 1204.  These witnesses, as well as others, also indicated more generally that they were unaware of any anti-homosexual comments or sentiment from Mr. Beffel or Mr. Zweifel.  <u>See</u>, <u>e.g.</u>, A 1220, A 1252.  The record also includes forceful endorsements of Mr. Beffel and Mr. Zweifel's character, such as this comment from the Deputy Principal Officer who worked closely with both officials in Rio: "[B]oth Mr. Zweifel and Mr. Beffel are honest and objective and would never allow any bias against sexual orientation, race, or anything, even if one existed, to influence their processional conduct.  I observed that Mr. Zweifel and Mr. Beffel always treated everyone with respect and fairness."  With regard to Mr. Zweifel,

the witness stated, "I found him to be one of the finest officers I ever met during my career. He is a person of exceptionally high integrity and would never engage in the type of conduct Mr. Olson alleged. Nor would he allow a subordinate to engage in it." A 1230-31.

      13.    The record contains a statement from Edwin Beffel at A 1196-1200 that includes the following passages:

      a.    "As I recall, some of Mr. Olson's communications dealing with the visa unit did not sit too well with the Embassy in Brasilia."

      b.    "When I arrived in Rio in August 1994 the staff was working until long after COB to cope with the demand and I felt that Mr. Olson was pressuring the FSB Staff in particular to remain after hours. I received some complaints from FSNs that said they were afraid to complain to Mr. Olson but couldn't remain after COB every night. I suggested that Karl make it more clear to them that the overtime was voluntary. Also, one of the Officers, Leilani Straw, was having health problems working on the visa line until 1:30 or later without lunch but the policy was to complete the interviews before anyone went to lunch. I felt that Karl could have been more flexible. Karl was a tough manager. In one conversation regarding Ms. Straw's complaint he implied that she was malingering. She was an older officer, as I was, and I don't think that Karl, who ran marathons, appreciated that she couldn't always keep up with the interview pace he insisted upon."

c.     "Mr. Olson and I initially disagreed over the need to make some changes in policies and procedures which were in place in the NIV unit when I arrived.  I was charged with improving the NIV unit's PR image while streamlining procedures as much as possible. . . . I wanted to change the travel agency program, modify a "No Documents" policy that, when carried to extremes, caused problems and wasn't in line with Department guidelines, discuss visa issuance criteria in the NIV unit, relieve some of the strain on the officers by using FSNs to assist with prescreening of applicants, and to be more flexible with lunchbreaks and overtime.  Mr. Olson and I often dissagreed [sic] on these issues.  He often referred to proposed changes as 'reinventing the wheel.'  I felt that he was too dismissive of my proposals and that we wasted a lot of time arguing over changes I felt were necessary. Also, I felt he was personalizing suggestions about how to do things better while I meant no criticism of his stewardship of the section during the summer or his running of the unit. He seemed overly defensive at times.  Layton Russell told me that the 'no documents' policy that Karl told me was a holdover from Layton's tour as section chief before June 1994 was not intended to discourage applicants from bringing documents to the interviews: officers could ask to see evidence if they thought they needed it.  Karl had gotten out the word that decisions were to be made based on the application and responses to brief questions only.  Documents in Brazil should never be used by themselves to decide a case: too much fraud.  However, Karl felt that they were a total

waste of time and allowed an applicant to dominate the interview. His verbal statements/guidelines to the line officers and his example at the windows left little doubt that he felt that they should not have to use them at all. We were getting complaints about snap judgments and brusque denials and sometimes denials of professionals who despite their appearance and in some cases nervousness, did have credentials and earnings statements which could offset an initial negative impression. We had to move fast on the line but I wanted to encourage the officers to ask for evidence if they felt they needed it. I wanted to have meetings about issuance criteria so that our decisions were reasonably uniform and humane but Karl didn't think that it was necessary. With 22 years in consular assignments and a previous tour in Brazil as CG and CCA I found these arguments with Mr. Olson annoying."

d.     "More than any officer that I had ever worked with, Mr. Olson was the subject of lots of complaints from the public and criticism in the press about the way he handled visa applicants in interviews. . . . I observed Karl's interviews on occasion and noted that he was sometimes overly abrupt or dismissive. These complaints went all the way to the Embassy. I received many. I urged him to be more sensitive to cultural differences in the way he treated the public. . . . Mr. Olson's usual reaction to advice and constructive criticism was to say that he had little time to accommodate the cultural quirks of applicants to 'meet all their individual needs'. He was very defensive."

e.      "One popular tourist guide for Brazilians traveling to the U.S. referred to
        Mr. Olson as a 'neo-nazi' and advised travelers seeking visas to be
        prepared for an extremely unpleasant experience at the Consulate.  I took a
        lot of heat from both CGs and the Embassy about Karl's public image."

f.      "There was some friction between Mr. Olson and the administrative
        section . . . .  Karl was very critical of their performance and this was
        probably known to them."

g.      "[W]e were given only two choices on the ER concerning promotion:
        *immediate* or after more experience.  I felt that he needed more time to get
        used to dealing with bureaucratic glitches and taking into account others'
        problems and that he needed to be more receptive to suggestions.  Also, he
        had a serious problem dealing with visa applicants."

h.      [With regard to 1995-1996 time frame] "He still did occasionally irritate
        some officers with the way he presented his views . . . ."

i.      "Karl's hard work and concern for the welfare of the staff was appreciated
        more, I think, by the Americans than by the FSNs with whom he was
        somewhat abrupt on occasions.  A couple of FSNs complained to Ana
        Maria Miranda and Roland Estrada that Mr. Olson had been abusive with
        them."

j.      "Karl sometimes submitted badly delayed efficiency reports/review
        statements on FSNs.  I discussed this with him in the draft ER and he
        agreed that this was a legitimate criticism. . . . I was required to put
        something in this section [Areas for Improvement] but even though he

agreed with part of my comment at the time, he now disputes it and charges bias!"

k.    "I felt that the categorizing of this visa decision [by plaintiff] as instrumental to the liberalization of Brazilian visa policy was exaggerated . . . .Layton Russell should definitely be sounded out because he is aware of the intense effort by the whole Embassy and all the consulates during a two-year period to get the Brazilians to change their policy.  Nobody had contacted me about the accomplishment that Mr. Olson is referring to and one would think that they would have.  I certainly would have included it if I felt that I could have.  I believe that it was on a 'wish list of accomplishments that Mr. Olson listed but I had some problems with it-especially the wording because it sounded to me like he was saying that he won the Visa War almost single-handed.  I had been the CG and country coordinator for consular affairs in Brasilia from 1988 to 1991 and dealt a great deal with this issue.  Most of the resistance to making the changes we wanted was centered in the Ministries of Foreign Affairs and Justice. The Senate was only the last stop in a long procedure. The reciprocity battle went back to around 1983 as I recall."

l.    "<u>Prejudicial EERs Result of Sexual Orientation</u>  Not true at all.  This is absurd."

m.    "I strongly doubt whether Zweifel criticized Karl in his EER because of Karl's sexual orientation.  Not only Mr. Zweifel but the DCM, and

reportedly the Ambassador were upset with Mr. Olson because of the bad

press play.  There may also have been a lack of communication."

14.     The record contains a statement from David Zweifel at A 1204-06 that includes

the following passages:

a.     "At the outset, I must stress one basic point:  any assertion by Mr.

Olson of homophobic bias in my review of the Employee Evaluation Report

(EER) in question is errant nonsense.  Two openly gay junior officers worked in

the Consular Section at Rio de Janeiro, directly under Mr. Olson's supervisions.

Their job performance was excellent, and both received very positive EERs and

reviewing statements, including recommendations for promotion."

b.      "That Mr. Olson occasionally ruffled feathers at other posts is an

understatement.  All too frequently, either the Supervising Consul in

Brasilia, the DCM, the Consul General in Sao Paulo, and even the

Ambassador called me to complain about his communications with those

posts or to raise issues brought to their attention by one or another of their

important Brazilian contacts."

c.     "The reaction of Mr. Olson's immediate staff was something I had to

deal with on a continuing basis.  Both American and Brazilian

employees in the Consular Section sought me out on occasion to

complain of his imperious attitudes and rudeness to them as well as to

the visa public."

d.     "During my Foreign Service career (over 35 years), I never met an

officer with a poorer sense of public relations than Mr. Olson.  As I reflect

on our time together in Rio, I cannot think of a week – or at times a day – in which I did not have to spend some of my own time soothing the outrage of one or another Brazilian who had taken offense at some action on the part of Mr. Olson.  An example: a former Foreign Minister and Ambassador to the United States was so incensed that he wrote an irate letter of complaint which was published in *O Globo*, generally recognized as one of the two most influential daily newspapers in Brazil.  That sort of unhelpful publicity roiled relations and all too frequently was the subject of dissatisfaction at the embassy as well as in Rio."

e.    "On a single occasion, I was invited to Mr. Olson's residence (the July, 1994, luncheon to which he refers).  My wife and I attended, but had other social commitments later in the afternoon.  We left before any film or films were shown.  I know nothing about an alleged 'investigation' into Mr. Olson as a 'homosexual security risk'.  Again, this allegation is, prima facie, preposterous."

f.    "In relation to Mr. Olson's actions in the incident involving boarding of an ADIS patient by VARIG airlines, I was anything but dismissive. Whether medically justified or not, the pilot was acting within the terms of our bilateral air agreement with Brazil.  The President of the Airline (Brazil's flag carrier) called me personally to complain vociferously of Mr. Olson's decision to issue the pilot a single-entry visa.  The Foreign Ministry in Brasilia took the case up with the Embassy, noting that the Brazilian Government was prepared to reciprocate—i.e. issue single entry

visas to employees of American flag carriers flying to Brazil. The implicit threat to orderly international travel is but another example of Mr. Olson's poor judgment on some matters."

15.    The record contains a statement from James Thiede at A 1208-1215 that includes the following passages:

a.    "Mr. Olson personally attracted quite a bit of negative press coverage in the Brazilian media, principally as a result of several incidents throughout 1995 and 1996 in which he yelled and screamed at difficult or obtuse visa applicants. His tendency to be rude towards all with whom he came in contact also contributed to some of these incidents. This criticism is actually quite understated and conveys to PER no sense of the frequency or scale of hostile media coverage which Mr. Olson received, such as several incidents which were printed up in  major Brazilian newspapers with national circulation."

b.    "The statement [in the EER] is accurate, and once again, actually understated the severity of the problems:  Mr. Olson's penchant for yelling and screaming at subordinate American staff, FSN's, visa applicants, officers from other sections and other agencies, and even at State officers who outranked him. This problem was aggravated by his daily rudeness towards most other people. . . . [S]tress caused Mr. Olson to subject subordinates, peers, and applicants to verbal tongue-lashings frequently during this period. These yelling and screaming incidents, combined with his usual rudeness and frequently cold manner, resulted in him alienating

14

most of the staff of ConGen Rio, with the partial exception of some female American paraconsular associates who found his eccentric behavior colorful, and thus were willing to overlook the verbal abuse of FSO and FSN employees. Although he made efforts to improve, Mr. Olson was unable to rein in his temper over the long run, and the American NIV staff was often 'walking on eggshells' when he was physically present in the section."

c.      "It is the belief of the NIV junior officers and paraconsular associates that the FSN's secretly held a party specifically to celebrate Mr. Olson's transfer away from ConGen-Rio de Janeiro."

d.      "I personally witnessed Mr. Olson yelling and screaming at not only visa applicants but also at State FSO's, USIS FSO's, and NIV FSN's."

e.      "Mr. Beffel, for Karl's sake, glosses over and fails to mention the frequent and repeated pattern of verbal/psychological abuse of FSO and FSN employees by Mr. Olson. Mr. Olson literally terrorized the staff and had employees walking in fear and trembling when he was physically present in the section. The consular FSN's did not find him to be at all fair, but rather to be vindictive, vicious, ferocious, and excessive."

f.      "Mr. Olson sometimes responded angrily to criticism or proposals for alternative processing methods."

g.      "I do not believe that Consul General Zweifel and Mr. Beffel included critical or prejudicial comments in Mr. Olson's EER's because of an anti-homosexual bias. Mr. Olson was very open about his sexual orientation,

and Rio had a history of having its consular section staffed by gay officers.
I never witnessed anyone—not even one individual—criticize Mr. Olson's
sexual orientation, mock it, or express opposition to or disdain for it.
When Mr. Olson was criticized it was always for the manner in which he
mistreated fellow employees through verbal and psychological abuse,
never for his [s]exual preference.  While I cannot certify what Mr.
Zweifel's personal attitudes are on homosexuality (since he and I
overlapped for only 3 ½ months and we had little interaction), I never
witnessed him make any anti-homosexual comment or action,  I can state
with confidence that Mr. Beffel was not anti-homosexual. . . . There was
nothing but tolerance for homosexual orientation in ConGen Rio during
1995-1996; I never witnessed any hostility toward Mr. Olson on this
point."

h.     "[H]e terrorized his subordinates, and alienated his peers, superior, and
applicants, through his yelling and screaming fits, as well as daily
rudeness and coldness.  We, his subordinates, respected him for his high
degree of operations competence, as well as for the exemplary standard of
hard work on the front lines that he set, but we feared him greatly, too – all
the time."

16.     The record contains a statement from Mark Lore at A 1216 that includes the
following passages:

a.     "[I]n one or two direct contacts with [plaintiff] and with regard to
Section IIA.B of the subject EER, Mr. Olson did strike me as

16

unnecessarily rigid and insensitive to the Embassy's political and public

relations concerns.  With regard to Section II.C, Mr. Olson's occasional

displays of insensitivity toward Brazilian visa applicants were well known

within both the Brazilian and US official communities.  They were the

subject of informal complaint to me on several occasions by foreign

ministry officials (although, to be fair, other visa officers in the mission

were also the subjects of such complaints)."

b.      "With regard to Mr. Olson's claim of bias, I did not observe any

prejudice against his sexual orientation on the part of Messrs. Zweifel and

Beffel.  Both of these officers appeared to me to act professionally in

dealing with the often difficult management problems of the visa unit in

Rio."

17.     The record contains a statement from Layton Russell at A 1217-1219 that

includes the following passages:

a.      "[Plaintiff's] tendency to strongly resist every minor policy change

contributed to certain inefficiencies, and there is no doubt that this

particular style in dealing with visa applicants sometimes exacerbated the

post's public relations problems."

b.      "Karl's perception that his actions were decisive in influencing the

Brazilian Senate to amend the law to extend the validity of tourist visas is

not factual.  There was no real opposition to this change and, in a country

where bureaucratic and legislative procedures are inevitably complicated

and act as a powerful impediment to change, the major challenge was to

motivate the Foreign Ministry and key members of the Congress to take

positive action to move the bill through the Congress.  Karl, of course, did

play a role in carrying out the Embassy's strategy, however, it was of

secondary importance, and, in my opinion, not always positive."

c.        "I have no reason to believe there is any basis for Karl's suspicion tht

his EERs were unfavorably influenced by a bias against his sexual

orientation. . . . Even though Karl's flamboyant style and aggressive

promotion of the gay life style was often viewed negatively, even among

other homosexuals, I do not believe that this was a factor contributing to

the criticisms in his EERs."

d.        "Karl is a very talented officer, but a great deal of his supervisor's time

and effort are required in order to ensure that his energies are properly

channeled. . . . Karl always found it difficult to accept that his proposals

were not favored, and made a strong effort to convince me of their worth

and viability.  This tendency of his to never give up, to continue returning

to the same issues and presenting the same arguments, is very

disconcerting.  Another characteristic of Karl's is a penchant for deviously

making procedural and policy changes which he knows his supervisor

would not agree with.  For example, when I returned from R & R, I

discovered that Karl had made a major change in requirements for

submitting visa applications by travel agents. This change was based on a

distortion of one of the my [sic] basic principles governing the visa

process.  Specifically, I had long instructed officers not to base visa

illegibility decisions on documents, and not to waste time analyzing

documents, since we know that those presented by visa applicants were

unreliable, and a survey had shown that this tended to result in unsound

decisions.  In discussing this concept, Karl had several times suggested

that travel agents be instructed not to send supporting documents, and I

stated my position that they should be permitted to send whatever

documentation they may desire. . . . Notwithstanding this, I found that

during my absence Karl had instructed the travel agencies to discontinue

submitting supporting documents.  I eventually decided that reversing

Karl's action would cause more problems than it was worth, and his

change was allowed to stand.  This is an excellent example of how a

subordinate can scheme to have his opinion prevail over that of his

supervisor, and it was typical of Karl to do everything short of clear

insubordination to get his way on policy and procedural issues. . . . It is

my impression, however, that after my departure from Rio, Karl's

tendency to force his opinions on his superiors was given free rein and this

became much more of a problem during the last two years of his tour.  In

large part because of this, Ed Beffel was unable to exert sufficient

influence to maintain control of the visa operation.  During the last year of

Karl's tour in Rio, it became necessary for the Consul General, Jim

Derham, to become heavily involved in the management of the section in

order to keep the operation on an even keel, and this was accomplished

only with the greatest difficulty."

18.     The record contains a statement from Nadia Tongour at A 1220-1221 that includes the following passages:

    a.     "Ultimately, the issue of public relations/image, I believe, became a serious source of friction between [plaintiff and Mr. Beffel] as well as between the Consul General and Karl.  The Consul General, in particular, made no secret of the fact that he found disturbing the frequent, negative articles in the press, criticizing the visa section and alleging rude treatment by visa officers (sometimes citing Karl Olson by name)."

    b.     "I do not know ether the CG or Ed Beffel were homophobic (if they were, Rio would have provided numerous targets).  I personally never heard either express any sentiment that would create that impression.  The criticisms that I heard centered on Karl's professional style/approach in dealings with the public and to a lesser extent on specific characteristics cited in the various various [sic] EERs."

19.     The record contains a statement from Roland Estrada at A 1225-27 that includes the following passages:

    a.     "Mr. Olson was not well regarded by both the American and local staff."

    b.     "My impression is that Mr. Olson exhibited a tendency to argue over small details.  The arguments could take place in the privacy of an office or out in the middle of an open area. There was no telling what issues would provoke an argument.  I found Mr. Olson to be not easily approachable."

c.    "I did receive reports that his supervision over locally hired employees was at times difficult and overbearing. A number of FSNs commented on Mr. Olson's somewhat combative interpersonal style."

d.    "Olson's strident personality made him at times a difficult person to deal with.  During this rating period a number of crises arose that questioned his ability to manage the non-immigrant section and properly deal with these situations."

e.    "The difference in management styles [between Mr. Beffel and plaintiff], the sometimes embarrassing situations that surfaced in running the section as it pertained to the public, and the explosive nature of Mr. Olson's personality made it difficult to have a collegial relationship with Mr. Olson."

20.    The record contains a statement from Charles Trotter at A 1228-1231 that includes the following passages:

a.    "Mr. Zweifel and Mr. Beffel are both honest and objective.  I observed that they always treated Mr. Olson fairly, without regard to his sexual orientation.  Both Mr. Zweifel and Mr. Beffel were committed to seeing that Mr. Olson and his NIV unit succeeded in accomplishing its overwhelming task."

b.    "I believe that the criticisms regarding Mr. Olson's somewhat narrow focus, resistance to changes suggested by Mr. Beffel, and tendency to be overly officious with NIV applicants are accurate.  This is based on my observation of Mr. Olson's performance and conversations with others."

c.      "I recall one incident in which Mr. Olson had denied a visa to a grandson of a prominent Brazilian singer.  This led to a very unfortunate sequence of events.  When Mr. Olson exited the Consulate to go to lunch later in the day, the singer followed Mr. Olson down the street and into a restaurant, and was verbally difficult with him.  Mr. Olson refused to discuss the matter and ultimately, out of frustration, waved his arms in the air when he was sitting down at a table.  The singer was very upset by this action.  She and her husband took it as a serious insult and ended up discussing the matter with me and Mr. Beffel in my office.  The singer's grandson was indeed eligible to receive a tourist visa.  The singer's behavior in this matter was highly inappropriate.  Nevertheless, I believe a less officious, more sensitive attitude by Mr. Olson, and a closer look at the application initially, could have prevented the matter from going so far and from taking me away from other pressing duties for which I was responsible. I would re-emphasize, however, that this situation was caused, at least in part, by the overwhelming workload that Mr. Olson faced and took very seriously, as he should have."

d.      Evaluation of Potential – "I found Mr. Beffel's criticisms accurate.  I also concur that improving his interpersonal skills should enable Mr. Olson to advance in the Foreign Service.  In my view, Mr. Olson is a very talented officer and valuable member of the Foreign Service who will advance to FS-1, and perhaps higher, if he can just learns [sic] to view

himself more objectively and make the adjustments in his performance
that were noted in the 1995 EER."

e.      Areas for Improvement – "Knowing Mr. Beffel's honesty and
objectivity, as well as my knowledge of Mr. Olson's sometimes officious
manner, I believe Mr. Beffel's comments are accurate.

f.      "Mr. Zweifel's comments in this section are accurate.  Mr. Zweifel is
honest and objective, and devoted considerable individual effort to helping
Mr. Olson improve his performance in the cited areas."

g.      Prejudicial EERs Result of Sexual Orientation – As previously stated,
I believe Mr. Beffel's and Mr. Zweifel's comments in Mr. Olson's 1995
EER are accurate.  I also believe that Mr. Olson's assertion, that their
criticisms and alleged errors in his 1995 EER resulted from their bias
against his sexual orientation, is absolutely false.  First, both Mr. Zweifel
and Mr. Beffel are honest and objective and would never allow any bias
against sexual orientation, race, or anything, even if one existed, to
influence their professional conduct.  I observed that Mr. Zweifel and Mr.
Beffel always treated everyone with respect and fairness, and without
bias."

h.      "To the best of my knowledge, and I am confident that my knowledge
of this question is accurate, Mr. Olson was never investigated as a
homosexual security risk.  I certainly never heard any discussion of such a
matter, never heard the rumor Mr. Olson referred to, and never saw any
cable on such a matter.  Mr. Zweifel certainly did not have 'a problem'

with Mr. Olson's sexual orientation, as Mr. Olson asserts.  As I previously stated, Mr. Zweifel always treated everyone he met with respect and fairness, and without bias."

i.      "I was aware of the incident with the VARIG pilot described in this section.  I do not recall handling any of it myself.  Mr. Zweifel, Mr. Beffel and Mr. Olson handled it.  I am certain that Mr. Zweifel's manner of handling the matter was not influenced by AIDS/gay issues, as suggested by Mr. Olson.  And Mr. Beffel certainly is not 'Aids-phobic.'"

j.      "In summary, based on my observations, I believe strongly that Mr. Zweifel and Mr. Beffel rated and reviewed Mr. Olson's 1995 EER accurately and that they did not make any falsely prejudicial statements in it whatsoever.  Neither Mr. Zweifel nor Mr. Beffel made any comments in the EER because of Mr. Olson's homosexual orientation."

k.      "I would like to add an additional comment regarding Mr. David Zweifel.  I worked very closely with him during my nearly two years in Rio.  I found him to be one of the finest officers I ever met during my career.  He is a person of exceptionally high integrity and would never engage in the type of conduct Mr. Olson alleged.  Nor would he allow a subordinate to engage in it."

21.  The record contains a statement from Ambassador Melvyn Levitsky at A 1232-1233 that includes the following passages:

a.      "Several instances of Mr. Olson's rudeness and discourtesy to visa applicants came to my attention.  Some were brought to me by the Foreign

Ministry.  Some made their way into the Brazilian press.  As a result of the repercussions of these cases, I undertook a campaign to emphasize 'courtesy and respect' to our visa officers.  I would normally not have to urge such basic principles on officers, but because I had received so many complaints about Mr. Olson (including allegations that he swore and screamed at some visa applicants), I felt it was necessary.  Reading the comments of his rating and reviewing officers, I believe their criticism of this aspect of Mr. Olson's performance were not only justified, but probably understated."

b.        "Mr. Olson's sexual orientation, as far as I know, was not a factor in the way he treated people, nor did it affect the judgment of his supervisors. I did discuss on several occasions with Consuls General Zweifel and Derham my displeasure with the problems generated by the Rio visa section which tarnished the image of the United States, but Mr. Olson's sexual orientation was never the basis of their or my concern in this regard."

c.        "Mr. Olson greatly exaggerates his role in the visa reciprocity issue. In reality we were successful in this area because of constant high level pressure on and discussions with the Brazilian Government in Brasilia.  It is highly improbably that the Brazilian Senate would have in any way been moved to action by the visa case Mr. Olson mentions.  In fact, in one instance the Chairman of the Brazilian Senate Foreign Relations

Committee visited me to complain about alleged poor treatment of

Brazilian citizens by the visa section Mr. Olson headed."

22. The record contains a statement from Leyda Garcia at A 1252 that includes the

following passage:

a. "In my presence, none of Mr. Olson's superiors made any derogatory

remarks reflecting Mr. Olson's sexual orientation."

23. The record contains a statement from James Derham at A 1290-1292 that includes

the following passages:

a. "In my experience [plaintiff's] reluctance to accept guidance often

crossed the line into insubordination."

b. "Mr. Olson was often abusive in his verbal or written communications

with FSN staff or U.S. colleagues."

c. "Mr. Olson's procrastination in preparing FSN evaluation reports was

a serious and continuing problem, and was brought to my attention several

times."

d. "In my experience, Mr. Olson's insistence on certain procedures

sometimes slipped into fanaticism.  I recall one incident where Mr. Olson

reacted to what he believed was line jumping by two NIV applicants being

assisted by a Consular Section FSN. He immediately berated the FSN in

front of a crowd of people (Consulate employees and others) and then

rejected the NIV applications of the two Brazilians.  I looked into the

matter and discovered that he had totally misapprehended the entire

situation – there had been no line jumping, the FSN had done nothing

wrong, and the NIV applicants were good faith travelers who did not know each other or the FSN. It took me hours to calm down the FSN, one of our most valued employees, and to do damage control with the irate NIV applicants. Even if Mr. Olson's perception had been correct, he overreacted. Similarly, Mr. Olson insisted that NIV applications be submitted with the photo stapled in a very precise way. Any deviation from this standard could result in Mr. Olson's preemptory rejection of the application, even when submitted on behalf of important Brazilian contacts referred by other Consulate sections. To avoid repeated problems, I finally transferred the responsibility for referrals from Mr. Olson (to Mr. Beffel)."

e.     "It does not strike me as plausible that action (or inaction) in Rio de Janeiro on one NIV case can be credited with passage of legislation in Brasilia. Mr. Olson's decision to balk at the DCM's request and force the Fiat Executive to re-schedule his trip, however, is representative of Mr. Olson's general tendency to make matters unpleasant for everyone."

f.     "My recollection is that nothing in the EER prepared by Mr. Beffel reflects bias against homosexuals. Mr. Olson never raised this issue with me. Others officers [sic] at post, who were friendly with Mr. Olson and frank in their discussions with me, did not mention this issue either."

24.   Cable 94 Rio de Janeiro 2982, which reported that plaintiff exhibited homosexual preferences, was titled "Request for Assistance." It indicated that the Regional Security Officer ("RSO") planned only to conduct a defensive briefing, and asked

Washington to advise "if further action is appropriate." The cable noted that Post "ha[d] not learned of any infamous or notorious conduct," and that Post did not have any counter-intelligence concerns regarding plaintiff. C 417.

25. Cable 94 Rio de Janeiro 2982 was a request for guidance from the Post's RSO, and it was communicated through the Diplomatic Security channel. C 417, C 524.

26. The Diplomatic Security bureau responded to Cable 94 Rio de Janeiro 2982 that, unlike in the past, an employee's homosexual orientation "was no longer considered an issue" unless the employee exhibited criminal, infamous, or notorious behavior. Upon receipt of that response, the Post's RSO office closed the matter. C 524.

27. Every document that was part of the FSGB's Record of Proceedings prior to its April 4, 2002 decision (i.e. prior to the remand) was also before the FSGB when the grievance was remanded, and every document from the earlier FSGB proceedings is part of the administrative record filed with the Court in this case. See C 96-420.

28. The September 7, 2005 e-mail from grievance staff officer Henry Noonan to FSGB special assistant Joe Pastic was not sent to any FSGB Board members.

29. The September 7, 2005 e-mail from grievance staff officer Henry Noonan to FSGB special assistant Joe Pastic did not contravene any FSGB regulations.

30. The September 7, 2005 e-mail from grievance staff officer Henry Noonan to FSGB special assistant Joe Pastic was included in the Board's Record of Proceedings. C 801.

31. Plaintiff's counsel was copied on the September 9, 2005 e-mail from FSGB officer Joseph Pastic to Henry Noonan of the Department's Grievance Staff, and that e-mail is now part of the Record before the Court.  C 803.

32. In response to the Court's November 8, 2006 Order, the FSGB "searched every place where we believed an *ex parte* communication related to this matter could be located."  Supplemental Declaration of Joe Pastic (Dec. 14, 2006).  The FSGB search unearthed ten *ex parte* communications, including an automatically generated "Out of Office Reply."  All were filed with the Court.  C 872-885.  Five of those *ex parte* communications involved plaintiff's counsel.  C 878, 880, 881, 884, 885.

Dated:  March 15, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar 498610
United States Attorney

_____
RUDOLPH CONTRERAS, D.C. Bar 434122
Assistant United States Attorney

/s/_____
JANE M. LYONS, D.C. Bar No. 451737
Assistant United States Attorney
Civil Division
555 4th Street, N.W. – Room E4822
Washington, D.C.  20530
(202) 514-7161

Of Counsel:
David P. Huitema, Esq.
Department of State