UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
KARL OLSON,                                    )
                                               )
        Plaintiff,                             )
                                               )
            v.                                 )        Civil Action No. 06-1205 (GK)
                                               )
CONDOLEEZZA RICE, Secretary of State, )
                                               )
        Defendant.                             )
_____)

**DEFENDANT'S MEMORANDUM IN OPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff, a member of the Foreign Service, returns to this Court seeking review of

a decision by the Foreign Service Grievance Board ("Board" or "FSGB") on remand

from this Court in Civil Action No. 02-1371 (GK).  After thoroughly considering the

entire record again, including the evidence of "managerial dysfunction" and "whether

anti-homosexual bias unfairly tainted" plaintiff's 1995 and 1996 performance evaluations

as specifically directed by the Court, the Board again decided to reject plaintiff's

grievances, and has explained its reasoning in a lengthy decision.  That decision is

supported by ample evidence in the Administrative Record.  Plaintiff's motion consists

primarily of his differing interpretation and characterization of that record and unfounded

accusations of procedural errors.  Because the FSGB followed its procedures in

considering the relevant evidence and made a rationale decision, any line drawing in the

accuracy and fairness of the plaintiff's performance evaluations should be left to the

Board and its decision to deny plaintiff's grievances should be upheld.

Pursuant to 22 U.S.C. § 4140, the FSGB's decision is subject to review under the familiar standards provided in the Administrative Procedure Act. 5 U.S.C. § 706. Because the FSGB's conclusions are well supported in the record and adequately explained in the decision, plaintiff cannot meet his burden of showing that the FSGB's decision was arbitrary, capricious, or otherwise contrary to law. Significantly, plaintiff fails to identify the undisputed material facts supporting his motion as required by Local Civil Rule 7(h). That rule requires that a motion for summary judgment be accompanied by "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." Beyond the procedural deficiency, however, plaintiff's motion should also be denied because the FSGB's decision cogently explains its denial of his grievances and is supported by the complete administrative record. Accordingly, for the reasons set forth below, defendant's cross-motion for summary judgment should be granted.

## DEFENDANT'S RESPONSE TO PLAINTIFF'S NARRATIVE STATEMENT OF FACTS

The "Statement of Facts" contained in plaintiff's brief contains an extensive amount of characterization and interpretation. In addition, some of the statements raise issues immaterial to plaintiff's claims, and much of the rest of the Statement of Facts is simply overstated. Defendant offers the following response to aid the Court in resolving this matter.

**Work Load and Work Environment.** Much of plaintiff's Statement of Facts focuses on the high volume and difficult work environment in the non-immigrant visa section during plaintiff's tour. See, e.g., paragraphs 1, 2, 7, 8, and 9. While many of

plaintiff's assertions are accurate, they are not material to his claims.  Plaintiff did not

grieve the working conditions in Rio; he grieved the content of his employee evaluations

("EERs").  The EERs themselves specifically note the difficult working conditions and

laud plaintiff for persevering in a difficult environment. For example, the EER contains a

section where supervisors can note "special circumstances influencing the work

program."  In plaintiff's 1994-1995 EER, Ed Beffel noted that "The section is grossly

understaffed, lacks space, is years behind in adequate automation.  The NIV volume has

increased 40% last year and has one of the highest case per officer workloads in the

world."  A 072.  The next year, Mr. Beffel wrote that "The physical plant in Rio's

Consular Section is woefully inadequate, as was the consular staffing for much of the

rating period.  The NIV work load rose 40 percent in FY-95 and has doubled since Mr.

Olson's arrival."  A 066.  In the first EER, Mr. Beffel stated that "Mr. Olson is the

hardest working officer I have ever served with.  He gets the work done against

tremendous pressures and lack of staff, space, and resources."  A 073.  The following

year's EER began by stating that:

> Mr. Olson's performance was excellent; remarkable in several areas.
> Rio experienced a seismic explosion of its NIV work load and is now the
> fifth largest NIV post in the world.  Thanks to Karl, Rio not only has no
> backlogs but attracts many well qualified applicants from all over Brazil.

A 067.

Some details from this portion of the Statement of Facts are, nonetheless,

exaggerated or argumentative.  For example, plaintiff states (at 3) that the "U.S.

Government Refuses to Assist" with the surge in visa applicants in Rio.  In fact, Mr.

Beffel sought to upgrade plaintiff's position because he was managing such a busy

operation.  A 1198, A 1290-91.  Moreover, Consul General Zweifel, Ambassador

Levitsky, and the Consular Affairs Bureau repeatedly pressed for additional staffing to assist with the high volume in Rio.  See, e.g., B 0153-56, 0161-62, 0176-79, 0181-83, 0186, 0189-90.  Unfortunately, the Department was not able to immediately increase permanent staff in the Rio consulate when the reciprocity policy was imposed, and this did exacerbate the strain on the NIV section's resources.  Within a year, however, the Department had assigned additional foreign service officers and doubled the locally employed, or foreign service national, staff ("FSNs").  Plaintiff's EERs note that in 1994-1995 he supervised two junior officers and seven Brazilian employees.  A 072.  By the same time the following year, he was supervising five junior officers and fifteen Brazilian employees.  A 066; see also A 1198 (commenting that inadequate staffing was "a very bad situation that only got better in mid-1995 with the arrival of more officers and a doubling of the NIV unit Brazilian staff."); A 1219 ("Although the Department did respond to this growth beginning in 1995, the response in terms of additional officer resources lagged far behind.").  In the interim, the consulate used short-term staffing as necessary.

Plaintiff also asserts that he made "tremendous efforts to facilitate work and improve morale" that did not receive support, but he does not provide any detail and cites only a single, cursory statement from a colleague.  There is substantial evidence in the record that plaintiff was a tyrant with both the junior officers and FSNs, which hardly improved morale.  See, e.g., Witness Statements of Edwin Beffel (A 1196, 1198, 1202), David Zweifel (A 1204-05), Roland Estrada (A 1225-26), James Thiede (A 1211-12, 1215), James Derham (A 1291).  After his supervisor counseled him about these problems and noted them in his 1994-1995 EER, plaintiff apparently did make efforts to

improve his leadership.  His EER the following year stated that "Karl is respected by his staff for energy level and willingness to work long hours keeping things running.  He encourages teamwork and suggestions, and generally exhibits insight and concern in dealing with his American staff.  Karl frequently hosts (and pays for) morale-enhancing pizza parties in the office and buffets at home." A 067.  Thus, the evidence on plaintiff's managerial efforts is mixed and accurately reflected in the record.

**Negative Press.**  Plaintiff suggests (in paragraph 4) that public dissatisfaction with the reciprocity policy and his prominent role as NIV Chief excuse the negative publicity directed at him.  In fact, while the Department may have expected public outcry when the reciprocity policy was implemented, the reaction was more muted and supportive than anticipated.  B 121.  In any event, criticism in plaintiff's EERs about negative publicity was not based simply on the fact that visa applicants complained because they endured a long wait, or received only short-term visas, or even that plaintiff denied their visa applications.  Rather, the criticism focused on the fact that plaintiff was rude and abusive to visa applicants.  See, e.g., Witness Statements of Edwin Beffel (A 1197), David Zweifel (A 1205), James Thiede (A 1210-11), Amb. Melvyn Levitsky (A 1232), & Layton Russell (A 1217).

**Criticism of Supervisors.**  Plaintiff devotes paragraphs three and six to off-base criticisms of his supervisors.  The Department disputes that plaintiff had "absentee and uninvolved supervisors."  Obviously, officials posted in another city were not in close physical proximity to plaintiff.  Similarly it is not surprising that senior leadership at the Rio consulate did not have office space in the public visa section.  Nor would they have participated "in the trenches" on the visa line; that was not their job.  However,

5

statements from both the chief of the consular section, Ed Beffel, and the Consul Generals, David Zweifel and then James Derham, belie the suggestion that they were out of touch or unfamiliar with the consulate's visa operations, the difficulties that accompanied the high volume, or (most significantly) plaintiff's performance.  A 1196-1206, A 1290-92.

Plaintiff also asserts in paragraph six that his supervisor was an alcoholic. Although there is evidence that Mr. Beffel had personal problems, the record does not establish that he was an alcoholic, nor is the issue material to plaintiff's grievance. Whether or not Mr. Beffel made rambling phone calls to other officers in the evenings is irrelevant—what matters here is his ability to assess plaintiff's job performance during the day.  Plaintiff takes issue with a reorganization implemented by Mr. Beffel, but the merits of that plan are not at issue in the grievance either, and the characterization that Mr. Beffel "undercut" plaintiff is pure argument (Mr. Beffel was, after all, plaintiff's Supervisor).  This case is not about re-hashing every disagreement plaintiff had with his supervisor.

Nor does Consul General Derham's directive that Mr. Beffel should be "hands off" with regard to the day-to-day operations of the non-immigrant visa section reflect any dissatisfaction with Mr. Beffel's performance.  The same directive states that "[a]s Section Chief, [Mr. Beffel] continues to be responsible for overall supervision of the Section and as such oversees all operations . . . ."  A 323.  Mr. Beffel was in charge of more than just the non-immigrant visas, and it was not his responsibility to be mired in that group's day-to-day operations.  However, because Consul General Derham lost confidence in plaintiff, he took the unusual step of reassigning a portion of his

responsibilities (referral visas) to the more seasoned and diplomatic Mr. Beffel. A 1291. Mr. Derham's predecessor, David Zweifel, also noted that, compared with plaintiff, "Mr. Beffel was by far the more experienced consular specialist." A 1205. The Consul General's statement that he "supported Mr. Beffel's positions" when policy differences arose with plaintiff further negates any suggestion that Mr. Beffel was incompetent or dysfunctional.

**Evidence of Anti-Homosexual Bias.** Paragraph five addresses the supposed "anti-homosexual atmosphere" in Rio, but plaintiff provides a highly selective and inflated review of the record. Plaintiff's assertion that "five credible DIS officers" gave statements concerning anti-gay bias is exaggerated. Only one witness (Ms. Straw) stated a belief that anti-homosexual bias affected plaintiff's EERs. A 1224. Only two witnesses (Ms. Straw and Mr. Schlaefer) even attributed any gay-related comments (crude jokes) to Mr. Beffel. A 1224 & 1246. Only one witness (Mr. Schlaefer) attributed anti-homosexual sentiments to Mr. Zweifel, while one other witness (Mr. Connell) supported plaintiff's theory that Mr. Zweifel's attendance at plaintiff's party led in some fashion to the 94 Rio 2982 cable. A 1246, 1015-16. The other witnesses cited by plaintiff did not even work in Rio and provided extremely vague statements that do not even identify Mr. Beffel or Mr. Zweifel. A 1006-1014. By contrast, five witnesses stated that bias did *not* affect the content of plaintiff's EERs. A 1232, A 1230-31, A 1292, A 1218-19, A 1214. Mr. Beffel and Mr. Zweifel adamantly denied the charge as well. A 1199-1200, A 1204. These witnesses, as well as others, also indicated more generally that they were unaware of any anti-homosexual comments or sentiment from Mr. Beffel or Mr. Zweifel. See, e.g., A 1220, A 1252.

There is scant evidence in the record concerning the "Queer Reserve Note." The record contains no evidence establishing that Mr. Beffel gave it to plaintiff or, if so, what the circumstances were and whether plaintiff truly was "humiliated and insulted." Even if it happened exactly as plaintiff claims and accepting that he would have been upset, however, such an isolated incident simply does not give plaintiff the right to dictate and edit the contents of his performance reviews as he seeks here.[1]

The August 3, 1994 cable to Diplomatic Security did not "trigger[] questions about Mr. Olson as a homosexual security risk," but simply asked for guidance from Washington. B 671. Apparently the response was that no follow-up was required, and so none was taken. C 524. Moreover, Mr. Zweifel did not deny that the cable existed, but denied any recollection of an investigation into plaintiff as a "homosexual security risk." This is not surprising since the routine cable was drafted by the Regional Security Officer and did not lead to any investigation of plaintiff. C 524.[2]

Finally, there is only one statement in the record relating to plaintiff's assertion that Mr. Beffel and Mr. Zweifel discussed a colleague's marriages in a positive light. That statement discusses only comments by Mr. Zweifel regarding one married foreign

---

[1] Plaintiff did not cite discrimination as a basis for his grievance, but even still, it is clear from the record that he could not satisfy the standards of a hostile work environment sort of claim. Clark County School District v. Breeden, 532 U.S. 268, 271 (2001) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient); Holbrook v. Reno, 196 F.3d 255, 263 (D.C. Cir. 1999) (to be actionable, harassment must be "sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment'" and "'unreasonably interfer[e] with an individual's work performance.'") (quoting Meritor Savings Bank v. Vinson, 477 U.S. 57, 65, 67 (1986)); Stewart v. Evans, 275 F.3d 1126, 1133 (D.C. Cir. 2002) ("Title VII is not a general civility code for the American workplace, nor does it serve as a remedy for all instances of verbal or physical harassment, for it does not purge the workplace of vulgarity.") (internal citations and quotations omitted); Valentin v. Principi, No. 02-1861 (JDB), Slip Op. at 12 (D.D.C. 2004) ("The key terms ... are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment.").

[2] Although the idea that sexual orientation might have any bearing on security would likely strike a reader in 2007 as odd, it is important to view this portion of the record as reflective of its times and to note that nothing happened to plaintiff as a result of the cable being sent and no investigation was conducted.

service officer, and there is no indication that plaintiff was even present for those comments.  A 1246.

**DFENDANT'S COUNTER STATEMENT OF FACTS**

In support of her cross-motion for summary judgment, defendant attaches a Statement of Material Facts Not in Genuine Dispute to her motion.  <u>See</u> Docket Entry No. 31.

**PROCEDURAL HISTORY AND THE BOARD'S DECISION**

On May 22, 1998, Plaintiff filed his agency-level grievance alleging that the Employee Evaluation Reports ("EERs") he received for the periods August 28, 1994 - April 15, 1995 and April 16, 1995 - April 15 1996 were inaccurate, falsely prejudicial, and that they improperly omitted favorable information and contain inadmissible comments.  A at 7-26.  On September 30, 1998, the Department denied any relief relating to the 1995 and 1996 EERs.  A 1156-1195.  Plaintiff appealed to the FSGB on November 25, 1998.  A at 2-78.  After a voluminous record was compiled, the Board found on April 4, 2002 that the two EERs in question were not inaccurate, falsely prejudicial, or otherwise defective.  A at 1302-59.  The Board did not specifically analyze whether homophobic attitudes affected and undermined the validity of plaintiff's EERs, because the evidence regarding plaintiff's job performance demonstrated that the EERs were accurate.

Plaintiff appealed to this Court on July 7, 2002.  On February 22, 2005, the Court granted in part, and denied in part, each party's motion for summary judgment.  <u>See</u> Memorandum Opinion, No. 02-1371 (D.D.C. Feb. 22, 2005) (C 002-017).  The Court granted summary judgment for the Department on plaintiff's claims that the FSGB

committed procedural errors that prejudiced his grievance. However, the Court remanded to the FSGB to consider whether anti-homosexual bias had tainted plaintiff's EERs. The Court also instructed that the Board should consider whether allegations of "personal and managerial dysfunction" on the part of plaintiff's supervisor, Edwin Beffel, prevented a fair evaluation.

In its Acknowledgement Order on remand, the Board indicated that it would make its decision based on the existing record evidence, unless the parties established a need to provide additional evidence concerning anti-homosexual bias. C 21-22. Neither party did so, and after providing an opportunity to review and add any missing documents to the record, the Board reconfirmed that no additional evidence would be added. C 96.

The parties submitted arguments in late July, 2005, and replies were filed in mid-August. C 439-562, C 563-739, C 741-43, C 745-68. Plaintiff belatedly sought to attach new evidentiary exhibits with his brief. The Board granted the Department's motion to exclude those exhibits. C 782.

The FSGB then made repeated attempts to close the Record of Proceedings ("ROP"). On August 30, 2005, the FSGB issued a proposed ROP, which included the entire, corrected record from the original grievance proceeding as well as all the briefing submitted on remand. C 783-85. Following requests for clarification from both parties, the Board issued an order on September 19, 2005 definitively setting out what would be included in the record and providing until October 3 for further comment. C 790-99. Grievant filed another motion regarding the record that the Board resolved on September 26, 2005. C 809-810. The Board excluded a final motion by grievant that was filed after the October 3, deadline. C 812-815.

On November 7, 2005, the FSGB issued its final decision on remand. C 816-60. The Board found that plaintiff had not met his burden of showing that anti-homosexual bias tainted his evaluations or that dysfunction rendered his manager not competent to properly evaluate him. C 816-60. Pursuant to the Court's order of remand, the FSGB considered whether anti-homosexual bias unfairly tainted Plaintiff's employment reviews and concluded that it did not. C 818. "On remand the Board found that Olson failed to shoulder his burden of establishing by a preponderance of the evidence, that the grievance was meritorious. The Board examined in depth the question directed for resolution on remand and concluded that Olson's claim that anti-homosexual bias tainted his evaluation had not been satisfactorily demonstrated." Id. The FSGB considered several witness statements, including those by Beffel and Zweifel, which asserted that the criticisms of Plaintiff in the EERs were not the product of any prejudice against homosexuals. C 822-34. It credited the statements of Beffel and Zweifel and noted that many witnesses corroborated their criticisms of Plaintiff. C 841-42.

Noting that even biased raters and reviewers can prepare valid EERs, it stated that "a most important initial question is whether the comments by Beffel in these EERs were contaminated as a product of the rater's managerial flaws." C 843-44 (citing Toy v United States, 263 F. Supp. 2d 1 (D.D.C.)). The FSGB concluded that "the preponderance of the evidence does not support the alleged cause-and-effect argument that homosexual bias produced the criticisms of Olson in the two EERs in question. Not only are the criticisms Olson condemns supported by the evidence of rater Beffel, and Olson's reviewers, but they also are corroborated by several others whose remarks are strikingly similar among themselves." C 845. The FSGB noted that the evaluation report

and supporting evidence showed that Plaintiff did not live up to his work requirements which included courteously managing the Non-Immigration Visa Unit ("NIVU") and improving the public relations image of that unit. C 845. The EERs provided a fair and balanced view of Plaintiff's performance because they not only duly recognized the problems that the unit faced, they also praised him for a number of accomplishments. C 846-47. The evidence supported comments in the EERs that showed inter alia that: (1) Plaintiff was overbearing (C 848-49); (2) Plaintiff's attitude "caused wasted time in dealing with minor issues" (C 849-50);and (3) he failed to prepare timely efficiency reports (C 851-52). Ultimately, the FSGB concluded that the evaluations were fair and accurate and that they have a rational basis because "the challenged comments in the EERs were not the consequence of any bias, but rather they were attributable to Olson's conduct." C 859. Thus, Plaintiff had not carried his burden under 22 C.F.R. 905.1(a). C 859.[3]

## ARGUMENT

Both the Complaint and Plaintiff's Motion for Summary Judgment Motion create a misimpression that plaintiff's performance evaluations say nothing positive about his efforts and completely ignore the difficulties faced by the entire consular section in Rio de Janeiro in 1994-95. In fact, the evaluations are fair and balanced, and paint a reasonably detailed picture of plaintiff's accomplishments under trying circumstances as well as some perceived areas for improvement. Notably, plaintiff's efforts to improve are commended in the second of the two evaluations he challenges. Plaintiff's grievance and

---

[3] Following the Board's decision, plaintiff first sought to re-open his prior district court case (Civil Action No. 02-1371 (GK)), which had been closed when the grievance was remanded to the FSGB. On June 30, 2006, after the Court denied plaintiff's request to re-open, plaintiff filed a new complaint--the complaint in this case.

arguments in this Court attempt to divert attention from certain deficiencies in his own performance, place blame with the workload and the difficult environment, and disparage the reputation and integrity of the senior officers who prepared his evaluations. However, the preponderance of the evidence does not bear out plaintiff's claims. Although the work environment was indeed challenging and there was some evidence of generalized anti-homosexual sentiment, the bulk of the evidence also confirmed that the problems identified in the EERs were real, the overall picture they presented was balanced, and the officials who prepared them did so with integrity.

I.    **THE FOREIGN SERVICE GRIEVANCE BOARD'S DECISION IS ENTITLED TO SUBSTANTIAL DEFERENCE.**

Under the Foreign Service Act of 1980, an aggrieved party can obtain review of a final decision of the FSGB in federal district court in accordance with the standards of the APA. Thus, a decision of the Board will not be set aside under 5 U.S.C. § 706(2)(A) unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This highly deferential standard of review reflects a legislative judgment that "the Board's familiarity with the foreign service ought to be respected by the judiciary." United States v. Paddack, 825 F.2d 504, 514 (D.C. Cir. 1987). The Board's decision is presumed to be valid, and it must be upheld as long as there is any rational basis for it. Motor Vehicle Mfrs. Ass'n of the U.S. Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 42-43 (1983). A court is not empowered to "substitute its judgment" for that of the Board. Id. As long as a decision is reasonable, it "need not be the best or most natural one" in the eyes of the court. Pauley v. BethEnergy Mines, 501 U.S. 680, 702; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); American Paper Institute v. American Electronic Power Servs. Corp., 461 U.S. 402, 422 (1983);

13

INS v. Wang, 450 U.S. 139, 144 (1981).  The court's review is limited to the administrative record that was before the Board at the time it made its decision.  Florida Power & Light v. Lorion, 470 U.S. 729, 743-44 (1985); Citizens to Preserve Overton Park, 401 U.S. at 420.

With regard to alleged procedural problems, a decision of the Board will not be set aside under 5 U.S.C. § 706(2)(D) unless it was made "without observance of procedure required by law."   Moreover, for any APA claim, "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706.  In other words, APA violations are only actionable if the plaintiff was prejudiced by the violation.  Procedural irregularities are not *per se* prejudicial, and it is the plaintiff's burden to establish prejudice.  See Carstens v. Nuclear Regulatory Comm'n, 742 F.2d 1546, 1558 (D.C. Cir. 1984).

## II.    THE BOARD REASONABLY FOUND THAT PLAINTIFF FAILED TO ESTABLISH THAT ANTI-HOMOSEXUAL BIAS TAINTED HIS EERS OR THAT MANAGERIAL DYSFUNCTION PRECLUDED AN ACCURATE EVALUATION.

The Board's decision in this case gives full consideration to plaintiff's arguments and evidence.  Weighing and evaluating evidence is the function of the Board.  See Toy v. U.S., 263 F. Supp. 2d 1, 7 (D.D.C. 2002).  The Board concluded that plaintiff had not satisfied his burden in establishing that anti-homosexual bias affected the content of his evaluations or that managerial dysfunction prevented a fair assessment of his performance.  The record amply supports those determinations.  Therefore, the Court should grant summary judgment for the defendant.

### A. Criticisms in Plaintiff's EERs Were Not the Result of Anti-Homosexual Bias, But Fairly and Accurately Reflected Some Shortcomings in Plaintiff's Performance, Among His Strengths and Accomplishments.

The central question for the Board to consider on remand was "whether anti-homosexual bias unfairly tainted Plaintiff's employment reviews."  C 017.  The question was not simply whether Beffel and Zweifel *harbored* any anti-homosexual bias, but rather whether any such bias, if it existed, "*tainted*" their evaluations of plaintiff.  The FSGB properly held that plaintiff had not met his burden in establishing, by a preponderance of the evidence, that bias undermined the validity of his EERs.  The Board based that holding on three determinations.  First, the Board found credible the witness statements of Beffel and Zweifel denying that anti-homosexual bias affected their evaluations of plaintiff.  Second, the Board noted that numerous other witnesses disagreed with plaintiff's claim that bias influenced his evaluations.  Finally, the Board determined that the record evidence established the validity and accuracy of the EERs in question.  Before reaching those conclusions, the Board reviewed all of the witness statements in the record along with each party's arguments.  The Board acknowledged that there was evidence on both sides in this grievance, but it was ultimately convinced by the great weight of evidence supporting the integrity of plaintiff's EERs.  Each of the Board's findings has ample support in the record, and the Board thoroughly explained the basis for its conclusions while giving full consideration to plaintiff's arguments and evidence in its decision.

Significantly, the 1996 EER notes plaintiff's efforts to improve in a key area -- managing staff members – which had been identified in the 1995 EER as a weakness.  Compare A1196, 1198, 1202, 1204-05, 1225-26 with A 067.  This reflects open-minded

evaluation of plaintiff's efforts and performance entirely contrary to what would be expected if the evaluations were tainted by a discriminatory bias.

**1.  The Board's Credibility Determinations Are Unassailable.**

Central to the Board's decision was its finding that the witness statements of Beffel and Zweifel were credible.  Both vehemently denied that anti-homosexual bias affected their reviews of plaintiff in any way.  A 1199-1200, A 1204.  Both also carefully reviewed the basis for their evaluations of plaintiff's job performance.  A 1196-1206. Finally, both provided more context on the consulate's operations, plaintiff's attitude and communications problems, and the nature of their relationships with plaintiff.  Id.

Credibility determinations are for the FSGB—the fact finder in this case—to make.  Previous cases have recognized that, "[a]s the finder of fact, . . ., the FSGB has the authority to find one witness more credible than another," and that, "[as] finder of fact, the FSGB can also assess the existence and degree of any bias on the part of the witnesses."  Toy v. U.S., 263 F. Supp. 2d 1, 7 (D.D.C. 2002).  The Court, when considering an appeal from the FSGB, cannot "substitute its own factual findings for those of the FSGB" unless the Board failed to consider the relevant evidence or made a clear error.  Shea v. U.S., 45 F. Supp. 2d 54, 61 (D.D.C. 1999).  In review under the APA standard, "credibility determinations . . . are virtually unreviewable."  Hambsch v. Dep't of the Treasury, 796 F.2d 430, 436 (Fed. Cir. 1986).  Even when the Federal Rules of Civil Procedure provide standard of review, the Supreme Court has emphasized the deference owed to the "original finder of fact."  Anderson v. Bessemer City, 470 U.S. 564, 573-75 (1985).

Here, the Board's credibility determinations were not made in a vacuum, based on a review of Beffel and Zweifel's statements in isolation. The factors discussed in the two sections below support the Board's findings that Beffel and Zweifel were credible. Other witnesses rejected the notion that bias infected plaintiff's evaluations and vouched for the integrity of Beffel and Zweifel. The record also shows that the criticisms in plaintiff's EERs were well founded and that plaintiff overstates the purported achievements that he believes should have been lauded.

**2. Numerous Witness Statements Support the Board's Conclusions.**

In addition to the statements from Beffel and Zweifel, six other witnesses provided statements vouching for the integrity of Beffel and Zweifel and refuting the notion that plaintiff's EERs are inaccurate on account of bias.

- Ambassador Levitsky testified that, "Mr. Olson's sexual orientation, as far as I know, was not a factor in the way he treated people, nor did it affect the judgment of his supervisors." Regarding concerns with plaintiff's visa section, the Ambassador stated, "I did discuss on several occasions with Consuls General Zweifel and Derham my displeasure with the problems generated by the Rio visa section which tarnished the image of the United States, but Mr. Olson's sexual orientation was never the basis of their or my concern in this regard." A 1232.

- Deputy Chief of Mission Mark Lore stated, "I did not observe any prejudice against [plaintiff's] sexual orientation on the part of Messrs. Zweifel and Beffel. Both of these officers appear to me to act professionally in dealing with the often difficult management problems of the visa unit in Rio." A 1216.

- Charles Trotter, Deputy Principal Officer in Rio from August 1993 until April 1995, stated, "I also believe that Mr. Olson's assertion, that their criticisms and alleged errors in his 1995 EER resulted from their bias against sexual orientation, is absolutely false. First, both Mr. Zweifel and Mr. Beffel are honest and objective and would never allow any bias against sexual orientation, race, or anything, even if one existed, to influence their processional conduct. I observed that Mr. Zweifel and Mr. Beffel always treated everyone with respect and fairness." With regard to Mr. Zweifel in particular, Mr. Trotter stated, "I worked very closely with

him during my nearly two years in Rio. I found him to be one of the finest officers I ever met during my career. He is a person of exceptionally high integrity and would never engage in the type of conduct Mr. Olson alleged. Nor would he allow a subordinate to engage in it." A 1230-31.

- Consul General Derham, who was plaintiff's reviewer in 1996, indicated that his "recollection is that nothing in the EER prepared by Mr. Beffel reflects bias against homosexuals. Mr. Olson never raised this issue with me. Other officers at post, who were friendly with Mr. Olson and frank in their discussions with me, did not mention this issue either." A 1292.

- Llayton Russell, plaintiff's supervisor in Rio for the months immediately preceding his grievance and subsequently Consul General in Brasilia, stated "I have no reason to believe there is any basis for Karl's suspicion that his EERs were unfavorably influenced by a bias against against his sexual orientation. . . . Even though Karl's flamboyant style and aggressive promotion of the gay life style was often viewed negatively, even among other homosexuals, I do not believe this was a factor contributing to the criticisms in his EERs. . . . It may well be that Karl did not receive fair recognition for his accomplishments. If this occurred, however, I am quite confident it has no direct relationship to his sexual orientation. A much more likely candidate would be Karl's basic tactical approach with his supervisors which causes serious discomfort and makes unreasonable demands on their time." A 1218-19.

- James Thiede, a consular officer who worked under plaintiff in Rio, also stated firmly, "I do not believe that Consul General Zweifel and Mr. Beffel included critical or prejudicial comments in Mr. Olson's EER's because of anti-homosexual bias." Mr. Thiede explained further, "When Mr. Olson was criticized it was always for the manner in which he mistreated fellow employees through verbal and psychological abuse, never for his sexual preference. While I cannot certify what Mr. Zweifel's personal attitudes are on homosexuality, [] I never witnessed him make any anti-homosexual comment or action. I can state with confidence that Mr. Beffel was not anti-homosexual." A 1214.

Other witnesses could not refute or confirm plaintiff's specific allegations, but

they indicated that they, at least, saw no evidence of anti-homosexual bias towards Mr.

Olson on the part of Mr. Beffel or Mr. Zweifel.

- Nadia Tongour stated that she, while she "did not know whether the CG [Zweifel] or Ed Beffel were homophobic," she "personally had never heard either express any sentiment that would create that impression. The criticisms that I heard centered on Karl's professional style/approach in

dealings with the public and to a lesser extent on specific characteristics cited in the various EERs." A 1220.

- Consular Professional Associate Leyda Garcia confirmed that in her presence, "none of Mr. Olson's superiors made any derogatory remarks reflecting Mr. Olson's sexual orientation." A 1252

These statements in the record belie any suggestion that the Board's decision was arbitrary or capricious.

### 3. The Record Evidence Provides Ample Basis for Concluding that Plaintiff's EERs Accurately and Fairly Reported His Performance.

Finally, as the Board noted, numerous witnesses corroborated the negative comments made in plaintiff's EERs. C 842 ("While we recognize that there is contradictory evidence, we are persuaded by so many witnesses giving evidence corroborative of the criticisms made against Olson."); C 845 ("Abrasive, rude, unduly temperamental, and unnecessarily provocative are some of the terms regularly used by a wide range of witnesses in describing Olson's behavior.").

With regard to plaintiff's interactions with subordinates and colleagues, for example, James Thiede stated that plaintiff had a "penchant for yelling and screaming at subordinate American staff, FSN's, visa applicants, officers from other sections and other agencies, and even at State officers who outranked him. This problem was aggravated by his daily rudeness towards most other people." A 1211.[4] Administrative Officer Roland Estrada also "received reports that his supervision over locally hired employees was at times difficult and overbearing. A number of FSNs commented on Mr. Olson's

---

[4] Mr. Thiede explained the effect of this behavior: "These yelling and screaming incidents, combined with his usual rudeness and frequently cold manner, resulted in him alienating most of the staff of ConGen Rio, with the partial exception of some female American paraconsular associates who found his eccentric behavior colorful, and thus were willing to overlook the verbal abuse of FSO and FSN employees." Id. Mr. Thiede stated that "Mr. Olson literally terrorized the staff and had employees walking in fear and trembling when he was physically present in the section." A 1212.

sometimes combative interpersonal style." A 1226. Consul General James Derham
further confirmed that plaintiff "was often abusive in his verbal or written
communications with FSN staff or U.S. colleagues." A 1290. He related a specific
example in which plaintiff erroneously "berated [an] FSN in front of a crowd of people,"
forcing the Consul General to spend hours "calm[ing] down the FSN, one of our most
valued employees, and to do damage control with the irate NIV applicants." A 1291.

The comments quoted above from James Thiede indicated that plaintiff was often
verbally abusive with colleagues and superiors outside of the visa section, and other
witnesses confirm his obstinant and forceful manner. Consul General James Derham
agreed that plaintiff was "overinvolved in minor procedural debates" and "overzealous,"
and he stated that plaintiff's "reluctance to accept guidance often crossed the line into
insubordination." A 1290. Layton Russell agreed that plaintiff had a "tendency to
strongly resist every minor policy change." A 1217. He further explained that when he
declined one of plaintiff's proposals, "Karl always found it difficult to accept that his
proposals were not favored and made a strong effort to convince me of their worth and
viability. This tendency of his to never give up, to continue returning to the same issues
and presenting the same arguments, is very disconcerting. Another characteristic of
Karl's is a penchant for deviously making procedural and policy changes which he knows
his supervisor would not agree with."[5] A 1218-1219. On the occasions when Mark Lore
dealt with plaintiff from Brasilia, he found plaintiff to be "unnecessarily rigid and
insensitive to the Embassy's political and public relations concerns." A 1216. See also

---

[5] Mr. Russell recounts an example in which he rejected a change in procedure proposed by plaintiff, and
plaintiff went ahead and made the changes against his supervisor's wishes while Mr. Russell was on
vacation. A 1219. This is particularly ironic, since plaintiff himself complains that Mr. Beffel did
something comparable to him (except that Mr. Beffel, the supervisor, had the authority to do so).

Statement of Charles Trotter (A 1228) (agreeing that plaintiff had a "somewhat narrow

focus" and was "resistant to suggestion), & James Derham (A 1290).

Furthermore, the record demonstrates that plaintiff was, at least at times, rude to

visa applicants. Complaints about plaintiff, including that he swore and screamed at visa

applicants, filtered all the way up to the Ambassador and other embassy staff in Brasilia.

A 1232; A 1216. Mr. Beffel observed plaintiff conducting visa interviews and noted that

he was "sometimes overly abrupt or dismissive." A 1197. James Thiede, one of

plaintiff's subordinates on the visa line, confirmed that he yelled and screamed at visa

applicants. A 1210-1211. Mr. Zweifel put it more bluntly:

> During my Foreign Service career (over 35 years), I never met an officer
> with a poorer sense of public relations than Mr. Olson. As I reflect on our
> time together in Rio, I cannot think of a week—or at times even a day—in
> which I did not have to spend some of my own time soothing the outrage
> of one or another Brazilian who had taken offense at some action on the
> part of Mr. Olson.

A 1205. Indeed, his replacement as Consul General, James Derham, transferred

responsibility for referrals (i.e. important visa requests submitted by other Consulate

sections) because of plaintiff's rigidity and fanaticism. A 1291.

Not only did the Consul General and Ambassador hear complaints about

plaintiff's conduct in person, they repeatedly had to read about plaintiff's rude and

intimidating conduct in the press. The former Foreign Minister of Brazil and

Ambassador to the United States "was so incensed that he wrote an irate letter of

complaint which was published in *O Globo*, generally recognized as one of the two most

influential daily newspapers in Brazil." A 1205. One travel guide for Brazilians even

"referred to Mr. Olson as a 'neo-nazi' and advised travelers seeking visas to be prepared

for an extremely unpleasant experience at the Consulate." A 1197. Indeed, James

Thiede stated that plaintiff's EERs "understated and conveyed to PER no sense of the frequency or scale of hostile media coverage which Mr. Olson received, such as several incidents which were printed up in major Brazilian newspapers with national circulation." A 1211.

Plaintiff's performance issues are not excused by alleged bias in the workplace or the acts or omissions of his managers. Inclusion of some negative comments, on balance, was appropriate. However sincerely held, plaintiff's self-serving characterization of his performance is insufficient to displace the significant evidence in this record. Accordingly, the evidence clearly establishes that the FSGB's holding is not arbitrary or capricious, but is reasonable based on all of the evidence before the Board.

   **B. The Board Reasonably Found that Plaintiff Failed to Establish That Managerial Dysfunction Prevented a Fair and Accurate Evaluation.**

Plaintiff mounts a vicious personal attack on his former supervisor, Edwin Beffel, much of which is irrelevant to the claims in this action. The Board identified the correct focus, addressing "both the question of whether Beffel was a dysfunctional manager, as well as the considerably more significant issue of whether the challenged EERs bear any taint of a dysfunctional managerial style." C 844.

The Board acknowledged the evidence concerning Beffel's possible or apparent problems with alcohol and considered plaintiff's critiques of Beffel's office reorganization and poor handling of consular affairs. Balancing that evidence was Beffel's decades of consular experience and the fact that he held and retained a senior management position. C 844-45. While he was Consul General, David Zweifel usually sided with Mr. Beffel when policy disagreements arose with plaintiff both because he "had overall responsibility for supervising the busy consular operations" and because

"Mr. Beffel was by far the more experienced consular specialist."  A 1205.  The Board concluded that the preponderance of the evidence failed to establish that Beffel was a dysfunctional manager.

Ultimately, however, this case is not about the effectiveness of Beffel's management style, the wisdom of the policies and procedures he put in place, or even his personal problems.  "[T]he far more important question . . . is whether the two EERs have been infected by bias."  C 845.  "Even if Beffel was a poor manager," the Board concluded, "we see no evidence that this fault seeped into preparation of these EERs." Id.  That conclusion was based on two related points.  First, the criticisms documented in plaintiff's EERs were, as discussed in the section above, confirmed by a number of witnesses other than Beffel.  Those criticisms do not reflect "Beffel's performance as a manager, but are . . . personal to Olson."  Id.  Second, these criticisms respond directly to "a continuing and primary responsibility of Olson's work requirements."  Id.  In other words, plaintiff's evaluations did not take him to task for tangential or secondary issues, but properly and accurately addressed his core job responsibilities.  The evaluations reflect competent, appropriate management rather than dysfunction.

**III.      PLAINTIFF'S CRITIQUES OF THE BOARD'S DECISION ARE INACCURATE AND OF NO CONSEQUENCE.**

Plaintiff's argument contains the very flaw that he incorrectly asserts is found in the Board's decision:  Plaintiff weighs the evidence with a thumb on the scale.  He ignores all of the record evidence supporting the view that his EERs reflected his flawed job performance, rather than bias.  He also mischaracterizes and inflates the significance of the evidence that he contends supports his grievance.  Plaintiff's critiques of the

Board's decision are themselves either inaccurate or inconsequential.  None provides a basis for overturning the Board's decision in this case.

### A.  Witness Credibility

Plaintiff (at 11-14) attacks the Board's finding that Mr. Beffel and Mr. Zweifel were credible on three grounds.  First, plaintiff sees great significance in the fact that Mr. Zweifel had no recollection of a cable referencing plaintiff's homosexuality which had his name, as the Consul General, appended at the end.  Second, plaintiff argues that the testimony concerning an incident involving an HIV-positive American airline passenger was inaccurate.  Finally, plaintiff disputes the Board's conclusion that Mr. Beffel and Mr. Zweifel were not prone to lying.  None of these arguments has merit.

Plaintiff makes much of the 1994 cable from Rio de Janeiro that had Mr. Zweifel's name appended at the end.  See B 671.  Mr. Zweifel had no recollection of the cable, and Plaintiff asserts that it was arbitrary and capricious for the Board to credit that denial or, by extension, any of Zweifel's testimony.  In its decision, the Board noted that State Department operating manuals explain that with the current cable-processing system, CableXpress, "the principal officer's name is automatically added to the end of the telegram by CableXpress" at some posts.  C 841.  Plaintiff notes that CableXpress did not exist in 1994, and contends that the Board's reference to CableXpress renders its entire credibility determination unsupportable.

This is an example of plaintiff's inability to see the forest for the trees.  The point the Board was making was that the addition of the consul general's name at the end of a cable from post was "a routine addition."  C 841.  There is no record evidence indicating that the principal officer's name was not added to cables as a matter of course in 1994.

Moreover, the text of 1994 Rio 2982 indicates that the request for assistance came from the Regional Security Officer, as one would expect: The message was sent through the Diplomatic Security channel and states "RSO requests background info to conduct proper defensive briefings."  B 671.  Additional record evidence confirms that the cable was "penned by the . . . RSO," not Consul General Zweifel, and indicates that this was a routine cable sent to ensure compliance with Diplomatic Security reporting requirements. C 524; A 1015.  Given this evidence, it was entirely reasonable for the Board to conclude that the cable was "routine" and that the consul general's lack of recollection of it was credible in light of the many cables and other documents that would have been part of his job.

Plaintiff attacks (at 12-14) the Board's decision on three separate bases related to its treatment of an incident in which a VARIG pilot refused to permit a sick American suffering from HIV/AIDS to board a plane without proper medical certification.  First, plaintiff contends that Mr. Zweifel's testimony about the incident was inaccurate. However, the record does not bear out plaintiff's contention.  Mr. Zweifel stated that the President of VARIG called him to complain about the incident, and that the Foreign Ministry raised the incident with the Embassy in Brasilia.  See A 1206.  Plaintiff notes VARIG's local Flight Operations Manager sent a letter to Mr. Zweifel and that he in turn wrote a response to that same local VARIG executive.  See A 437.  Plaintiff then leaps to the conclusion that the exchange of letters with the local executive must have represented the full scope of the incident.  However, there is nothing in the record refuting Mr. Zweifel's statement that the President of VARIG called him and that the Foreign Ministry raised the issue with the Embassy.

Even if Zweifel had conflated two different incidents or mistook the details years after the fact, plaintiff blows the significance of these details far out of proportion.  The fundamental point of the VARIG matter is that plaintiff handled it in a way that, in Mr. Zweifel's view, contravened the airline's rights under bilateral agreements between Brazil and the United States, and did so in way that caused unnecessary friction.

Next, plaintiff asserts that the Board improperly "credited Mr. Beffel's statement that Mr. Zweifel, the DCM [Deputy Chief of Mission] and the Ambassador were upset with Mr. Olson 'because of the bad press the embassy received over a problem involving Olson and an AIDS victim.'"  ROP 824.  Plaintiff believes he has caught Mr. Beffel in a misstatement, because he asserts that there was no press coverage of the VARIG incident. In reality, the Board conflated two different but related points in summarizing Mr. Beffel's witness statement.  After a paragraph addressing the Rio cable and the VARIG matter, Mr. Beffel's statement goes on to address Mr. Zweifel's lack of bias against plaintiff.  That passage referred to bad press generally, but it made no representations concerning the VARIG incident.[6]

In a third attack on the Board's treatment of the VARIG incident, plaintiff asserts that "the Board did not even get the facts straight," because it stated that the passenger was a woman, when in fact it was a man.  This is truly petty stuff.  The gender of the

---

[6]In that separate paragraph, Mr. Beffel wrote, "I strongly doubt whether Zweifel criticized Karl in his EER because of Karl's sexual orientation.  Not only Mr. Zweifel but the DCM, and reportedly the Ambassador were upset with Mr. Olson because of the bad press play.  There may also have been a lack of communication"  A 1199-1200; C 451-52.  Earlier in his witness statement, Mr. Beffel indicated that "[o]ne popular tourist guide for Brazilians traveling to the U.S. referred to Mr. Olson as a 'new-nazi' and advised travelers seeking visas to be prepared for an extremely unpleasant experience at the Consulate.  I took a lot of heat from both CGs and the Embassy about Karl's public image."  A1197; C 449.  Similarly, Mr. Zweifel stated that "a former Foreign Minister and Ambassador to the United States was so incensed that he wrote an irate letter of complaint which was published in *O Globo*, generally recognized as one of the two most influential daily newspapers in Brazil.  That sort of unhelpful publicity roiled relations and all too frequently was the subject of dissatisfaction at the embassy as well as in Rio."  C 457.  Plaintiff does not dispute any of these representations in the record.

passenger has been ambiguous in plaintiff's own description of the incident to the Board. In his brief on remand, plaintiff wrote, "According to the Vice Consul, a VARIG Brazilian Airlines pilot made a scene using many AIDS-phobic and homophobic remarks and refused to allow the American passenger to board despite her formal request."  ROP 582.  A similar formulation appears in the Complaint at ¶ 52.  Indeed, the gender of the passenger is of no moment whatsoever.

Finally, plaintiff takes issue with the Board's determination that neither Zweifel nor Beffel "had any characteristics that would make them prone to be untruthful."  ROP 841.  Obviously, animosity toward plaintiff would be a reason to fabricate a negative EER—the whole point of the proceedings on remand was to determine whether in fact anti-gay bias did lead to unfair evaluations.  In order to help answer that question, the Board considered whether there was a heightened basis to suspect fabrication in the description of plaintiff's performance in his EERs.  The credibility of Mr. Zweifel and Mr. Beffel would be compromised, for example, if they had untruthful characters or some other interest that would be served by unfairly criticizing plaintiff.  The Board did not identify any such interest, and neither does plaintiff.

Plaintiff does query (at 14) whether Mr. Beffel's alleged "drinking problem, or his reported incompetence and dysfunction gave him further motive to lie," but plaintiff never explains what that motive might be or how it would be focused on his evaluations. It is conceivable that personal problems and managerial dysfunction could cloud an evaluator's perception, rendering an evaluation inaccurate, but they provide no reason to affirmatively fabricate a document that goes only into the employee's official personnel file.

27

**B. Plaintiff's Attack on the Board's Summary of Witness Statements Is Unavailing.**

Plaintiff asserts (at 14) that the FSGB "paraphrased, summarized and cherry-picked" when it reviewed each of the witness statements in the record. Of course the Board summarized and paraphrased witness statements; otherwise its 40 page opinion would have been 100 pages long. Plaintiff does not explain why an administrative body like the FSGB would need to exhaustively quote every single point of evidence, pro and con, in a final decision. Here the FSGB did just what one would expect: It focused on the evidence most relevant to its decision while providing enough of a broad summary to establish that it had considered all of the evidence in the record. Moreover, the Board's summary of witness statements is far more inclusive and even-handed than plaintiff's. As we show below, plaintiff grossly overstates the evidence regarding anti-homosexual bias on the part of Beffel and Zweifel.

**C. There Is Little Record Evidence that Anti-Homosexual Bias Affected the Substance of Plaintiff's EERs.**

Plaintiff presents all the evidence in the record supporting his claim of anti-gay bias (at 30-35), twisting and inflating much of it in the process. At first glance, the most significant evidence would be the statements of "[f]ive objective DOS officers," but plaintiff places more weight on those witnesses' testimony than it can bear.

- Two of the witnesses to which plaintiff is referring, Donna Hamilton and Leigh Carter, were not even stationed in Rio de Janeiro; they came to the post once for a short visit and commented in their statements only generally about "homophobic attitudes by management." A 1006-1014. Their statements made no mention of Mr. Beffel or Mr. Zweifel; Ms. Hamilton acknowledged that she "cannot remember specifics," and Ms. Carter acknowledged the "vagueness" of her recollection.

- A third witness, David Connell, does not label Mr. Beffel or Mr. Zweifel as homophobic either, and he states explicitly that he did "not have

28

enough personal observation to conclude" whether Mr. Zweifel's "views or Mr. Beffel's on homosexuality or homosexual culture influenced their respective comments on Mr. Olson's EERs." A 1015-16. In the statement he makes no further mention of Mr. Beffel at all, and the only allegation regarding Mr. Zweifel is the speculation that his attendance at a party thrown by plaintiff led to the sending of the 94 Rio 2982 cable.

- A fourth witness, Leilani Straw, did opine that Mr. Beffel "participated in 'joking' and derisive comments about homosexuality referring to Karl," and believed it "probable that Ed Beffel omitted achievements and included prejudicial statements in the EERs because of Karl's homosexual orientation." A 1224. She "did not witness any similar conversations involving Mr. Zweifel," and thus could only say that she "fe[lt] that he too may possibly have unfairly criticized Karl because of his homosexual orientation." Id.

- The fifth witness, David Schlaefer, stated that Mr. Beffel made "crude jokes about homosexuality, but [did] not recall any specific comment directed against Karl," and it was "difficult for [him] to offer an opinion as to whether [Mr. Beffel's] negative EER comments were partly motivated by prejudice." A 1246. He did express the second-hand view that Mr. Zweifel "disapproved of homosexuality and that Karl had a rough time because of this," but he "stress[ed] that [he] never heard Mr. Zweifel personally make any inappropriate comments about Karl in particular or gays in general."

In short, only one witness (Ms. Straw) stated a belief that anti-homosexual bias affected plaintiff's EERs. Only two witnesses (Ms. Straw and Mr. Schlaefer) even attributed any gay-related comments (crude jokes) to Mr. Beffel. Only one witness (Mr. Schlaefer) attributed anti-homosexual sentiments to Mr. Zweifel, while one other witness (Mr. Connell) supported plaintiff's speculation that Mr. Zweifel's attendance at plaintiff's party led in some fashion to the 94 Rio 2982 cable. The Board did not ignore this evidence, but properly found it that it was outweighed by other evidence supporting the fairness and accuracy of the EERs.

None of the other evidence that plaintiff offers touches directly on the question of whether the substance of plaintiff's EERs reflects bias on the part of the rater or reviewer,

and most does not even suggest that Beffel or Zweifel harbored any sort of bias at all.

For example, plaintiff writes (at 33) that "Mr. Zweifel chose to send a cable reporting Mr.

Olson['s] homosexuality," but as discussed above, the cable plainly indicates that it was

sent from the Regional Security Officer and that it merely asked for guidance from the

Diplomatic Security bureau.  And once again, plaintiff asserts (at 33) that Mr. Zweifel

sent "a letter supporting the pilot, not Mr. Olson," with regard to the VARIG incident.

But while plaintiff may see that incident as a referendum on attitudes toward

homosexuality, it is more accurately viewed as a question of treaty rights and handling

consular business with diplomacy.  Moreover, Mr. Zweifel's letter is sensitive, balanced,

and firm in defending the conduct of U.S. consular officials in handling the matter.  A

437.  Finally, plaintiff asserts (at 31 and 33) that Mr. Beffel gave him a mock three-dollar

bill and discussed the marriages of heterosexual colleagues in a positive light.  Even if

true, this is hardly compelling evidence that animus guided Mr. Beffel (or Mr. Zweifel) in

preparing plaintiff's evaluations.

### D.  Mr. Beffel's Alleged "Personal and Managerial Dysfunction."

Plaintiff asserts (at 27) that the Board "ignored material and relevant evidence in

the AR about Mr. Beffel's drinking problem, his dysfunction and incompetence, his

failed effort to reorganize the NIV Section which resulted in chaos, and his lack of

professional knowledge of consular affairs."  In fact, the Board considered all of these

issues.  The Board just was not convinced that the preponderance of the evidence

established that Mr. Beffel was dysfunctional or that dysfunction precluded a clear

review of plaintiff's performance.  This case is not a referendum on Mr. Beffel's

"professional knowledge," the wisdom of his initiatives, his leadership, or even his

private life.  What matters is whether Mr. Beffel was able to evaluate plaintiff's job

performance.  And though plaintiff is eager to rake Mr. Beffel's reputation over the coals,

he never even attempts to explain how Mr. Beffel's purported "managerial dysfunction"

precluded an accurate assessment of plaintiff's performance.

### E.  Plaintiff's Attacks on the Substance of His EERs Are Unconvincing.

Plaintiff does not identify specific passages in his EERs that are falsely

prejudicial, but he attacks (at 35-41) the Board's analysis of the general categories of

problems that he identified.  His reasoning as to each such category is flawed.

First, plaintiff argues (at 36) that he should not be blamed for negative press

clippings, because the U.S. government expected bad publicity when it implemented the

"reciprocity policy" and because plaintiff's 1996 EER praised plaintiff for positive media

coverage that he had generated.  It is unclear what portion of the Board's decision

plaintiff is critiquing here, but in any event his arguments are off-base.  The fact that the

reciprocity policy itself was unpopular and increased frustration with the U.S. consular

operations does not excuse bad publicity for being a "neo-nazi," yelling and screaming at

visa applicants, or disrespecting distinguished members of Brazilian society.  Yet that is

the press coverage that plaintiff produced in the 1994-1995 period.  See A 1205; A 1197;

A 1211.

The fact that plaintiff responded to the criticisms in his 1995 EER and found ways

to generate positive press coverage the following year does nothing to undermine the

criticisms from 1994-1995.  If anything, the fact that his 1996 EER *praised* plaintiff for

his PR efforts that year demonstrates that Mr. Beffel and Mr. Derham were fair and

objective in assessing plaintiff's performance.  It is ironic that plaintiff repeatedly cites

language drafted by the purportedly biased rating and reviewing officials as credible evidence supporting his claims.

Next, plaintiff questions the conclusion that he was resistant to change, had a narrow focus, and was overly rigid. Plaintiff first argues (at 36-37) that the evidence supporting his position is more persuasive than the evidence supporting these criticisms in his EER, but quibbling about the weight given to different witnesses is not a basis for reversal under the APA. Moreover, plaintiff's critique is misguided. Some colleagues credited his willingness as a supervisor to do whatever it took to get the job done. But the criticism in his EERs—supported by a number of witnesses—was that plaintiff was narrow and resistant to change in dealing with *his* supervisors and other embassy officials outside of the visa unit. Plaintiff next argues that his resistance to one initiative from Mr. Beffel was justified, and that in one instance he actually agreed with a proposal from Mr. Derham. However, the critique in his EERs was not based on the merits or handling of any one dispute, but on plaintiff's general demeanor.

Plaintiff also challenges the conclusions (at 38 and 39-40) that he was "overly demanding of his staff." He notes that some of the officers he supervised, along with Mr. Russell, made generally positive statements about plaintiff's leadership. However, another employee offered a scathing critique, A 1211-1212, and plaintiff does not dispute other witnesses' statements that Brazilian employees, as well as some foreign service officers, complained about him. Plaintiff then cites language from his 1996 EER that his staff held him in high regard. However, Mr. Beffel credited plaintiff with a much improved performance in his second year (when staffing and automation increased and

the reciprocity policy had ended).  Plaintiff is not grieving that statement, and it does not undermine criticisms related to the previous year.

Finally, plaintiff argues (at 40-42) that he should have received recognition in his EER for the Brazilian government's decision to extend the length of visas for U.S. citizens, which in turn led to the end of the "reciprocity policy."  The Board acknowledged (at C 855) the statements of plaintiff's immediate colleagues who agreed that his support should have been noted.  But here, the most convincing statements come from the senior officials and those in Brasilia who were involved with lobbying the Brazilian government to make the change.  The Ambassador stated that plaintiff "greatly exaggerated his role in the visa reciprocity issue," which required "constant high level pressure and discussions with the Brazilian government."  A 1233.  In fact, the Ambassador suggested that complaints about plaintiff may have hindered the lobbying efforts.  Id.  Mr. Russell, who supervised plaintiff in Rio and then became Consul General in Brasilia indicated that plaintiff's role "was of secondary importance and . . . not always positive."  A 1218.  And James Derham, Consul General in Rio, found it implausible that plaintiff's efforts in the non-immigrant visa section made a significant difference.  A 1291-1292.  By virtue of their positions, these people possessed close knowledge of the reasons for the change in policy and their words reasonably cast doubt on plaintiff's self-serving statements about his own role.  In this, as in other areas, plaintiff utterly fails to show that the Board's analysis was arbitrary in light of the full record.

IV.     **THE BOARD COMMITTED NO PROCEDURAL ERROR WITH REGARD TO THE RECORD OF PROCEEDINGS, AND PLAINTIFF SUFFERED NO PREJUDICE RELATED TO THE RECORD.**

Plaintiff asserts three procedural errors in his summary judgment brief (at 42-43), but none has merit—and none would have caused plaintiff prejudice in any event.

First, plaintiff states (at 42) that pages were left out of the administrative record in "the earlier action before this Court." However, plaintiff acknowledges that those pages were in the record considered by the FSGB both in its original decision and on remand, and plaintiff further acknowledges that those pages are in the administrative record filed in this case. See C 96-420. Even if these materials were kept from the Board or the Court, there are no allegations in the complaint that they contain evidence of anti-homosexual bias or managerial dysfunction not found elsewhere in the record. For both of these reasons, there is no way that plaintiff could show prejudice from the accidental exclusion of pages from the record filed in a different, earlier court action.

Second, plaintiff argues (at 42) that an e-mail exchange between the Department's grievance staff and the FSGB's special assistant concerning the status of a pending motion "tainted" the Board's decision and should have been included in the administrative record. Plaintiff does not explain how this innocuous e-mail affected the Board's decision, nor could he, because the e-mail exchange did not involve any Board members and was not considered by the Board. Moreover, the e-mails are now included in the administrative record. See Docket Entry Nos. 22-23.

Finally, plaintiff accuses the FSGB of failing to comply with the Court's November 8, 2006 order to include "all communications" between the Department's grievance staff and the FSGB staff in the administrative record. This issue is addressed

in a pending motion before the Court. The FSGB did comply with the Court's order; it searched in every place where communications related to plaintiff's grievance were reasonably likely to have been located and filed the results of that search with the Court.[7] Id. None of the communications that had previously been left out of the record of proceedings contravened any FSGB rule. None were substantive. All were properly excluded from the record of proceedings. Furthermore, plaintiff makes no allegation that any *ex parte* communication occurred providing evidence or argument related to the merits of his grievance. Nor is there any allegation or evidence that any Board member—i.e. the three individuals who decided plaintiff's grievance—received or sent any *ex parte* communications at all. Plaintiff does not, and could not, argue prejudice from the exclusion of these materials from the administrative record.

## V.      THE COURT SHOULD REMAND IF IT DOES NOT AFFIRM THE BOARD'S DECISION

The final pages of plaintiff's motion (at 43-45) seek to show that his 1995 and 1996 EERs have caused him prejudice. These arguments are speculative and they cite to materials outside the record. For example, plaintiff asserts (at 43, fn. 18) that more than half of the foreign service officers who joined the Department the same year as plaintiff have been promoted at least one grade higher than plaintiff. No record cite is provided, and the corollary is that a significant portion of his class-mates are at the same level or lower than plaintiff. Plaintiff also asserts (at 45) that he was diagnosed with depression in 1996 and that his down-graded medical clearance means that he cannot be assigned to many posts around the world. That fact alone may explain the moderate pace of plaintiff's career progression, but it is more likely that the stress from supervising an

---

[7] A number of the *ex parte* e-mails involved plaintiff's counsel.

overtaxed visa line or some other factor unrelated to his job caused his depression, rather than the evaluations themselves.

In any event, although plaintiff's focus and arguments advanced to the FSGB and this Court have shifted and evolved some over the years, defendant respectfully submits that the FSGB has reasonably addressed plaintiff's myriad theories without procedural error and its decision should be affirmed.  But even if the Court were to conclude that the FSGB's decision on remand still failed to pass muster, the proper course would be to remand for additional fact-finding as to plaintiff's grievance and appropriate remedies. Alpharma, Inc. v. Leavitt, 460 F.3d 373 (D.C. Cir. 2006) (remanding to the FDA a second time to address issues raised by the initial decision on remand).

**Conclusion**

For all these reasons, the Court should deny plaintiff's motion for summary judgment and grant defendant's cross-motion for summary judgment.

Dated:  March 15, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar 498610
United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. Bar 434122
Assistant United States Attorney

36

/s/_____
JANE M. LYONS, D.C. Bar No. 451737
Assistant United States Attorney
Civil Division
555 4th Street, N.W. – Room E4822
Washington, D.C.  20530
(202) 514-7161

Of Counsel:
David P. Huitema, Esq.
Department of State