UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
KARL OLSON,                        )
                                   )
     Plaintiff,                    )
                                   )
          v.                       )   Civil Action No.  06-1205 (GK)
                                   )
CONDOLEEZZA RICE, Secretary of State, )
                                   )
     Defendant.                    )
_____)

**DEFENDANT'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant respectfully files this Reply to plaintiff's Opposition and in further support of defendant's Cross-Motion for Summary Judgment.  Plaintiff raises a multitude of issues, from wording and characterization of various points in defendant's previous brief, to the details of specific examples found in witness statements, to the weight given different witness statements by the Foreign Service Grievance Board ("FSGB" or "Board").  Much of this material is recycled from plaintiff's earlier Motion for Summary Judgment; to the extent defendant has previously addressed those arguments, she will not repeat them here.  Defendant does, however, address plaintiff's new arguments, section by section, below.

Plaintiff's scattershot approach, however, should not distract the Court from the central point:  the FSGB did just what the Court directed on remand.  It analyzed thoroughly whether anti-homosexual bias or managerial dysfunction tainted plaintiff's 1994-1996 evaluations and explained its conclusions in a well-reasoned and detailed opinion.  The Board concluded that plaintiff had failed to satisfy his burden of proof and thus upheld the denial of his grievances.

1

Try as he might, plaintiff cannot deny that there is significant record evidence supporting the Board's conclusion. Instead, he either ignores that evidence, takes issue with how much weight it should be given or seeks to explain it away, or focuses instead on the limited evidence on plaintiff's side of the ledger.

According to plaintiff, none of the supervisors or senior officials who made a statement for the record (including the Ambassador to Brazil) is credible. Plaintiff would have the Court believe that they all falsified their statements out of either anti-homosexual bias or sycophantic loyalty to the embassy's biased leadership. By contrast, plaintiff would have the Court credit the statements of his subordinates and colleagues (most of whom filed statements in response to his request) – unless they had anything negative to say about him. Plaintiff even suggests (Pl.'s Opp. at 25) that the FSGB itself may now harbor bias against him.

In short, plaintiff asks this Court to re-consider all the evidence-based arguments that failed to convince the FSGB (or that he failed to make below). Under the APA standard of review applicable to appeals from the FSGB, however, plaintiff cannot prevail on that approach. However sincere his self-serving disagreement with the Board, it is insufficient to create any issue of material fact and defendant's motion should be granted. Cf. Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (federal anti-discrimination statutes do not generally authorize federal courts to act as a "super-personnel department"); Childs v. Pitosky, Civ. Action No. 98-2560, Mem. Op. at 11 (D.D.C. Nov. 8, 2000), summarily affirmed, No. 01-5018 (D.C. Cir. May 30, 2001) ("A genuine issue of material fact is not created by plaintiff's own belief as to the reason for [the disputed personnel action].").

I.  **The Court Should Not Second-Guess the FSGB's Credibility Determinations as the Fact-Finder.**

   A.  **The Court May Evaluate Credibility Within the Context of the Board's Proceeding and the Administrative Record**

Plaintiff takes defendant to task (1) for asserting that credibility determinations are "unreviewable" (Pl.'s Reply & Opp. at 1) but defendant never made any such claim.[1] The question is simply what degree of deference is owed to the FSGB, as the finder of fact, in foreign service grievances. In defendant's opening brief (at 16), she noted that a court sitting in review cannot substitute its own credibility determinations absent a clear error or a failure to consider the relevant evidence. Defendant went on to argue, based on that standard, that the FSGB's credibility determinations are unassailable. Plaintiff now argues (Pl's Opp. at 1-3) that the Board's credibility determinations are particularly susceptible to second-guessing because no hearing was held before the FSGB, but that argument fails for a number of reasons.

Plaintiff ignores the two cases cited by defendant that involved appeals from FSGB decisions. See Toy v. U.S., 263 F. Supp. 2d 1, 7 (D.D.C. 2002); Shea v. U.S., 45 F. Supp. 2d 54, 61 (D.D.C. 1999). The FSGB did not hold a hearing in either case, yet the Court deferred to the FSGB as fact-finder on both occasions.[2] The opinions specifically noted the FSGB's authority to make credibility determinations and assess bias, and acknowledged that the federal courts are not to substitute their own interpretations of the evidence. See id.

Hearings are the exception rather than the norm in the FSGB. The Board's regulations allow for hearings whenever the panel believes it necessary, but hearings are required in only a

---

[1] Hereinafter, citations to "Pl.'s Opp." are to Plaintiff's Reply Mem. in Opp. to Def.'s Cross-Motion for Summ. J. & in Support of His Mot. For Summ. J. [Docket Entry Nos. 33-35 - filed under seal].

[2] Toy: ". . . without hearing, the FSGB denied all requested relief to the plaintiff. . . ." and "[o]n remand before the FSGB, no hearing was held." Shea: "[P]laintiff argues that the FSGB's decision violates 22 U.S.C. § 4137(a) because . . . credibility determinations were made without a hearing or explanation. Plaintiff, however, demands too much. The Board's ten-page decision is deliberate, fact-specific, and well-reasoned."

3

limited range of cases.  See 22 C.F.R. § 906.  When this case was remanded, the Board indicated that it would render a decision based on the record evidence already compiled.  See C 21-22.  Plaintiff neither objected nor requested a hearing.

       Plaintiff's citation to a series of MSPB cases and appeals is unconvincing.  Those decisions simply note that demeanor while testifying is one factor used to assess credibility.  None say that demeanor is a critical element that must factor into all credibility determinations.  Further, it is unsurprising that demeanor would be listed as a routine factor for consideration in MSPB cases, because appellants are automatically entitled to a hearing before the MSPB.  The other cases cited by plaintiff are completely inapposite because the context (criminal cases and deportation matters) and the standard of review are different.

       Nor does plaintiff's argument make much logical sense.  He would have this Court set aside the Board's evaluation of the record evidence because there was no live hearing, but this Court has no closer insight into the mindset of the witnesses than the FSGB, because this Court is itself reviewing only the paper record.  Moreover, the Court has far less familiarity with the foreign service, the employee evaluation system, and the types of claims asserted by plaintiff than the FSGB, essentially an expert body, calls on when weighing the evidence.  Cf. United States v. Paddack, 825 F.2d 504, 514 (D.C. Cir. 1987) (". . . the Board's familiarity with the foreign service ought to be respected by the judiciary.").  At bottom, the Court should simply reject plaintiff's alternative and self-interested interpretation of the record because the Board's credibility assessments are rational.

       **B.**    **The Record Evidence Does Not Undermine the Credibility of Mr. Beffel or Mr. Zweifel.**

       In the Opposition, plaintiff revisits (Pl.'s Opp. at 3-8) his arguments that Mr. Zweifel's credibility is undermined by his failure to recollect a routine cable that he did not write and his

statement concerning VARIG airline's complaint about how plaintiff handled an incident with a sick American passenger.  Here, defendant addresses only those points that were not contained in earlier briefing.

      First, plaintiff suggests (Pl's Opp. at 4) that there is no foundation for defendant's assertion that the Regional Security Officer (rather than Consul General Zweifel) drafted the 94 Rio 2982 cable.  However, the witness statement of David Connell, which defendant cited (Pl.'s Opp. at 25), refers to "the same RSO who penned Rio 2982."  A 1015.  Further, the cable itself states "RSO requests background info to conduct proper defensive briefing," further confirming that the cable was penned by the RSO for diplomatic security purposes.  B 671.  Defendant does not dispute that Mr. Connell held the opinion that the Consul General asked for the background check following a party at plaintiff's apartment, but that belief—held by one witness based on no more than a coincidence of timing—is small basis indeed for questioning the credibility of Mr. Zweifel's statement that he did not know of any investigation into plaintiff as a security risk.

      With regard to the VARIG incident, plaintiff misses the point when he argues (Pl.'s Opp. at 6) that the United States had no treaty obligation to grant multiple-entry visas to Brazilian pilots.  Rather, the point is that VARIG was within *its* rights to deny boarding to an ill passenger with no medical certification.  Plaintiff does not dispute in his brief that his handling of the situation caused unnecessary friction.  Plaintiff does contend, however, that embassy officials in Brasilia would have mentioned the VARIG incident in their witness statements if the Brazilian Foreign Ministry had raised the matter with the embassy.  It is pure speculation to assert that the Foreign Ministry must not have complained because a witness did not single out that specific incident when commenting generally on plaintiff's problems with customer service.

5

Here, for the first time, plaintiff (Pl.'s Opp. at 6) disputes Mr. Zweifel's statement that a former Foreign Minister and Ambassador to the United States wrote a complaint letter to *O Globo* because of the poor treatment he received from plaintiff. See A 1205. There is no record evidence to support plaintiff's argument. Beyond the notion that this argument was not presented to the Board, plaintiff also makes a leap of logic, arguing that because the record includes a cable documenting a complaint by the Foreign Minister about "humiliating" visa procedures, Mr. Zweifel must have fabricated the *O Globo* incident. Plaintiff also goes outside the record to report that he has not been able to find the *O Globo* letter himself.

Plaintiff accuses defendant (Pl.'s Opp. at 7) of being untruthful when defendant purportedly indicated that six witnesses vouched for the integrity of Mr. Beffel and Mr. Zweifel. In fact, it is plaintiff who misleads, for he omitted half the sentence from defendant's brief that he described as false.[3] That sentence introduced verbatim excerpts from the six witness statements. Plaintiff does not dispute that those witness statements are in the record and quoted accurately in defendant's brief.

### C. The FSGB's Credibility Determinations Concerning Other Witnesses Were Reasonable.

Plaintiff asserts (Pl.'s Opp. at 8-12) that it was arbitrary and capricious for the FSGB to credit the testimony of five other witnesses aside from Mr. Beffel and Mr. Zweifel. Plaintiff notes that most of these witnesses did not work closely with the NIV section, and thus did not observe his work on a day-to-day basis. Although accurate, plaintiff's observation is of little, if any, significance-- those witnesses did not purport to be on the visa line with plaintiff; they commented only on what they *did* know based on their interactions with plaintiff, with his

---

[3] The full sentence stated: "In addition to the comments from Beffel and Zweifel, six other witnesses provided statements vouching for the integrity of Beffel and Zweifel and refuting the notion that plaintiff's EERs are inaccurate on account of bias."

6

colleagues, and with others who complained about plaintiff. Plaintiff also accuses the ambassador of harboring anti-homosexual bias, and charges other senior leadership with either similar bias or a career-minded tendency to shade their testimony to support management. Where plaintiff goes beyond these general charges and challenges specific statements, he largely repeats material from earlier briefing. The new arguments are not supported by evidence in the record.

For example, plaintiff attempts (Pl.'s Opp. at 9) to pick apart Mr. Russell's statement that plaintiff would "deviously mak[e] procedural and policy changes which he knows his supervisor would not agree with." The example offered by Mr. Russell was that plaintiff told travel agents to stop submitting supporting documents with visa applications while Mr. Russell, his supervisor at the time, was away from the office. Plaintiff offers an explanation of "[w]hat actually happened" without any citation to the record, as if the Court should just take his word for it. Plaintiff then asserts that Mr. Russell later complimented plaintiff for this policy and touted the virtues of the change. The reader must assume that the passages cited by plaintiff discuss the very changes that Mr. Russell alluded to in his witness statement. Even if that were the case, it would not undermine Mr. Russell's statement, which did not criticize the merits of plaintiff's new travel agent policy (indeed, he acknowledged maintaining the change that plaintiff put into place). See A 1218-19. Rather, Mr. Russell criticized the way in which plaintiff put the policy into place, against his supervisor's wishes while the supervisor was out of town. Plaintiff does not dispute that charge.

Plaintiff also attempts to take issue with details of Mr. Derham's statement. Plaintiff claims that e-mail in the record (at C 43-44) shows that he issued a visa for Fiat's president as requested and in polite fashion, contrary to Mr. Derham's characterization at A 1291-92. While

7

the e-mails to the Deputy Chief of Mission ("DCM") were polite, however, they indicate that, following the DCM's initial request, plaintiff had suggested denying special consideration for the Fiat President. The e-mails offer a limited view of how the situation was handled, but they indicate that the DCM firmly insisted on issuing the visa promptly, noting to plaintiff that "we've rubbed it in enough." A 44. No one disputes that, at the end of the day, plaintiff did follow orders.

Plaintiff also disputes (Pl's Opp. at 10) Mr. Derham's statement that he transferred responsibility for visa referrals from plaintiff to Mr. Beffel. Plaintiff asserts that Mr. Derham has it backwards, because he had given plaintiff day-to-day responsibility for referrals in an August 28, 1995 memo. See A 323. But that memo does not cast doubt on Mr. Derham's statement, which indicates that he had once assigned referrals to plaintiff but "finally" (i.e. after some time) made a change because of plaintiff's poor customer service.[4]

Finally, plaintiff attacks (Pl.'s Opp. at 12) the credibility of James Thiede on two grounds. First, plaintiff brands Mr. Thiede "a loner" who was "fearful and unhappy," developed health problems and buckled under the stress of the visa work in Rio, and who may be bitter about his own EER (which plaintiff prepared). Support for many of these assertions cannot be found in the record, and it is not clear why Mr. Thiede's personality or health issues would preclude honest testimony.[5] Plaintiff also asserts that Mr. Thiede's statements conflict with those of the other employees plaintiff supervised. There is plenty of evidence in the record

---

[4] Plaintiff also attaches State Department's current regulations (dated 2006) concerning referral visas, but they indicate that both the chief of the consular section and the chief of non-immigrant visas can play substantial roles in the operation of the referral system. See, e.g. 9 FAM 401 ("Referrals must be transferred . . . to the chief of the consular and/or visa section or nonimmigrant visa (NIV) unit . . . ."); 9 FAM 402 (". . . senior consular officers at each post should be responsible for the adjudication of visa referral cases. Class A referrals must be adjudicated by the chief of the consular section (or someone acting officially in that capacity). Class B referrals should be adjudicated by a supervisory consular officer or the chief of section (or someone acting officially in one of those capacities)."); 9 FAM 406.

[5] And if dissatisfaction with an EER were enough to discredit an employee's statements about his or her rating official, then plaintiff's own statements and argument in this case would have to be discounted.

8

corroborating Mr. Thiede's testimony. See, e.g., A 1196, 1198, 1202; A 1204-05; A 1225-26; & A 1291. Moreover, while all of plaintiff's subordinates (including Mr. Thiede) praised him for maintaining an extremely efficient operation that managed to keep up with the high work load, most shied away from commenting on whether he was ever rude or abusive to visa applicants or staff, or they touched on that subject very delicately. See A 342, A 1015-16, A 1222-1224, A 1246-48.

### D.  The Fact That Plaintiff Was Not Curtailed Is Irrelevant.

Plaintiff offers a new rhetorical argument in his brief (Pl.'s Opp. at 12-13): Embassy leadership would have curtailed him if he was really as bad they say in their witness statements, so those statements must be exaggerated. Plaintiff asserts that curtailment was never considered, without any citation to the record or first-hand knowledge, but even that is beside the point because curtailment is a management tool available to the Chief of Mission as a last resort. It is expensive and disruptive to post. Not every employee whose performance is subpar or problematic can or should be curtailed, and this is an area of broad management discretion. It is not disputed that the NIV section at the Rio consulate was short-staffed and over-worked. Nor is there any dispute that plaintiff helped keep the unit functioning through difficult times. Here, management did exactly what it should have done when faced with an employee whose performance was both valuable and flawed in significant ways: Document the performance (including the problems) accurately and work with the employee to improve the situation.

### E.   The FSGB Did Not Ignore Witness Statements that Supported Aspects of Plaintiff's Claims, But Properly Found That Testimony to Be Outweighed By Other Evidence.

Plaintiff summarizes the testimony of a number of witnesses (Pl.'s Opp. at 13-15) and asserts that the FSGB failed to give that testimony adequate weight. Defendant has already

responded to plaintiff's characterization of the witness statements, and the testimony speaks for itself. The FSGB did not ignore these witness statements, but summarized them itself in its opinion. See C 822-834. Nor did the FSGB discount these statements. Rather, the Board properly found that the testimony marshaled by plaintiff did not satisfy his burden, but was instead outweighed by the evidence supporting the validity and integrity of plaintiff's EERs. See C 842.

II.     **The FSGB's Finding that Plaintiff's Performance and Potential Were Assessed Fairly Was Neither Arbitrary Nor Capricious, and Plaintiff Did Not Carry His Burden of Establishing that Bias or Dysfunction Affected His EERs.**

Plaintiff begins Section II of his brief (Pl.'s Opp. at 15-18) with the legal argument that bias can render a witness's testimony unreliable, and then asserts that having Mr. Beffel and Mr. Zweifel prepare his EERs violated "fundamental fairness" because of their purported anti-homosexual bias. Defendant does not dispute that bias *can* undermine the reliability of witness testimony, and in extreme cases a management official's antipathy toward a subordinate may make it inappropriate to rate or review the subordinate's performance. However, personality conflicts, contentious relationships, and dissatisfaction with a subordinate's performance are realities in every office. It is simply not the case that a manager who dislikes an employee or is dissatisfied with an employee's performance cannot prepare a fair and accurate evaluation. See, e.g., FSGB No. 2004-030 (March 3, 2005) at 13; FSGB 98-05 (Sep. 30, 1999) at 7-8, 22. Otherwise, any negative comment in an EER would be grounds for the argument that the dissatisfied rater or review harbored a disqualifying bias against the employee. Moreover, it is the FSGB as the fact-finder which "can also assess the existence and degree of any bias on the part of the witnesses." Toy, 263 F. Supp. 2d at 7; see also Shea, 45 F. Supp. 2d at 61. In this case, there simply was not sufficient evidence of either bias on the part of Mr. Beffel or Mr.

Zweifel, or flaws in the EER's appraisal of plaintiff's performance, to meet the plaintiff's burden of showing that his evaluations were falsely prejudicial.

In this section of his brief, plaintiff's main contention was that he has had positive evaluations every year except 1994-1996 (although he does not cite to any such positive EERs in the record except for his 1993-1994 evaluation, for which the supposedly-biased Mr. Zweifel was the reviewing officer). According to plaintiff, "what changed" was the arrival of Mr. Beffel along with Ambassador Levitsky and Mr. Zweifel's attendance at a luncheon party thrown by plaintiff. According to plaintiff, "[t]he Ambassador's homophobia allowed Mr. Beffel and Mr. Zweifel to give free rein to their anti-homosexual biases." However, evidence of homophobia on the Ambassador's part is scant indeed, and it is unclear how his presence in Brasilia would affect the content of employee evaluations in Rio de Janeiro which the Ambassador did not prepare. Nor does plaintiff explain how Mr. Zweifel, who was the reviewing official for the 1993-1994 evaluation that plaintiff lauds as fair and accurate, suddenly developed anti-gay animus toward plaintiff the following year. The record does not suggest that plaintiff's homosexuality was ever hidden in Rio de Janeiro or that Mr. Zweifel first learned of his orientation at the July 30, 1994, party.

There were far more significant changes in the 1994-1996 period than those identified by plaintiff. This was the time of the reciprocity policy, the exploding volume of visa applicants, and the efforts to update the technology and facilities used by the NIV section. These challenges were noted in plaintiff's evaluations. As the challenges increased, shortcomings in plaintiff's performance became more glaring. With additional experience, his performance improved somewhat (if not completely), which is why the evaluation written by Mr. Beffel in 1996 contains more positive statements and less criticism than the 1995 evaluation.

11

Plaintiff also asserts (Pl.'s Opp. at 17-18) that Mr. Beffel "needed to cover up and blame someone for his mistakes," and that in order "to deflect criticism from himself, . . . Mr. Olson became the fall guy." Plaintiff did not make the case in the record that Mr. Beffel faced significant criticism or pressure because of mistakes he made in his own job. But in any event, a subordinate's EER is an extremely ineffective way for a rater to "deflect criticism from himself." An EER is included only in the rated employee's own personnel file, which is used only for personnel purposes and to which access is limited.

### III.   Plaintiff's EERs Were Not Inaccurate or Unfairly Prejudicial, and They Did Not Omit Important Achievements.

Plaintiff renews his arguments (Pl.'s Opp. at 18-22) that three areas of criticism in his EERs were unfairly prejudicial: (1) blame for negative publicity, (2) being abrupt, abrasive, and rude with staff, and (3) being resistant to change and rigid. Plaintiff's perspective is inherently suspect and his arguments fall short of demonstrating that the Board erred. See Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 5 (D.D.C. 2000) (describing as "well-settled" the notion that "plaintiff's self-serving statements as to her competence or her superior performance do not serve to raise material issues of fact" with regard to an employment action based on performance).

With regard to press coverage, plaintiff asserts (Pl.'s Opp. at 18-19) that he was scapegoated for the bad press resulting from the U.S. government's reciprocity policy, which allowed for only short-term visas. As we noted in our earlier brief (at 5, 31), however, the criticisms in plaintiff's EER's were based on bad press attributable specifically to plaintiff's own rudeness with visa applicants. He does not dispute that such negative publicity existed. With regard to one specific piece of publicity, however plaintiff does assert (for the first time in the Opposition) that Mr. Zweifel falsely charged that a former Foreign Minister wrote a letter of

complaint to *O Globo* based on plaintiff's conduct. However, the record contains no evidence negating Mr. Zweifel's witness statement. Plaintiff also asserts that Mr. Beffel falsely claimed that the VARIG incident resulted in bad publicity, but he does not cite to Mr. Beffel's witness statement. See A 1196-1200. As we explained in our opening brief (at 26), Mr. Beffel addressed both the VARIG incident and bad publicity in his witness statement, but he never stated that the VARIG matter itself resulted in any press coverage.

With regard to his abrasive and demanding demeanor with other staff, plaintiff asserts (at 20) that most of his subordinates who submitted statements said "that they did not feel he was overly demanding." This overstates the case; as we noted above, while most of the NIV staff who submitted statements applauded plaintiff's efforts to run a tight, efficient operation in a very stressful environment, most did not even address whether he was rude, abrasive, or overly demanding with staff. See, e.g., A 342, A 1015-16, A 1222-1224, A 1246-48. But even accepting that there are statements supportive of plaintiff's performance, he cannot dispute that the record contains substantial evidence that he treated staff-members (particularly the locally employed staff) poorly. This evidence includes both eye-witness accounts of plaintiff screaming at employees and multiple witnesses who reported receiving complaints about plaintiff from his staff. See A 1196, 1198, 1202; A 1204-05; A 1225-26; A 1211-12, 1215; & A 1291. That evidence is more than sufficient to support the FSGB's determination that the criticism in plaintiff's EERs was well-founded.

With regard to the criticism that plaintiff was stubborn and resistant to change, plaintiff continues to argue (Pl.'s Opp. at 21-22) that he was quite right to resist one change that his supervisor sought to impose, and that the record includes statements lauding his flexible, problem-solving approach within the NIV unit. However, the record also contains plenty of

evidence that plaintiff was defensive and impolite in handling disagreements with both supervisors and officials from outside the consular section.  See, e.g., A 1196-98, A 1204-05, A 1213, A 1216, A 1228, A 1217-19, & A 1290.

Finally, plaintiff argues (Pl.'s Opp. at 22) that his 1994-1995 EER improperly failed to mention his contribution to the Embassy's efforts to encourage Brazil to extend the length of visas for U.S. citizens.  Faced with a year's performance, managers exercise their judgment with regard to noting criticisms and lauding accomplishments.  Here, the question is not whether plaintiff's efforts could have been mentioned in his EER, but whether the Court should second-guess the judgment of plaintiff's rating and reviewing officers as to whether a contribution was substantial enough to *require* inclusion in the EER.  Every official with broad knowledge or direct involvement lobbying for longer visas opined that plaintiff's role was insubstantial and undeserving of special mention in his EER.  See A 1218, A 1233, A 1291-92.

**IV.     The FSGB's Procedures Were Proper and Caused Plaintiff No Prejudice.**

Defendant has thoroughly addressed plaintiff's procedural claims in prior briefing. Nothing in his Opposition requires a further response.

**V. & VI.     Plaintiff Has Not Established Harm From His 1994-1996 EERs, and the Court Cannot Grant Relief Based on the Existing Record.**

Plaintiff's discussion (Pl.'s Opp. at 23-24) confirms that the record does not establish any harm resulting from the 1994-1996 EERs, even if those evaluations were flawed.  We have already addressed plaintiff's arguments concerning promotion statistics and the fact that his medical clearance limits the range of career-enhancing assignments available to him.  Now, plaintiff adds (Pl.'s Opp. at 24) a motley assortment of record cites that do nothing to establish injury from his Rio de Janeiro EERs.  He cites portions of his own argument from his initial grievance submission and his FSGB briefing (A 20, A 24, A 326, A 331), a 1996 workers

14

compensation application for wrist pain allegedly caused by repetitive stapling and other clerical motions (A 30-31, A 33-38), and statements from his career development officer and Ms. Leilani Straw about plaintiff's volunteering for an assignment in Croatia (A 347, A 350).

When the FSGB determines that a grievance has merit and that a Selection Board considered an employee for promotion based on flawed EERs or using flawed procedures, the Board asks for additional evidence as to whether the grievant would have been promoted if given fair consideration.  See 22 C.F.R. § 905.1; see, e.g., FSGB 97-097 (May 12, 1999).  Typically, that means the Department puts together a Reconstituted Selection Board to consider the grievant for promotion.  See, e.g., Harter v. United States, 871 F.2d 1140 (D.C. Cir. 1989); FSGB 97-097 (May 12, 1999).  Because there has been no finding yet that plaintiff's EERs were falsely prejudicial (nor should there be), none of the evidence relating to possible remedies has been developed.  Therefore, even if the Court were to reverse the FSGB on the merits of plaintiff's claim, it should remand to the Board for consideration of appropriate relief.

## CONCLUSION

For the reasons stated above and in defendant's Cross-Motion for Summary Judgment, the Court should hold that the FSGB's decision was not arbitrary, capricious, or contrary to law, and the Court should grant summary judgment for the defendant.

Dated:  May 8, 2007.

                                      Respectfully submitted,

                                      _____
                                      JEFFREY A. TAYLOR, D.C. Bar No. 498610
                                      United States Attorney

                                      /s/_____
                                      RUDOLPH CONTRERAS, D.C. Bar No. 434122
                                      Assistant United States Attorney

/s/_____
JANE M. LYONS, D.C. Bar No. 451737
Assistant United States Attorney
555 4th Street, N.W. – Room E4822
Washington, D.C.  20530
(202) 514-7161