UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KARL OLSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1205 (GK) |
| | ) | |
| HILLARY CLINTON,[1] | ) | |
| in her capacity as | ) | |
| Secretary of State | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION[2]

Plaintiff, Karl Olson, a Foreign Service Officer in the United States Department of State ("DOS" or the "Department"), brings this action against Condoleeza Rice, Secretary of the DOS, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Plaintiff seeks judicial review of a Foreign Service Grievance Board ("FSGB" or "Board") decision, alleging that it was "arbitrary and capricious" and "tainted by prejudicial procedural errors." 5 U.S.C. § 706(2).

---

[1] Former Secretary of State Condoleeza Rice was named as the original lead respondent in this case. Pursuant to Federal Rule of Civil Procedure 25(d), the Court automatically substitutes her successor, Secretary of State Hillary Clinton, as the new lead respondent.

[2] Because Plaintiff filed all his pleadings under seal, it is necessary to redact various sections of this Opinion.

On February 3, 2005, in a prior action brought by Plaintiff, this Court remanded the case to the FSGB to "consider evidence of alleged anti-homosexual-bias." Mem. Op., Olson v. Powell, 02-1371, at 11 (Feb. 3, 2005) ("Mem. Op.").

This matter is now before the Court on Plaintiff's Motion for Summary Judgment [Dkt. No. 30] and Defendant's Cross-Motion for Summary Judgment [Dkt. No. 31]. Upon consideration of the Motions, Oppositions, Replies, the entire record herein, and for the reasons stated below, Plaintiff's Motion is **denied** and Defendant's Motion is **granted**.

## I.   Background[3]

### A.   Factual Background[4]

Plaintiff has been a Foreign Service Officer with the DOS since 1985 and was tenured in 1988. From September 1993 to August 1996, he served as the Chief of the Non-Immigrant Visa ("NIV") Section of the United States Consulate General in Rio de Janeiro, Brazil. His rank at that time was Foreign Service Officer Class Three. In 2000, he was promoted to Class Two.

Plaintiff was the second-ranking officer in a six-officer Consular Section and supervised approximately twenty employees,

---

[3]   Unless otherwise noted, the facts set forth herein are undisputed.

[4]   Because the factual background of this case has not changed since the Court's February 3, 2005 Opinion, this section is drawn heavily from that Opinion.

including up to five American Junior Officers and fifteen Brazilian Foreign Service Nationals ("FSN"). During his service in Rio de Janeiro, his Consular Section was understaffed, lacked adequate space and resources, and faced a rapidly increasing workload.

While serving in Rio de Janeiro, Plaintiff received Employee Evaluation Reports ("EER"), covering the periods of (1) August 28, 1994, to April 15, 1995 ("First EER"), and (2) April 16, 1996, to August 30, 1996 ("Second EER").[5] His rating officer for each EER was Edwin L. Beffel, the Chief of the Consular Section. His reviewing officer for the first EER was Consul General James M. Derham. His reviewing officer for the second EER was Consul General David E. Zweifel.

These two EERs contained a mixture of positive comments and negative comments. For example, the 1994-1995 EER stated that Plaintiff "gets the work done against tremendous pressure and lack of staff, space, and resources" and that Plaintiff "has grown into a very capable, tolerant, and experienced manager under unimaginably stressful, constantly changing circumstances." Compl., Ex. 3 at 31 (FSGB Final Decision, Nov. 7, 2005). In 1995, Beffel wrote that Plaintiff is "the hardest working officer I have

_____

[5] Every year, foreign service officers are evaluated by their supervisors in EERs. Gonzalez v. Dep't of State, 135 F. Supp. 2d 193, 194 (D.D.C. 2001). Those EERs reflect the assessment of a rating officer and a reviewing officer. Toy v. United States, 263 F. Supp. 2d 1, 3 (D.D.C. 2002). Foreign service selection boards use the EERs to evaluate foreign service officers for promotion or selection out of the service. Id.

ever served with." Def.'s Statement of Material Facts at 3.

The EERs also contained critical feedback. In the 1994-1995 EER, Beffel wrote that Plaintiff was "at times overly demanding of his staff" and had "a tendency to be overly officious with NIV applicants," which "generated an unusual amount of complaints directed against him publicly." Def.'s Mot. at 4.

Aside from the EERs themselves, the record includes numerous statements by other employees concerning Plaintiff's struggles to foster a collegial working environment and to handle interactions with the Brazilian public with aplomb. Consular Officer James Thiede stated that Plaintiff "attracted quite a bit of negative press coverage in the Brazilian media, principally as a result of several incidents throughout 1995 and 1996 in which he yelled and screamed at difficult or obtuse visa applicants." Def.'s Statement of Material Facts at 14. He also discussed Plaintiff's "tendency to be rude," his "daily rudeness," and stated that he "personally witnessed Mr. Olson yelling and screaming not only at visa applicants but also at State FSO's, USIS FSO's, and NIV FSN's [sic]." Id. at 14-15. He claims that Plaintiff "literally terrorized the staff and had employees walking in fear and trembling." Id. at 15.

Mark Lore, the Deputy Chief of Mission, stated that Plaintiff could be "unnecessarily rigid and insensitive" and that his "occasional displays of insensitivity toward Brazilian visa

4

applicants were well known within both the Brazilian and U.S. official communities." <u>Id.</u> at 17.

Consul General Layton Russell stated that "a great deal of [Plaintiff's] supervisor's time and effort are required to ensure that his efforts are properly channeled" and that "it was typical of Karl to do everything short of clear insubordination to get his way on policy and procedural issues." <u>Id.</u> at 18-19.   He also referred to "frequent, negative articles in the press" that alleged "rude treatment by visa officers" and cited Plaintiff by name.  <u>Id.</u> at 20.

Economic Officer Nadia Tongour overheard criticisms of "Karl's professional style/approach in dealings with the public." <u>Id.</u> at 20.   Deputy Principal Officer Charles Trotter acknowledged that "improving his interpersonal skills should enable Mr. Olson to advance in the Foreign Service." <u>Id.</u> at 22.

Administrative Officer Roland Estrada stated that Plaintiff was "not well regarded by both the American and local staff," that he "exhibited a tendency to argue over small details," and that his "strident personality made him at times a difficult person to deal with." <u>Id.</u> at 20-21.

Ambassador Melvyn Levitsky stated that he handled "[s]everal instances of Mr. Olson's rudeness and discourtesy to visa applicants." <u>Id.</u> at 24.   He stated that he "received so many complaints about Mr. Olson" that he initiated a "campaign to

emphasize 'courtesy and respect' to our visa officers."  Id. at 25.

Consul General James Derham stated that "Mr. Olson was often abusive" and that his "procrastination in preparing FSN evaluation reports was a serious continuing problem."  Id. at 26.  He recalled incidents in which Plaintiff "slipped into fanaticism" and "berated" other employees.  Id. at 26.

In addition, some of Plaintiff's colleagues felt that certain supervisors at the Consulate General demonstrated anti-homophobic sentiments.   Donna Hamilton, the Deputy Assistant Secretary for Visa Services, wrote that "comments were made to us both in Rio and Brasilia that indicated homophobic attitudes by management at both posts."

Consular Affairs Management Analyst Leigh Carter noticed during a 1996 visit to the Consulate that "an atmosphere of homophobia prevailed at the top ranks of th[e] post."  Consular Officer Leilani Straw believed that Beffel "omitted achievements and included prejudicial statements in [Plaintiff's employment evaluations] because of his homosexual orientation."  She also said there was "joking and derisive comments" about homosexuals at the post.

Consular Officer David Schlaefer was told that Consul General David E. Zweifel was pleased about his coming to the Consulate because Zweifel was "glad that a heterosexual was 'finally' coming

6

into the section." Schlaefer also said that Zweifel disapproved of homosexuality and that this was "well known in the Consulate community."

Finally, Consular Officer David Connell, who was homosexual and worked for Plaintiff, said that tolerance toward homosexuals ended after Zweifel joined the post in August of 1994.

In June 1994, an American citizen who needed urgent medical treatment for HIV/AIDS attempted to return to the United States on a VARIG Airlines flight. The pilot refused to allow the passenger to board the plane because the passenger did not have a medical certificate.

In response, Plaintiff began issuing the pilot single-entry visas, forcing him to reapply for visas every time he had a flight scheduled to the United States. The President of VARIG ultimately called Zweifel to complain about the treatment, alerting him that the Brazilian government was prepared to reciprocate by issuing single-entry visas to American airline personnel. In response, Zweifel ordered that airline personnel should be issued multiple-entry visas.

On August 31, 1994, Zweifel sent a letter to the President of VARIG, apologizing for the incident and acknowledging that the VARIG pilot had a right to request a medical certificate for the passenger.

On August 3, 1994, the Diplomatic Security Office in Brazil

7

sent a telegram (the "Cable") to the DOS's Diplomatic Security Office in Washington, D.C., which read as follows:

> THE FOLLOWING STATE OFFICERS ASSIGNED TO THE CONGEN RIO DE JANEIRO CLEARLY EXHIBIT HOMOSEXUAL PREFERENCES AND RSO REQUESTS BACKGROUND INFO TO CONDUCT PROPER DEFENSIVE BRIEFINGS FOR EACH, INCLUDING RELATIONSHIP REPORTING UNDER PROVISIONS OF 3 FAM 609.  WE HAVE NOT LEARNED OF ANY INFAMOUS OR NOTORIOUS CONDUCT NOR HAVE CI CONCERNS, SUCH AS CONTACT PATTERNS, ARISEN. PLEASE ADVISE IF THESE MEN ARE DECLARED.   IF FURTHER ACTION IS APPROPRIATE PLEASE ADVISE.

The cable was titled a "Request for Assistance," and Plaintiff was one of the two officers named in the cable.  According to an August 23, 2000, memo from Juliane Tilton, then the Consulate's Regional Security Office Secretary, the Consulate received a response indicating that "sexual orientation (homosexuality) was no longer considered an issue by the Department of State."[6]

On an unspecified date, Beffel gave Plaintiff a "mock three dollar bill with the words 'Queer Reserve Note' printed on the front." Compl., Ex. 3 at 19.

Other employees stated that they did not observe anti-homosexual bias at the Consulate General.  Thiede stated that he did not believe that Zweifel and Beffel "included critical or prejudicial comments in Mr. Olson's EER's [sic] because of an anti-homosexual bias" and that "[t]here was nothing but tolerance for homosexual orientation" at the Consulate General.  Def.'s Statement

---

[6]  Tilton indicated in the memo that she did not recall the exact date of the response but thought it was received soon after the initial cable was sent.

of Material Facts at 15-16.   Lore stated that he did not observe
"any prejudice" against Plaintiff's sexual orientation by Zweifel
and Beffel.   Id. at 17.   Tongour never heard either Zweifel or
Beffel "express any sentiment" that would indicate they were
homophobic.   Id. at 20.

Similarly, Trotter stated that Zweifel and Beffel "always
treated   Mr.   Olson   fairly,   without   regard   to   his   sexual
orientation," and that they are "honest and objective and would
never allow any bias against sexual orientation, race, or anything,
even if one existed, to influence their professional conduct."   Id.
at   23.   Ambassador   Levitsky   stated   that   Plaintiff's   sexual
orientation did not "affect the judgment of his supervisors."   Id.
at 25.   Derham recounts that "nothing in the EER prepared by Mr.
Beffel reflects bias against homosexuals" and that none of the
officers in the Consulate General ever raised the issue of anti-
homosexual bias with him.   Id. at 27.

**B.   Procedural Background**

On May 22, 1998, Plaintiff filed a grievance with the DOS,
alleging that the EERs covering his time in Rio de Janeiro were
inaccurate and falsely prejudicial, omitted favorable information,
contained   inadmissible   comments,   and   were   based   on   the
anti-homosexual bias of Beffel and Zweifel.

On September 30, 1998, the DOS denied Plaintiff's grievance.
On November 25, 1998, Plaintiff appealed the decision to the FSGB.

On April 4, 2002, the FSGB issued an opinion, finding that the EERs in question were not inaccurate, falsely prejudicial, or otherwise defective.  The FSGB also found that even though there was "weighty evidence [of anti-homosexual bias] from credible outside observers," the evidence of bias was irrelevant because it had already determined that Plaintiff's EERs were not inaccurate or falsely prejudicial.

On July 7, 2002, Plaintiff filed a Complaint in this Court. Plaintiff and Defendant each filed Motions for Summary Judgment.

On February 3, 2005, the Court granted in part and denied in part Plaintiff's Motion and granted in part and denied in part Defendant's Motion.  It found that the FSGB's decision was arbitrary and capricious because it did not consider "weighty evidence" of Beffel's and Zweifel's anti-homosexual bias.  It remanded the case to the FSGB to consider this evidence.  In addition, it found that the FSGB's decision was not tainted by procedural errors because any such errors were not prejudicial.

The Court stated that the FSGB decision had failed to demonstrate a "rational connection between the facts found and the choice made." Mem. Op. at 11.  In deciding that it did not need to consider evidence of bias, the FSGB "ignore[d] a relevant factor" in determining that "the subjective judgments contained in the EERs were fair and accurate." Id.  The Court stated that the "logic of this reasoning is hard to fathom." Id.

The Court remanded the case to the FSGB to "consider evidence of alleged anti-homosexual bias." The issue on remand was limited to determining "whether homosexual bias unfairly tainted" the EERs. Order, <u>Olson v. Powell</u>, 02-1371 (Feb. 3, 2005). The Court specifically directed the FSGB to "consider all relevant evidence in determining whether the judgments and evaluations (which were necessarily subjective) of Beffel and Zweifel were tainted by bias or were, in their totality, fair and accurate." Mem. Op. at 11 n.7.

On remand, the FSGB issued its final decision on November 7, 2005. It made two principal findings. First, it "concluded that Olson's claim that anti-homosexual bias tainted his evaluations had not been satisfactorily demonstrated." Compl., Ex. 3 at 2. After examining the evidence presented by both sides, the Board "found more credible the evidence which showed the validity of the evaluations." <u>Id.</u> Second, it determined that Olson had not demonstrated that "his rater was a dysfunctional manager not competent to properly evaluate him." <u>Id.</u>

On June 30, 2006, nearly eight months after the FSGB's decision, Plaintiff filed this Complaint. He again alleged that the FSGB's decision was arbitrary and capricious and "tainted by procedural errors." Compl. He sought fourteen specific types of relief: (1) reversal of the FSGB's decision, (2) promotion to FS-02, backdated to 1995 with interest, (3) promotion to FS-01,

11

backdated to 2000 with interest, (4) promotion to Senior Foreign
Service, Class of Counselor (FE-OC), backdated to 2005 with
interest, (5) expungement of his 1994-1995 EER, (6) one additional
year time-in-class and time-in-service, (7) expungement of "all
falsely prejudicial and inaccurate comments" in Plaintiff's 1995-
1996 EER, (8) elimination of "any and all derogatory information in
[his] DOS records, (9) inclusion of his "substantial contributions
and efforts on the visa reciprocity issue and their positive
effects on U.S. policy" in his EER file, (10) an order to the State
Department's Medical Decision to conduct a medical examination to
"restore [Plaintiff's] Category One medical clearance," (11) an
order to Defendant to "assign [Plaintiff] to the Foreign Service
assignment of his choice, to take effect within one year," (12) an
award of equitable damages, (13) an award of reasonable attorney
fees and costs incurred in this action and in the previous one, 02-
1371, and (14) consequential damages.  Id.

## II.   Standard of Review

Summary judgment will be granted when there is no genuine
issue as to any material fact.  See Fed. R. Civ. P. 56(c).  Since
this case involves a challenge to a final administrative decision,
the Court's review on summary judgment is limited to the
administrative record.  Holy Land Found. for Relief and Dev. v.
Ashcroft, 333 F.3d 156 (D.C. Cir. 2003) (citing Camp v. Pitts, 411
U.S. 138, 142 (1973)); Richards v. Immigration & Naturalization

Serv., 554 F.2d 1173, 1177 (D.C. Cir. 1977)) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record.").

The Foreign Service Act provides that the APA "shall apply without limitation or exception" to a district court's review of a decision by the FSGB.   22 U.S.C. § 4140(a); Toy v. United States, 263 F. Supp. 2d 1, 5 (D.D.C. 2002).   Under the APA, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).

"The arbitrary and capricious standard [of the APA] is a narrow standard of review."   Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).   This Circuit has held that "[t]his court's review is . . . highly deferential" and "we are 'not to substitute [our] judgment for that of the agency" but must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."   Bloch v. Powell, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (citations and internal quotation marks omitted); see also Wright v. Foreign Serv. Grievance Bd., 503 F. Supp. 2d 163, 172 (D.D.C. 2007) ("This deferential standard of review reflects a legislative judgment that the Foreign Service Grievance Board's familiarity with the foreign service ought to be respected by the judiciary.")

13

(internal punctuation omitted); see also United States v. Paddack, 825 F.2d 504, 514 (D.C. Cir. 1987). In reviewing an agency action, the Court "must consider whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc., 401 U.S. at 416.

If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the [agency decision] is reasonable and must be upheld." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 521 (D.C. Cir. 1983) (citation omitted); see Kisser v. Cisneros, 14 F.3d 615, 619 (D.C. Cir. 1994).

The FSGB is responsible for making findings of fact. Toy, 263 F. Supp. 2d at 7. Accordingly, the FSGB possesses the "authority to find one witness more credible than another" and to "assess the existence and degree of any bias on the part of the witnesses." Id. (citing United States v. Abel, 469 U.S. 45, 52 (1984)).

Despite this deferential standard, the Court will "intervene to ensure that the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for the action.'" Petroleum Commc'ns, Inc. v. FCC, 22 F.3d 1164, 1172 (D.C. Cir. 1994) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). "Moreover, the agency's decision must evince 'a rational connection between the facts found

14

and the choice made.'" <u>Toy</u>, 263 F. Supp. 2d at 5-6 (quoting <u>State</u> <u>Farm</u>, 463 U.S. at 43).

A court may reverse an FSGB's decision if it finds that it was "wholly unsupported by the evidence in the record" or if the "requisite 'rational connection' is missing." <u>Toy</u>, 263 F. Supp. 2d at 10. In addition, if the agency fails to provide a "reasoned explanation" or if "the record belies the agency's conclusion," then a court must reverse it. <u>Toy</u>, 263 F. Supp. 2d at 6 (quoting <u>AT&T Co. v. FCC</u>, 974 F.2d 1351, 1354 (D.C. Cir. 1992)). "Regardless of whether it may agree with the FSGB's holding, a court must restrict itself to determining whether the FSGB's decision was reasonable and supported by the weight of the entire record." <u>Ehrman v. United States</u>, 429 F. Supp. 2d 61, 68 (D.D.C. 2006).

## III. Analysis

### A.   The Falsely Prejudicial Standard

A member of the Foreign Service may bring a grievance before the FSGB when he believes that one of his EERs contains "falsely prejudicial material which may have been a substantial factor in an agency action."   22 C.F.R. § 905.1(b).   When he makes this allegation, the grievant bears the burden of establishing by a preponderance of the evidence that his claim is meritorious. <u>Id.</u> at § 905.1(a).   Though EERs carry a "presumption of regularity," this presumption "yields if the EER is shown to be .

. . tainted by bias." Compl., Ex. 3 at 26.  However, even if the reviewers and raters who draft an EER are biased, the EER is not falsely prejudicial if it is accurate.      See 22 C.F.R. § 905.18(a)(1); see Compl., Ex. 3 at 27 ("The issue in the grievance is whether these differences resulted in an <u>inaccurate and falsely</u> prejudicial EER harmful to his career.") (citing FSGB, Case No. 94-50 (Mar. 2, 1995)) (emphasis added).

In its prior opinion, the Court stated that "bias would clearly be relevant to a decision about the fairness and accuracy of [Beffel and Zweifel's] judgment," but it did not indicate that evidence of bias would be sufficient to grant Plaintiff relief. Mem. Op. at 11.  The Court stated that the FSGB's decision would be upheld if it "consider[ed] all relevant evidence" and determined that the "judgments and evaluations (which were necessarily subjective) of Beffel and Zweifel were tainted by bias or were, in their totality, fair and accurate."  Id. at 11 n.7.

**B.    The FSGB's Decision Was Not Arbitrary and Capricious.**

Plaintiff alleges that his EERs contain material that is "falsely prejudicial and inaccurate." Compl. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

16



As the Court previously stated in its February 3, 2005 Opinion, there is strong evidence in the record that anti-homosexual bias pervaded the atmosphere of the Consulate General in Rio de Janeiro.   Mem. Op. at 11.   Numerous staff members have

recounted the "atmosphere of homophobia" or described "joking and derisive comments," see supra I.A (describing the comments of Straw and Carter), although it is also true that other staff members observed no such bias.

Perhaps the most disturbing incident was the sending of Cable 94 Rio de Janeiro 2982. The Cable targeted Plaintiff for no reason other than his sexual orientation and cited his homosexuality as its basis for initiating a defensive briefing. See Def.'s Statement of Material Facts at 27-28.

It is problematic that the Discussion and Findings section of the FSGB's decision makes no mention of the Cable and also omits any reference to the mock three dollar bill, one of Plaintiff's key allegations. Several important questions remain unanswered: Who wrote the Cable? Did the Cable's author participate in filling out Plaintiff's EERs? Did the incident with the mock three dollar bill occur?

The Board attaches a substantial amount of weight to statements made by Beffel and Zweifel, the very two officers whom Plaintiff accuses of anti-homosexual bias. The decision concluded that "[n]either had any motive to lie." Compl., Ex. 3 at 25. It is not clear, however, that two supervisors would have no motive to lie when their professional reputations would be damaged if the Board found them to be homophobic.

Despite these shortcomings in the Board's decision, the Court

must determine not whether the Board's decision was perfectly correct, but whether it was arbitrary. See Bloch, 348 F.3d at 1068 ("[W]e will "uphold an agency decision of less than ideal clarity if the agency's path may reasonably be discerned.") (internal citations omitted); see Miller v. Dep't of Navy, 2009 WL 485735, at *4 (D.D.C. 2009, Feb. 27, 2009) (holding that the task of a court reviewing an agency decision is to determine whether the decision was "deficient" not to "reinvestigate" the plaintiff's claims). It is not this Court's role to determine the facts anew or to reach its own conclusions about whether Plaintiff's EERs were accurate. See Ackerman v. United States, 324 F. Supp. 2d 1, 7 (D.D.C. 2004) ("[U]nder the highly deferential administrative review standard, the decision to weight different events in a foreign service officer's employment history is within the expertise of the FSGB and must receive deference."

     The Board wrote a detailed, thorough, 43-page opinion in which it acknowledged comments made by numerous staff members about the anti-homosexual atmosphere. However, it also stated, "even biased raters and reviewers can prepare valid EERs." Compl., Ex. 3 at 27. Therefore the critical question is not whether bias existed -- it did -- but whether the FSGB's decision was arbitrary and capricious when it determined that the EERs were not falsely prejudicial.

     For each of Plaintiff's allegations, the Board cites to evidence from numerous sources affirming the statements made in the

EERs at issue. See, e.g., Compl., Ex. 3 at 29 ("Not only are the criticisms Olson condemns supported by the evidence of rater Beffel, and Olson's reviewers, but they also are corroborated by several others whose remarks are strikingly similar among themselves.").[7] In the aggregate, they provide strong support for the Board's conclusion that the EERs were accurate.

For example, the Board cites Derham's comments that Plaintiff's insistence "on certain procedures sometimes slipped into fanaticism," and that "a touch of over zealousness slips into his performance." Compl., Ex. 3 at 32. It discusses Thiede's recollection of incidents in which Plaintiff "yelled and screamed" at visa applicants. Id. Other staff members, including Ambassador Levitsky, Trotter, Tongour, Beffel, and Zweifel recounted similar difficulties in working with Plaintiff. See supra I.A. The Board summarizes the comments by acknowledging their intensity and their volume: "Strong criticisms, indeed! And, from several sources." Compl., Ex. 3 at 32.

The Board also determines that the EERs were accurate because they were not one-sided. It refers to the multitude of statements in the EERs that praise Plaintiff's performance and that acknowledge the challenging conditions in which he worked. The EERs stated that Plaintiff "gets the work done against tremendous

---

[7]    In its previous Opinion, the Court recognized that Plaintiff "undoubtedly had serious personality issues, as reflected in his EERs." Mem. Op. at 11 n.7.

pressures and lack of staff, space, and resources," and that Plaintiff was working during "a very hectic time," in which "Rio experienced a seismic explosion of its NIV workload." Compl., Ex. 3 at 31.  The EERs stated that Plaintiff "responded to a serious crisis with a masterstroke."  Id.  The Board notes that several comments praise Olson and describe him as not overbearing.  Id. at 32.

In reviewing the decision of the FSGB, this Court must defer to the Board's factual determination that the large number of staff members who reported Plaintiff's problems at work were truthful. After reviewing all the statements in the record, the Board reasonably determined that the statements made by Plaintiff's co-workers and supervisors were consistent with the statements made in the EERs.  See Compl., Ex. 3 at 26 (stating that the Board denied Plaintiff's claim because it was "persuaded by so many witnesses giving evidence corroborative of the criticisms made against Olson").  It reasonably determined that the substantial number of statements consistent with the EERs adds weight to Defendant's argument that they are accurate.  See id.

Given the quantity and consistency of the statements made by Plaintiff's co-workers, Plaintiff has failed to demonstrate that the Board acted arbitrarily and capriciously when it found that the EERs were not "falsely prejudicial."

21

## C.    The FSGB's Procedures Were Not Arbitrary and Capricious.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

In response, Defendant makes four arguments. First, Defendant argues that Plaintiff "acknowledges that those pages" left out of the Administrative Record in the earlier case before this Court "were in the record considered by the FSGB both in its original decision and on remand, and plaintiff further acknowledges that those pages are in the administrative record filed in this case." Def.'s Opp'n at 34.    Second, Plaintiff does not explain "how" the omission of the email "tainted" the FSGB's decision.    Id.    In addition, Defendant states that the emails are now included in the Administrative Record.    Id.    Third, Defendant argues that the FSGB complied with the Order by searching "in every place" where relevant communications were "reasonably likely to have been

22

located." Id. at 34-35. Finally, Defendant argues that "Plaintiff does not, and could not, argue prejudice from the exclusion of these materials." Id. at 35.

When a plaintiff alleges that an agency's decision suffers from procedural flaws that render its decision "arbitrary and capricious," he must show that procedural errors existed and that prejudice resulted from these errors. Carstens v. Nuclear Regulatory Comm'n, 742 F.2d 1546, 1558 (D.C. Cir. 1984) ("[T]he onus is squarely on [the plaintiff] to establish prejudice."); Mem. Op. at 12.

In the February 3, 2005 Opinion, the Court found that Plaintiff had "fail[ed] to offer any evidence" that procedural errors occurred and "fail[ed] to cite any actual prejudice that resulted" from the alleged errors. Mem. Op. at 12-13.

Similarly, in the Motions now before this Court, Plaintiff has failed to demonstrate that the alleged procedural errors caused him actual prejudice. He has made only the conclusory argument that the FSGB's decision was "tainted" by ex parte email communications that were not included in the Administrative Record. He has not stated how the exclusion of these communications tainted the decision, and therefore has failed to carry his burden to show they caused him any prejudice. Moreover, he has not identified any specific prejudice that resulted from the other alleged procedural defects.

## IV.   Conclusion

For the reasons set forth above, Plaintiff's Motion for Summary Judgment [Dkt. No. 30] is **denied,** and Defendant's Motion for Summary Judgment [Dkt. No. 31] is **granted.** An Order shall accompany this Memorandum Opinion.

March 12, 2009

/s/ Gladys Kessler

Gladys Kessler
United States District Judge

**Copies to: Attorneys of record via ECF**

24